# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VELSICOL CHEMICAL LLC, et al. | ) | Case No 23-12544 |
| | ) | |
| Debtors. | ) | Honorable David D. Cleary |
| | ) | |
| | ) | (Jointly Administered) |

# DEBTORS' OBJECTION TO THE DISTRICT
# OF COLUMBIA'S  BANKRUPTCY RULE 2004 MOTION

Velsicol Chemical, LLC ("Velsicol Chemical"), Velsicol Chemical Holdings Corporation ("Velsicol Holding") and Resnovae Holdings Corp. ("Resnovae" and, collectively with Velsicol Chemical and Velsicol Holdings, the "Debtors"), through their counsel, file this objection to the Motion of the District of Columbia Pursuant to Federal Rule of Bankruptcy Procedure 2004 for Order Authorizing Discovery Related to Debtors and Related Entities and Individuals (the "2004 Motion") and the Supplemental Memorandum filed by the District of Columbia's (the "District"), and states follows:

## PRELIMINARY STATEMENT

1. By the 2004 Motion and Supplemental Memorandum, the District seeks to take extensive discovery-- in some cases going back thirteen (13) plus years -- based on nothing more than a concocted baseless claim that the Debtors are in essence hiding assets related to one of its bank accounts. This Court should deny the request for a 2004 Exam.

2. As discussed below, the District has failed to even demonstrate the propriety of any Rule 2004 examination. Its claims to such a right are premised on bald, unsupported assertions or false statements concerning the facts.

3. Moreover, even if there was a basis for such an exam, the District's request for information concerning transactions which occurred more than a decade ago are improper given the governing statutes of limitations. There is no merit to the District's claim that it can evade a state statute of limitations on fraudulent conveyance under the doctrine of *nullum tempus,* nor to its claim that the Trustee can thus also ignore the statute of limitations based on the District's purported status as a "golden creditor." As is discussed below, cases which have discussed the issue make clear that the doctrine does not allow the District to avoid the relevant statute of

limitations. (Notably, there is no truth to the District's statements to this Court that the *nullum tempus* issue was decided in its favor by a court in DC.) And, in any event, the District cannot claim "golden creditor" status because it has not filed a claim here.

4. The District's failure to even attempt to set forth a proper basis for a Rule 2004 examination and its reliance on false and misleading arguments in support suggest that its requests are an improper attempt to harass Debtors while hiding behind a reliance on the generally "broad" discovery which Rule 2004 will permit in proper circumstances.

## RELEVANT BACKGROUND

5. On September 21, 2023, the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code. The Debtors are managing their operations and financial affairs as debtors-in-possession. The Debtors' cases were necessitated primarily by two legacy issues, one of which was brought by the District for alleged contamination of waterways in the District of Columbia for a product (Chlordane) that was last in commerce over four decades ago (the "District Litigation").

6. During the course of the District Litigation, Velsicol produced extensive discovery including financial information to the District.

7. Prior to filing the 2004 Motion, the District never reached out to the Debtors to discuss its discovery requests, ask questions or seek additional information. And, the District failed to ask a single question during the extensive 341 meeting conducted by the US Trustee.

8. On December 11, 2023, the District filed its 2004 Motion seeking extensive discovery including production of documents by each of the Debtors (although it has not even alleged it is a creditor of each of the Debtors) going back over 75 years to January 1, 1947.

9. In addition to its request for documents, the District seeks to take nine (9) 2004 exams, including the exam of a representative of each of the Debtors, each of Resnovae's five (5)

2

shareholders and of Arsenal Capital Partners ("Arsenal"), who sold the stock of Velsicol Holdings to Resnovae in a stock sale transaction in 2012.

10. Counsel for the District and Debtors met and conferred to try to limit the scope of the discovery requested in the 2004 Motion and so that the Debtors could obtain a better understanding of the District's concerns. While the parties did make some progress, they were not able to come to an agreement on the scope of the 2004 requests.

11. On December 29, 2023, the District filed a Supplemental Memorandum. For the first time, the District set forth its alleged basis for the need for its overwhelming discovery requests. While the District has now at least alleged some argument why the discovery it seeks is relevant, those arguments are based upon false premises and false or misleading statements.

12. For example, as set forth in more detail below, the District made incorrect assertions regarding purported "sale proceeds" obtained by Velsicol, including that: (i) in 2018 and 2020 Velsicol Chemical supposedly received a combined total of $15,561,291.13 in sale proceeds from what the District calls the "Pershing Account" but that when Velsicol filed bankruptcy it only listed $1,890,955 in the account; and (ii) that a substantial amount of sale proceeds from a 2010 transaction or the sale of Genovique Specialties Corp to Eastman Chemical Company (the "Eastman Sale") ended up in a Pershing Account and that account has supposedly generated tens of millions of dollars in "sales proceeds" which the "ultimate disposition of the proceeds from the sale of the over $28 million in assets from 2018 to 2022" is not known by the District. As detailed below, these assertions were made by the District either in ignorance of basic financial reporting or were deliberate misstatements.

13. Moreover, the District also alleges that the 2004 discovery regarding the sale by Arsenal of Velsicol Holding stock in 2012 is relevant because it has "information that tends to show that key high-level management from Arsenal Capital Partners continued to be involved in

3

the management of Velsicol Chemical LLC for years after the sale." But this statement, made without citation to evidence is simply untrue; high-level management from Arsenal was not involved in the management of Velsicol after the sale.

## ARGUMENT

**Relevant Legal Standards**

14. Rule 2004 provides, in relevant part, that the Court "may order the examination of any entity" relating "to the acts, conduct, or property or the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate." Fed. R. Bankr. P. 2004. While the scope of discovery under Rule 2004 is broad, "the availability of Rule 2004 as a discovery tool is not unlimited." *In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002). Rather, the Rule allows a party in interest to obtain a court order allowing the examination of any entity but that inquiry **"must have relevance**." *In re* Diocese *of Buffalo, N.Y.*, BK 20-10322 CLB, 2023 WL 8212832, at *1 (Bankr. W.D.N.Y. Nov. 14, 2023, emphasis supplied); See also, In re *Wilcher*, 56 B.R. 428, 434 (Bankr. N.D. Ill. 1985) ( scope of the examination permitted under Rule 2004 "is not without limits." "The examination of a witness as to matters having no relationship to the debtor's affairs or no effect on the administration of his estate is improper").

15. Rule 2004 requests that are unsupported, overbroad, or designed to harass, if granted, would result only in unnecessary costs and harm to the bankruptcy estate. Thus, courts apply a two-prong test in determining whether to grant Rule 2004 discovery. First, the moving party must show good cause for the requested discovery. *Wilcher*, 56 B.R. at 434-35 ("[T]he examiner bears the burden of proving that good cause exists for taking the requested discovery."). To establish good cause, "[t]he movant must show "some reasonable basis to examine the material sought to be discovered . . . [and] that the requested documents are necessary to establish the

4

movant's claim, or the denial or production would cause undue hardship." *In re Youk-See*, 450 B.R. 312, 319-20 (Bankr. D. Mass 2011) (*quoting Wilcher*, 56 B.R. 428).

16. Second, the court weighs the relevance of the discovery against the burden it will impose upon the producing party. *Wilcher*, 56 B.R. at 434.

17. Here, the District has not established (and cannot establish) good cause for the bulk of its discovery requests and any potential benefits of much of the requested discovery are greatly outweighed by the burdens the production will impose upon the Debtors.

**There is No Good Cause for the Bulk of the Discovery Requests**

18. The Rule 2004 examination proposed by the District is far ranging and highly intrusive. It now contains 15 extensive document requests, many containing subparts. In addition, the District still seeks examination of each of the Debtors, the five shareholders of Debtor Resnovae (See, Motion Exh's F-J) as well as the examination of a predecessor owner, Arsenal (See, Motion Exh. E).

19. In its original 2004 Motion, the District did nothing to demonstrate that the examination is permitted under this standard, instead merely parroting the language of the Rule. (See, Motion ¶¶8, 15, 21.) This is inadequate. *In re Onatah Farms, LLC*, 2021 WL 2808813, at *1 (Bankr. N.D. Ind. Apr. 29, 2021) ("[P]arroting the language of the rule does little to assist the court. Demonstrating adequate cause for an examination requires more that simply paraphrasing the language of the rule…. Otherwise, the court serves only as a rubber stamp for anything that can recite the language of the rule"), citing *Wade v. Hopper*, 993 F.2d 1246, 1249 (7th Cir. 1993) ("Simply quoting [the rule's] language is inadequate"). The Motion merely states that certain transaction have occurred. It fails to provide a reasonable basis as to why such discovery would be relevant to the Debtors' bankruptcy estates, especially since both transactions are well outside any

5

applicable statute of limitations period. And even if it were right that no statute of limitations applies, the absence of a limitation period, without more, does not make a request relevant.

20. The District's request to take nine examinations – one of each debtor, 5 of the shareholders of Resnovae and Arsenal -- is also excessive and unnecessary. The District's only purported "cause" for doing so was the assertion that "the financial documents produced thus far by the Debtors strongly suggest that Debtor Resnovae's individual shareholders, as well as its predecessor owner Arsenal Capital Partners….possess information relevant to the Debtor' acts, conduct and financial condition, including information related to the final disposition of assets…." (See, District Motion ¶8.) This is essentially a meaningless argument; such a broad statement could be made about virtually every shareholder of every closely held company. Moreover, if the information sought relates to relevant transfers made by the Debtors, such information can be obtained from the Debtors themselves.

21. The District's 2004 Motion is thus inadequate to show good cause as to the need to take 2004 examinations of any of the shareholders.

22. The District's Supplemental Memorandum fairs no better in providing why the discovery requests are relevant. There, the District attempts to make the 2009 Eastman Sale relevant for a 2004 exam based on a false narrative that proceeds from that sale went into the Pershing Account and are now "missing." In fact, the Pershing Account was not open at the time of the Eastman Sale (it was only open a few years later in the fourth quarter of 2012). Obviously, the proceeds from a 2009 transaction could not be placed into an account which had yet to come into existence. Any link between the Pershing Account and the Eastman Sale is a fiction.

23. In any event, the District's entire premise that tens of millions of dollars are missing from alleged "sale proceeds" in the Pershing Account is false. The District's argument is based on certain attachments to the Debtors' tax returns (Schedule 1099-B and Schedule 8949). But that

6

argument involves either a complete misunderstanding of how Schedule 1099-B works for tax reporting purposes or is an intentional misrepresentation of the information.

24. For example, in paragraph 10 of the Supplemental Memorandum, the District insists that almost $14 million dollars of "sale proceeds" is unaccounted. As support, the District points to the Debtors' Form 1099-B for 2018 and 2020 and claims that those documents establish that the Debtor received "a combined total of $15,561,291 in sale proceeds from the Pershing Account." The District then notes that when the Debtors filed bankruptcy, the account only contained $1,890,955, thus suggesting that millions of dollars which "should" be in the Pershing Account are unaccounted for. The District attempts to do the same thing in paragraph 12 of the Supplemental Memorandum, there arguing that between 2018 and 2022, Resnovae reported on its tax returns proceeds from the sale of short-term and long-term investments of $28,057,827. In another attempt to make it appear that funds out of the Pershing Account are unaccounted for, the District alleges that the $28,057,827 in sale proceeds is more than 50% of the value of the reported Additional Paid in Capital for the same time period.

25. The District's suggestions of "missing proceeds" based on the amount of "sale proceeds" are fundamentally flawed and used merely to create a specter to support its position.

26. The Pershing Account is a typical investment account that is set up with an investment advisor to invest in stocks, mutual funds, bonds, mutual funds and treasury bills. As an initial matter, Velsicol set up the Pershing Account in the fourth quarter of 2012 as an investment account to invest working capital that was not immediately needed so that it would receive a reasonable return on its money rather than having those funds parked in a traditional bank account earning little or no interest. To the extent Velsicol needed operating funds, it would transfer funds out of the investment account into its operating account and similarly, when it had excess cash, it

7

would transfer those funds out of its operating account and into the investment account to be invested.

27. A Form 1099-B reports the proceeds from sales of capital assets, such as stocks and bonds. U.S. tax law requires broker-dealers to report information about these sales to sellers for tax purposes. A taxpayer then transfers the information from a 1099-B to Form 8949 to calculate their preliminary gains and losses. For each year the Pershing Account has been open, Pershing provided a 1099-B Report to Velsicol, reporting the sale of all investments during the year. A copy of the 1099-B forms from 2018 through 2022 are attached as Exhibit A.

28. It is important to note that a 1099-B reports all sales of investments in the account during the year. It also lists a total for the (i) amount of proceeds from those sales; (ii) the costs and other basis; and (iii) the realized gain or (loss). The following chart sets forth that information from the Velsicol's 1099-Bs from 2018 through 2022:

| | Chart Showing Amounts Included on Form 1099-B and Form 8949 | | | |
|---|---|---|---|---|
| | Applicable Page of 1099-B | Cumulative amount of sales per year | Cost basis | Realized gain or (loss) |
| 2018 | Pg 19 of 34 | $10,066,163 | $10,013,986 | $52,710 |
| 2019 | Pg 16 of 35 | $9,712,677 | $9,717,948 | $101,542 |
| 2020 | Pg 14 of 27 | $5,495,129 | $5,206,699 | $288,769 |
| 2021 | Pg 6 of 16 | $2,539,304 | $2,129,248 | $410,056 |
| 2022 | Pg 9 of 16 | $910,554 | $986,156 | $(75,601) |
| Total | | $28,723,827 [1] | $28,054,037 | $777,476 |

29. The District's allegation that it does not know of the ultimate disposition of the $28 million in sale proceeds shows a complete lack of understanding of the "sale proceeds" listed on a 1099-B. In a typical investment account like the Pershing Account, stocks, mutual funds, bonds, money market accounts and treasury bills are often sold whether it be for tax purposes, maturity purposes, reallocation purpose, a change in investment strategy or just to sell or buy other

---

[1] The District lists the total amount as $28,057,827. This amount is $600,000 less than the actual amount as the District failed to include the "Short Term Noncovered amounts in 2022."

investments. The proceeds from the sale are then typically reinvested back into other stocks, mutual funds, bonds, money market accounts and treasury bills. This can occur over and over for a particular year and each time a sale occurs, the 1099-B reflects the proceeds from the sale as "sale proceeds." Accordingly, an account with say $2 million could have "sale proceeds" reported during the year of multiple times that amount depending on how often investments were sold during the year. But the term "sale proceeds" as reported on a 1099-B, has nothing to do with the amount of money in the account, the amount of profits earned from any sales or whether any transfers were made out of the investment account. Rather, all it tells is the amount of proceeds from any sale of any investment during the year.

30.     The District's made-up narrative that an examination is necessary because $28 million is unaccounted for is simply false. The Debtors did not have cumulative sale proceeds of $28 million. Rather it reinvested the sale proceeds over and over again in each of the 5 years. In addition, the District improperly adds up the "sale proceeds" for each year even though it is the basically same funds in the account year after year. Thus, the District's argument that cause exists to take a Rule 2004 exam because "the ultimate disposition of the proceeds from the sale of over $28 million in assets from 2018 and 2022 is unknown to the District" is simply false. If the District actually took the time to read the 1099-Bs they would realize that there was a total gain during the entire five-year period of $777,476, a far cry from the $28 million it is alleging.[2]

31.     The District seeks an examination of the Debtors as well as third party, Arsenal, on the topic of (i) "all documents relating to the sale of Genovique Specialties Corporation in or around 2010 to Eastman Chemical Company". (See, Motion, Exh A-1).

---

[2] The Debtors agree to provide the District with copies of the Pershing Account Statements so they can see the amounts in such accounts and to alleviate any concerns that $28 million is unaccounted for. The Debtors also take issue with the District's allegation that they are aware of distributions to Resnovae's shareholders "in an amount exceeding 5 million dollars" (See Supplemental Memorandum at ¶13) (emphasis added), when there were distributions in 2018 and 2020 totaling 5 million dollars, not exceeding.

32. The District has also sought extensive discovery of materials with respect to the above categories of old transactions, as well as other transactions from more than a decade ago. (See Motion, Exhibit A, Requests 4, 5, 6, 7, 8, 9, 10, 11, 13, 14 and 15) for which the District has also failed to assert any relevance to the issues for which a 2004 Examination could be appropriate. These include, among many other things:

- **More than a decade's** worth of not only Velsicol and Velsicol Chemical Irelands' federal income tax returns, income statements and cash flow statements, but also "annual budgets and year end results, asset ledgers, loan and mortgage agreements."

- **More than a decade's worth** of "Documents showing all of Velsicol's investment and financial accounts … and the disposition of proceeds from sales of any assets…."

- **More than a decade's worth** of "Documents related to Velsicol or Shareholders ownership interest, right to payment, reimbursement, coverage, exclusion, or payments made between Velsicol, the Shareholders and Alembic, Inc, and any remaining financial interest Velsicol or Shareholders have in Alembic Inc."

See, Motion, Exh A. for the full list of documents which the District has sought without providing any justification.

33. Other than to once again parrot Rule 2004 and baldly assert that it has "ample cause" to propound the discovery requests (See, Motion ¶20), the District has provided this Court with **no information** as to why the requested documents are in any way relevant to the only issues for which discovery could properly be sought under the Rule: documents related to " the acts, conduct or property or to the liabilities and financial condition of the debtors." As just one example, what possible relevance could ten-year old budgets (or any budget) have to the issues for which a 2004 Examination is appropriate?

**The Potential Benefits of the Requested Discovery are Greatly Outweighed by the Burdens The Production Will Impose on the Debtors.**

34. As discussed above, the document production requested by the District is essentially limitless. Based upon the requested scope of the discovery, the collection, review and

10

production process will cost the Debtors, their management, and their professionals a substantial amount of time and resources. For example, the majority of requests ask for "documents relating to" or "documents showing" with respect to each, most often, general topic and in many cases seeking information dating back over a decade ago. It is simply unrealistic that the Debtors could produce this amount of material without substantial costs and disruption to their business and the administration of these chapter 11 cases (especially where the Debtors only have 8 employees).

35. Requests for documents dating back over a decade ago are extremely burdensome and are not likely to produce information leading to any causes of action that are not otherwise barred by an applicable statute of limitations. As such, after balancing the interest of the parties and weighing the relevance of a necessity of the information sought by the District, the requests should be appropriately tailored to avoid imposing any unnecessary costs and risks on the Debtors' estates.

36. To that end, the Debtors have agreed to produce to the District and any other creditor (subject to an appropriate protective order) with the documents listed on Exhibit B (not because they are required to or because they believe the documents are relevant but rather to avoid incurring unnecessary time, costs and delays).

**The District's Argument That There is No Look-Back Period Should Be Rejected.**

37. The District makes a novel claim that it has an unlimited "look back" period and thus that it has a right to seek documents and other information concerning transactions that are more than a decade old and otherwise outside of the applicable state law statute of limitations for avoidance actions (here 4 years). The District's argument in this regard is fatally flawed because it is premised on incorrect assertions of both the fact and the law.

38. The District's argument arises from the fact that under Section 544(b)(1) of the Bankruptcy Code, the Trustee stands in the shoes of an "actual unsecured creditor" and the Trustee

11

can reach an asset if a creditor could do so outside of bankruptcy. The District asserts that this is called a "golden creditor" rule and that the District is the "golden creditor." The District then posits that pursuant to the doctrine of "*nullum tempus*" (under which "no time runs against the state") there is no limitations period which can run against it with respect to its fraudulent conveyance claims under state law, and thus that the Trustee-standing in its shoes is not subject to any statute of limitations for a fraudulent conveyance claim. This argument is meritless for numerous reasons.

39. First, in order to invoke the "golden creditor" rule, the creditor must hold a general unsecured claim that is allowable under section 502. *See, In re J & M Sales Inc.*, 18-11801 (JTD), 2022 WL 532721, at *3 (Bankr. D. Del. Feb. 22, 2022)("It is not difficult to conclude that by referring to the requirements of Section 502 in Section 544(b), Congress intended that for a trustee to pursue potential fraudulent transfers under Section 544(b) an allowable claim only includes those claims for which a proof of claim has been "). The District's claim to "golden creditor" status falters on this required status as a creditor holding an unsecured claim.

40. Here, the District has not filed a proof of claim and even if the District were to file a proof of claim, it does not mean that its claim will be allowed or that it will have a claim against any Debtor other than Velsicol Chemical. Not only do the Debtors believe that the District will have a very difficult time proving any claim, but the DC Superior Court in the District Litigation also voiced significant doubt noting the "challenge the District's going to face in proving its Complaint" and that the District has a "heavy lift in front of you." (See, Exhibit C attached hereto, 5/23/23 Transcript of Proceedings, P. 67.) The DC Superior Court further noted that Velsicol had presented a "very, very strong case" in its defense. (Id.) In any event, the District has yet to file a claim and thus there is no merit to the District's assertion that it is currently a "golden creditor."

12

41. There is also no merit to the District's claim that it can avoid the statute of limitations in the District of Columbia's fraudulent conveyance act (the "DC Act") based on the legal doctrine of *nullum tempus*.

42. As an initial matter it must be noted that the District dissembled to this Court in both in its Motion and in oral presentation by claiming that the *nullum tempus* issue was resolved in its favor in a DC Superior Court. (See, Supplemental Memorandum f.n. 1.) In fact, the opposite is true.

43. In the DC Superior Court, the District did raise the doctrine of *nullum tempus* in a motion to strike statute of limitations and laches defenses raised by Velsicol. The District claimed that the doctrine served as a hard line rule which automatically abrogated any limitations period. The DC Superior Court denied that motion. (See, Exhibit C, attached hereto, 5/23/23 Tr. of Proceedings at P. 67.) Obviously, if the DC Superior Court had accepted the *nullum tempus* argument it would have granted that motion because those defenses would not apply if *nullum tempus* nixed the applicable period of limitation or claim to laches.

44. Although the DC Superior court also denied Velsicol's motion for judgment on the pleadings on its laches defense, it did not hold that the defense could not succeed; it merely held that the issue needed to be developed through discovery. Indeed, the court noted its "concerns" with the District's ability to sustain its case and explicitly noted the failure of the District to earlier "seek relief from the party it believed caused the injury." (See, Exh. B. at P. 68.) The court stated that although it would give the District an opportunity to develop these issues it was "just not so sure the District would have as easy a time of surviving the next phase when I must review this matter and weigh any potential attack or challenge." (Id.)

45. The bottom line is that contrary to the District's express representations to this Court in its Motion and open court, it is unquestionable that there has been no ruling that the

13

District is immune from any limitations period, let alone a ruling that it is not subject to one with respect to a purported fraudulent conveyance claim.

46. In any event, the doctrine of *nullum tempus* provides no help to the District here. As the District concedes, the doctrine only abrogates a limitation period when the statute at issue is silent as to its application against the District. (See, Supplemental Memorandum ¶19.) The District insists, *ipsi dixit*, that the relevant statute -- the District's Fraudulent Conveyance Act (the "DC Act")-- is silent as to its application to the District. (*Id*.) But the District's failure to explain or cite to any support for this assertion is telling. Contrary to the District's bald claim, the DC Act expressly includes a government entity like the District. Thus, *nullum tempus* does not apply to any fraudulent conveyance claim that could be asserted by the District nor to the Trustee standing in its shoes.

47. Specifically, Section 28–3101(4) of the DC Act defines a "creditor" to mean "a person who has a claim," and Section 28–3101(9) of that Act further defines a "person" to include a "government or governmental subdivision, agency, or instrumentality," which definition would clearly include the District.

48. Courts in other jurisdictions dealing with the same language of the DC Act, have expressly held that such language "makes it clear that the government is not exempt from its time limitations" and thus that *nullum tempus* is inapplicable when a claim is made under such a fraudulent conveyance statute. *Miller v. Fallas (In re J&M Sales)*, 20-5775, (Bankr. D. Delaware, August 20, 2021, a copy of that opinion is attached hereto as Exhibit D.); *See also, In re Maxus Energy Corp.*, 641 B.R. 467, 546 (Bankr. D. Del. 2022).

49. In the *Miller v. Fallas* case a creditor argued that the state's fraudulent conveyance statute's limitation period did not bar its claim based on the doctrine of *nullum tempus*. (*Id*. at P. 25.) In Delaware, as in DC, it was "the generally recognized rule, unless the statute expressly

14

provides to the contrary, that statutes of limitations do not apply to a state when suing in its sovereign capacity." *Id.*, *citing Wilmington v. Dukes*, 157 A.2d 789, 794 (Del. 1960). And in Delaware, the fraudulent conveyance act, like the DC Act defined "creditor" to mean "a person who has a claim" and then defined a "person" to mean, inter alia, a "government or governmental subdivision or agency" *Id*, citing 6 Del. C. § 1301).

50. Given this language, said the *Miller v. Fallas* court, "any state government entity asserting a claim here would be doing so as a "creditor," [and thus] that entity, and consequently the Trustee, would be required to file its claim before the time limitations expire and the claim is extinguished*." Id.*

51. Following and relying on *Miller v Fallas*, another court held that the language of fraudulent conveyance acts in Ohio and Wisconsin (which are also identical to that in the DC Act) also barred application of *nullum tempus*. *In re Maxus Energy Corp.*, 641 B.R. 467, 546 (Bankr. D. Del. 2022) (under language of the Act "any state government entity asserting a claim here would be doing so as a "creditor," [thus] that entity, and consequently the [t]rustee, would be required to file its claim before the time limitations expire and the claim is extinguished.") The *Maxus* court thus dismissed the trustee's constructive fraudulent transfer claims as time barred despite the Trustee's attempt to assert that *nullum tempus* abrogated any time bar as to claims by the states of Wisconsin and Ohio. *Id*.

52. Thus, because the DC Act explicitly includes a government entity like the District, the District, even if somehow a "golden creditor" (despite the fact that it has not filed a claim) is not entitled to evade a state statute of limitations ---and neither is the Trustee who steps into its shoes.

53. Lastly, the District assumes, without more, that the laws of the District would apply to an avoidance action against defendants in a fraudulent conveyance action. The District has not

15

shown that the District of Columbia's law would even be applicable to a fraudulent conveyance action brought against alleged transferees of a fraudulent conveyance.

54. If, as the District suggests, no government entity (state of federal) is ever subject to a statute of limitations on any of its claims due to the application of *nullum tempus*, there would be no look back periods for fraudulent transfer claims. If the District's position were true, the IRS would not have to rely on a ten-year look back period but could simply rely upon the argument that it is not bound by any state laws applicable statute of limitations because of nullum tempus and thus, there would never be any finality in any commercial transaction or bankruptcy proceeding.

55. Finally, the District's fallback argument, that the "lookback period applied should be no less than 10 years because the IRS is a creditor" also fails. The District falsely states that the IRS is a creditor (and it provides nothing to back up its affirmative statement). The IRS has not filed a proof of claim in any of the Debtors' cases and the Debtors do not believe they will have any liability to the IRS as they do not owe any taxes and will not owe taxes for the 2023 tax year. The District also overlooks the fact the even if the IRS will not be a creditor in all of the cases, especially in light of the fact that that certain of the Debtors are S corporations and others are single member entities. Accordingly, the District's attempts to rely upon the IRS as its "golden creditor" also fails.

**RESERVATION OF RIGHTS**

56. The bottom line is that the requested documents and examination topics are extraordinarily overbroad and burdensome. To the extent relief is granted at all (and it should not be, for the reasons described herein), the Debtors and other parties should retain the right to object to individual requests on all available grounds. To the extent the Court authorize any discovery pursuant to Rule 2004, the order authorizing such discovery should preserve the Debtors' and other

16

parties' rights and ability to review and object to specific discovery requests or examinations on any and all grounds available under applicable rules, including, but not limited to, the Federal Rules of Civil Procedure as adopted by the Federal Rules of Bankruptcy Procedures on customary grounds including but not limited to overbreadth, burden and relevance, to assert any applicable claim of privilege and to condition any production upon entry of an appropriate protective order.

## CONCLUSION

Based upon the foregoing, the Debtors respectfully request that the Court deny the relief requested in the 2004 Motion or grant such other and further relief as it deems just.

Date: January 9, 2024

*VELSICOL CHEMICAL, LLC, VELSICOL CHEMICAL HOLDINGS CORPORATION and RESNOVAE HOLDINGS CORP.*

By: /s/ Jeffrey M. Schwartz
   One of Their Attorneys

Jeffrey M. Schwartz (#6209982)
Steven P. Blonder (#6215773)
**MUCH SHELIST, P.C.**
191 N. Wacker Drive, Suite 1800
Chicago, Illinois 60606
Telephone: (312) 521-2000
Facsimile: (312) 521-3000
jschwartz@muchlaw.com
sblonder@muchlaw.com

*Counsel to the Debtors*

17

## CERTIFICATE OF SERVICE

I, Jeffrey M. Schwartz, an attorney, hereby certify that on January 9, 2024, I served a copy of the Debtors' Objection to the District of Colombia's Bankruptcy Rule 2004 Motion via the CM/ECF system upon all parties entitled to receive electronic notice in this case.

/s/ Jeffrey M. Schwartz

14201284