**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VELSICOL CHEMICAL LLC, et al. | ) | Case No 23-12544 |
| | ) | |
| Debtors.[1] | ) | Honorable David D Cleary |
| | ) | |
| | ) | (Jointly Administered) |

**ORDER CONFIRMING DEBTORS THIRD AMENDED**
**SUBCHAPTER V JOINT PLAN OF REORGANIZATION**

THIS CAUSE coming to be heard in connection with the hearing (the "**Hearing**") on August 5, 2025, in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") to consider confirmation of the Debtors' Third Amended Subchapter V Joint Plan of Reorganization filed on June 10, 2025 [Docket No. 248] (as may be amended, modified, or supplemented, the "**Plan**"), by Velsicol Chemical, LLC ("**Velsicol**"), Velsicol Chemical Holding Corporation ("**Holdings**") and Resnovae Holding Corp. ("**Resnovae**" and collectively with Velsicol and Holdings, the "**Debtors**"); due written notice having been given to all parties entitled thereto in accordance with the *Order (I) Scheduling a Hearing to Consider Confirmation of the Plan; (II) Approving the Form of Ballots and Proposed Solicitation and Tabulation Procedures; (III) Scheduling Certain Dates in Connection with Confirmation; and (IV) Granting Related Relief* (the "**Procedures Order**") [Docket No. 254], entered by the Court on June 11, 2025**,** as evidenced by the (i) *Declaration of Service* filed by BMC Group, Inc. ("**BMC**") on June 17, 2025 [Docket No 256], (ii) the Affidavits of Publication of Notice of Hearing on Confirmation of the Debtors' Plan and Certain Dates in Connection with the Plan [Docket No. 267], published on June 17, 2025, where the Debtors also published a *Notice of Hearing to Consider Confirmation of the Debtors*

---

[1] The Debtors in these Cases are Velsicol Chemical, LLC, Velsicol Chemical Holdings Corporation, and Resnovae Holdings Corp.

*Plan and Certain Dates in Connection With Plan Confirmation* in the Wall Street Journal, and the USA Today, and (iii) in the *Affidavit* filed on July 30, 2025. [Docket No 270] (collectively, the "**Certificates of Service**"); all objections to confirmation of the Plan having been considered and overruled, withdrawn or resolved by agreement of the objector and the Debtors; the Court having reviewed and considered the Plan, *the Declaration of Terri Marshall Regarding Voting and Tabulation of Ballots For the Debtors' Third Amended Subchapter V Joint Plan of Reorganization* (including the "**Ballot Report**" attached thereto as Exhibit A) filed herein on July 23, 2025 [Docket No.266], (the "**Ballot Report Declaration**"), the *Debtors' Memorandum of Law in Support of Confirmation of the Debtors' Third Amended Subchapter V Joint Plan or Reorganization* filed on July 30, 2025 [Docket No. 275] (the "**Confirmation Memorandum**"), the evidence submitted by the Debtors during the Hearing having been uncontroverted by any party in interest, and the Court therefore having accepted the proffers made at the Hearing as true in making the findings of fact and conclusions of law set forth herein, the Court having considered that all Classes of impaired creditors that were entitled to vote on the Plan have accepted the Plan; the Court having taken judicial notice of all filings related to the Plan, and having heard and considered the statements of counsel and other parties in interest present at the Hearing; and the Court being otherwise fully advised in the premises, the Court hereby makes the following findings of fact and conclusions of law[2]:

     A.     <u>Notice</u>. Due, adequate, and sufficient notice and opportunity to review and evaluate the Plan and to participate in the Hearing, as evidenced by the Certificates of Service, has been given to all parties entitled thereto pursuant to the applicable Bankruptcy Rules and in accordance with the

---

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate. Fed. R. Banta. P. 7052.

Procedures Order and no further or additional notice of the confirmation hearing or the deadlines related to the confirmation hearing was necessary or required. .

B.    <u>Proper Classification of Claims - 11 U.S.C. §§ 1122 and 1123</u>. The Plan adequately and properly identifies and classifies all claims, including but not limited to the classification of the claims of the District of Columbia as a General Unsecured Claim in Class 3A.

C.    <u>Implementation of the Plan - 11 U.S.C. § 1123(a)(5)</u>. The Plan provides adequate means for the Plan's implementation.

D.    <u>Interest of Creditors, Equity Securities - 11 U.S.C. §§ 1123(a)(6) and 1123(a)(7)</u> . The Plan does not provide for the issuance of non-voting equity securities as equity will retain their Interests and the Plan contains only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the Plan and any successor to such officer, director, or trustee. Current management will continue with no new directors or officers being appointed under the Plan.

E.    <u>Assumption & Rejection - 11 U.S.C. § 1123(b)(2)</u>. Article 6 of the Plan, pursuant to 11 U.S.C. § 365, provides for the assumption, rejection, or assignment of any executory contract or unexpired lease of the Debtors not previously rejected under such section.

F.    <u>Other Provisions - 11 U.S.C. §§ 1123(b)(3) and 1123(b)(6)</u> . The Plan contains provisions consistent with section 1123(b)(3) including the retention of causes under Article VII of the Plan and settlement of various Claims and controversies and release, injunction and/or exculpation of certain parties as set forth in Article X of the Plan each of which are in the best interest of creditors and each of the provisions of the Plan is appropriate and not inconsistent with the applicable provisions of the Bankruptcy Code.

G.    <u>Principal Purpose of the Plan - 11 U.S.C. § 1129(d)</u>. The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933.

H.    <u>Contents of a Subchapter V Plan - 11 U.S.C. § 1190</u>. The Plan was filed in compliance with section 1190 of the Bankruptcy Code.

I.    <u>Satisfaction of Conditions - 11 U.S.C. § 1191(a)</u>. The Plan satisfies the relevant provisions of 11 U.S.C. § 1129(a) and, as a result, is a consensual Subchapter V plan under 11 U.S.C. § 1191(a). With respect to the relevant provisions of 11 U.S.C. § 1129(a), the Court finds and concludes as follows:

i.    <u>11 U.S.C. §§ 1129(a)(1) and 1129(a)(2)</u>. The Plan complies with the applicable provisions of the Bankruptcy Code.

ii.    <u>11 U.S.C. § 1129(a)(3)</u>. The Plan was proposed in good faith and not by any means forbidden by law. In so finding, this Court has considered the totality of the circumstances of these Chapter 11 Cases and that the Plan provides for payments of projected disposable income over a five (5) year period rather than a three (3) year period. The Plan is the result of extensive, good faith, arm's-length negotiations among the Debtors, their principal constituencies and the Subchapter V Trustee.

iii.    <u>11 U.S.C. § 1129(a)(4)</u>. The Plan complies with section 1129(a)(4) as the payment of professional fees and expenses made or to be made by the Debtors to professionals employed in these Chapter 11 Cases have been approved by, or are subject to the approval of, the Court as reasonable.

iv.    <u>11 U.S.C. § 1129(a)(5)</u>. The Plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director of the Debtors; and such appointment to, or continuance in, is consistent with the interests of creditors and equity

security holders, and with public policy. The Debtors have disclosed the identity of any insider

that will be employed by the reorganized debtors, and the nature of any compensation for such

insider.

       v.     <u>11 U.S.C. § 1129(a)(6)</u>. Because the Debtors are not subject to any such

regulation and the Plan does not propose any such rate changes, section 1129(a)(6) is

inapplicable.

       vi.     <u>11 U.S.C. § 1129(a)(7)</u>. Under the Plan each impaired class of claims or

interests, each holder of a claim or interest of such class has accepted the Plan, or will receive or

retain under the Plan on account of such claim or interest property of a value, as of the effective

date of the Plan, that is not less than the amount that such holder would so receive or retain if the

Debtors were liquidated under chapter 7 of this title on such date.

       vii.     <u>11 U.S.C. § 1129(a)(8)</u>. With respect to each class of claims or interests, all

impaired classes, including Classes 3A, 3B, and 3C have accepted the Plan and all other Classes

under the Plan are not impaired.

       viii.     <u>11 U.S.C. § 1129(a)(9)</u>. The Plan complies with section 1129(a)(9) of the

Bankruptcy Code.

       ix.     <u>11 U.S.C. § 1129(a)(10)</u>. If a class of claims is impaired under the Plan, at least

one class of claims that is impaired under the Plan has accepted the Plan (here all impaired

classes have accepted the Plan), determined without including any acceptance of the Plan by any

insider.

       x.     <u>11 U.S.C. § 1129(a)(11)</u>. Confirmation of the Plan is not likely to be followed

by the liquidation, or the need for further financial reorganization, of the Debtors or any

successor to the Debtors under the Plan.

xi.    <u>11 U.S.C. § 1129(a)(13)</u>. The Plan complies with section 1129(a)(13) of the Bankruptcy Code.

xii.    <u>11 U.S.C. § 1129(a)(14) and (15)</u>. The Debtors are a business entity and are not required to pay domestic support obligations, thereby satisfying or rendering moot sections 1129(a)(14) and (15) of the Bankruptcy Code.

xiii.    <u>11 U.S.C. § 1129(a)(16)</u>. The Plan provides that all transfers of property under the Plan shall be made in accordance with applicable provisions of non-bankruptcy law governing the Debtors, thereby satisfying section 1129(a)(16) of the Bankruptcy Code.

S.    <u>Injunction</u>. The injunctions contained in sections 10.2 and 10.3 of the Plan are consistent with the Bankruptcy Code and applicable law and are approved.

T.    <u>Exculpation</u>. The exculpation provided in Section 10.4 of the Plan for the benefit of the Exculpated Parties is approved, is appropriately tailored to the circumstances of these Chapter 11 Cases, reasonable in scope and does not relieve any party of liability for an act or omission to the extent such act or omission is a result of willful misconduct or gross negligence, as determined by a Final Order.

U.    <u>Releases</u>. The releases contained in Section 10.5 of the Plan (the "**Debtor Releases**") are essential components of the Plan and appropriate. Good and valid justification has been provided in support of the Debtor Releases, Accordingly, the Debtor Releases are: (a) a good faith settlement and compromise of the Claims; (b) in the best interests of the Debtors and all holders of Claims and Interests; (c) fair, equitable, and reasonable; and (d) given and made after due notice and opportunity for a hearing.

6

V.    The settlements effectuated by the provisions of the Plan, including Article I and Article X, are in the best interests of the Debtors' estates and their creditors and avoids delay without increasing costs, with no certainty of success in litigation.

W.    Based upon the findings above and additional findings of fact at the Hearing, the Confirmation Memorandum and evidence proffered, adduced and/or presented at the Hearing, statements of counsel and interested parties having been made on the record at the Hearing, and applicable documents of record in the Chapter 11 Cases, the Debtors have satisfied their burden of proving the applicable elements of sections 1129, 1190 and 1191 of the Bankruptcy Code and applicable Bankruptcy Rules, including Rule 9019 and the Debtors have satisfied all requirements from confirmation of the Plan under the Bankruptcy Code.

**NOW, THEREFORE, IT IS HEREBY ORDERED** as follows:

1.    The above-described findings are incorporated herein as if fully restated here.

2.    The Plan, a copy of which is attached hereto as Exhibit 1, is confirmed pursuant to section § 1191(a) of the Bankruptcy Code.

3.    To the extent any objections to confirmation of the Plan have not been resolved or withdrawn, any such objections are hereby denied.

4.    Notwithstanding anything to the contrary in the Plan, the Effective Date shall be the latter to occur of (i) the Conditions to Confirmation and Conditions to Effective Date set forth in section 9.1 and 9.2 of the Plan; and (ii) August 30, 2025.

5.    <u>Compromises and Settlements</u>. The compromises and settlements set forth in the Plan, including the DC Settlement, are approved and will be effective immediately and binding on all parties in interest on the Effective Date. With respect to the DC Settlement Agreement attached to the Plan as Exhibit 6 (i) the terms of the Settlement Agreement are fair, equitable, and in the best interest of the

Debtors, the Debtors' estate, the creditors, and all other parties-in-interests and given the uncertainty of such litigation is a sound exercise of the Debtors' business judgement; (ii) the settlement was entered into in good faith and at arms length; and (iii) the terms of the Settlement Agreement fall well within the reasonable range of litigation possibilities.

6.    <u>Good Faith</u>. The Plan was negotiated in good faith and at arm's length, and the Debtors have not engaged in any collusive or unfair conduct in connection with the Plan.

7.    <u>Binding Effect of Plan</u>. Pursuant 11 U.S.C. § 1141, except as provided in §§ 1141(d)(2) and (3), upon the Effective Date, the provisions of the Plan shall bind the Debtors, and any creditor, and equity security holder, whether or not the claim or interest of such creditor or equity holder is impaired under the Plan and whether or not such creditor or equity security holder has accepted the Plan.

8.    <u>Re-vesting of Property</u>. Under 11 U.S.C. § 1141(b), except as otherwise provided in the Plan or in this Confirmation Order, as of the Effective Date, all of the property of the Debtors estates (including without limitation, all Causes of Action) vests in the Debtors. Except as otherwise provided in the Plan or in this Order, after confirmation of the Plan, the property dealt with by the Plan is free and clear of all claims and interests of creditors and equity security holders.

9.    <u>Post-Confirmation Operation of Business</u>. Except as otherwise provided in the Plan or in this Confirmation Order, on and after the Effective Date, the Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code and Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provisions of the Bankruptcy Code. From and after the Effective Date, the Debtors are entitled to retain and compensate professionals without the necessity of further approval of this Court. Except as set forth in the Plan concerning objections to claims, the Debtors may also settle or compromise any claims without Court approval.

10.     <u>Injunction and Discharge</u>. Except as otherwise expressly provided in the Plan or in this Confirmation Order, as of the Effective Date: (i) the Debtors shall be discharged from any debt to the fullest extent provided by 11 U.S.C. § 1141(d) and all holders of any discharged claims against the Debtors are enjoined from enforcing any such claim to the fullest extent provided by 11 U.S.C. § 524(a). This Confirmation Order will constitute a determination of the discharge of all the Claims against the Debtors, subject to the occurrence of the Effective Date.

11.     <u>Disbursing Agent</u>. Matthew Brash is named as Disbursing Agent with respect to all Class 3A claims and must make all payments to holders of allowed claims in Class 3A as required by the Plan.

12.     <u>Effect of Confirmation Order on Plan</u>. The failure to reference or address all or part of any particular provision of the Plan herein has no effect on the validity, binding effect, or enforceability of such provision and such provision has the same validity, binding effect, and enforceability as every other provision of the Plan. To the extent that any inconsistencies exist between the terms of the Plan and this Confirmation Order, the terms of this Confirmation Order shall control.

13.     <u>Documents And Actions Required to Effectuate Plan</u>. The Debtors and their respective agents and attorneys are hereby authorized and empowered to carry out the provisions of the Plan and to perform the acts and execute and deliver the documents as are necessary and appropriate in connection with the Plan and Confirmation Order.

14.     <u>Discharge of the Subchapter V Trustee</u>. Under 11 U.S.C. § 1183, the service of the Subchapter V Trustee in the case shall terminate when the Plan has been substantially consummated, except that the United States trustee may reappoint a trustee as needed for performance of duties under § 1183(b)(3)(C) and §1185(a). Notwithstanding anything set forth in the Confirmation Order, the Subchapter V Trustee's services, except as otherwise provided for in the Plan (including acting as

Disbursing Agent and to monitor any cure payments provided in section 7.14 of the Plan), shall be terminated.

15.     <u>Notice of Entry of Confirmation Order and Effective Date</u>. The form of notice of entry of this Confirmation Order and the Effective Date, attached hereto as Exhibit 2 (the "**Effective Date Notice**"), provides adequate and reasonable notice and is hereby approved. On or within five business days of the Effective Date, the Reorganized Debtors shall file and serve the Effective Date Notice on the following parties: (i) all parties listed in the creditor matrix maintained by BMC and (ii) such additional Persons and entities as deemed appropriate by the Debtors.

16.     <u>Post-Effective Date Service List</u>. Except as otherwise provided in the Plan or this Confirmation Order, notice of all subsequent pleadings in the Chapter 11 Cases after the Effective Date shall be limited to the following parties: (i) the Reorganized Debtors and their counsel, (ii) the Subchapter V Trustee in his capacity as Distribution Agent, (iii) the U.S. Trustee, and (iv) any party known to de directly affected by the relief sought.

17.     <u>Waiver of Stay</u>. Notwithstanding Bankruptcy Rules 3020(e), 6004(h) and 6006(d), the terms and conditions of this Confirmation Order will be effective and enforceable immediately upon its entry.

18.     <u>Rejection of Executory Contracts and Leases</u>. Except as otherwise provided in a separate order of the Court, all executory contracts and unexpired leases not otherwise assumed are deemed rejected as of the Effective Date.

19.     <u>Assumption of Assumed Contracts</u>**.** Pursuant to the terms of Section 6.1 of the Plan, as of the Effective Date, the Executory Contracts listed on Exhibit 3 to the Plan shall be deemed assumed and the assumption of such Executory Contracts is reasonable and in the best interest of the Debtors' estates. Notwithstanding anything in the Plan to the contrary, the Debtors may remove any Executory

Contract listed on Exhibit 3 to the Plan prior to the Effective Date by filing with the Court and serving a

notice to the counterparty that such Executory Contract is being removed from Exhibit 3 and will not be

assumed. The Cure Amounts listed on Exhibit 3 to the Plan are deemed the amounts necessary to cure

all defaults within the meaning of section 365(b) of the Bankruptcy Code under such Assume Contracts.

All counterparties to Assumed Contracts who did not timely file an objection to the assumption of the

Assumed Contracts in accordance with the Plan are deemed to consent to the assumption by the

Reorganized Debtors of their respective Assumed Contract.

20.     Rejected Damage Claims. In the event that the rejection of an Executory Contract or

Unexpired Lease under the Plan results in damages to the other party or parties to such contract or lease,

any Claim for such damages shall be classified and treated in Class 3 (General Unsecured Claims) of the

applicable Debtor under the Plan. Such Claim shall be forever barred and shall not be enforceable

against the Debtors, the Debtors' Estates or the Reorganized Debtors, unless a proof of Claim is filed no

later than thirty (30) days after the Effective Date. **FAILURE TO FILE AND SERVE SUCH**

**PROOF OF CLAIM TIMELY AND PROPERLY SHALL RESULT IN SUCH CLAIM BEING**

**FOREVER BARRED AND DISCHARGED. IF, FOR ANY REASON, ANY SUCH CLAIM IS**

**INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER**

**OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY TO BE**

**DISTRIBUTED PURSUANT TO THE PLAN AND SHALL BE SUBJECT TO THE**

**INJUNCTION.**

21.     Administrative Claims. Except as otherwise provided in the Plan, requests for payment

of Administrative Claims must be filed no later than thirty (30) days after the Effective Date, with the

Court and served on the Reorganized Debtors and their counsel. Such proof of Administrative Claim

must include at a minimum: (i) the name of the holder of the Administrative Claim; (ii) the asserted

amount of the Administrative Claim; (iii) the basis of the Administrative Claim; and (iv) supporting documentation for the Administrative Claim. **FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE CLAIM TIMELY AND PROPERLY SHALL RESULT IN SUCH CLAIM BEING FOREVER BARRED AND DISALLOWED. IF FOR ANY REASON ANY SUCH ADMINISTRATIVE CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL NOT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THE PLAN AND SHALL BE SUBJECT TO THE INJUNCTION.**

22.    <u>HCC and HISD</u>. Notwithstanding anything in the Plan or this Confirmation Order, the claim of the Houston Community College System ("**HCC**") filed in the principal amount of $1,043.28 and the claim of the Houston Independent School District ("**HISD**" and collectively with HCC, the "**Texas Taxing Authorities**") filed in the principal amount of $9.821.87 (the "**Texas Taxing Authorities Claims**") shall be paid in full, with statutory interest, within thirty (30) days of the Effective Date. Statutory Interest of 1% per month shall be calculated as of February 1, 2024, and shall continue until the Texas Taxing Authorities Claims are paid in full. The Texas Taxing Authorities shall retain their respective pre- and post-petition statutory liens on Velsicol's assets until they have been paid in full. Velsicol shall pay all post-petition ad valorem property taxes (tax year 2025) in the ordinary course of business prior to delinquency and without the need of the Texas Taxing Authorities to file administrative expense claims.

23.    <u>The State of Tennessee</u>. The Debtors and Reorganized Debtors' liabilities for the Memphis Site (as defined in the Plan) to the State of Tennessee, the Environmental Response Trust and Environmental Response Trustee are fully dischargeable and are discharged, including liabilities under any Environmental Laws, liabilities associated with closure and post-closure, and liabilities associated

with corrective action. On the Effective Date, Proof of Claim No 63 filed on March 18, 2024 by the

Tennessee Department of Environment and Conservations in the amount of $8,507.56 shall be deemed

disallowed and Claim No 64 filed on March 18, 2024 by the Tennessee Department of Environment and

Conservations shall be deemed to be an Allowed General Unsecured Claim in the amount of

$250,000.00, solely against Velsicol in Class 3A. BMC is hereby authorized to make such changes to

the claims register. Notwithstanding anything else in this Order, the United States Environmental

Protection Agency reserves all rights and arguments concerning the dischargeability of any liabilities

under Federal Environmental Law it may have relating to the Memphis Site, to the extent any such

liabilities exist, and the Debtors and Reorganized Debtors reserve their rights and arguments that any

such liabilities are dischargeable under the Plan and applicable law.

24.    PBGC. On the Effective Date, all claims filed by the Pension Benefit and Guaranty

Corporation ("**PBGC**"), including but not limited to the Claim numbers 8, 9, 10, 11, 12, 13, 14, 15, 16,

65, 66, 67, 68, 69, 70, 71, 72 and 73 shall be deemed withdrawn. BMC is hereby authorized to make

such changes to the claims register.

25.    Marshal Consent Decree. Notwithstanding anything to the contrary in the Plan,

Reorganized Velsicol shall as of the Effective Date assume the Consent Decree entered on September

15, 1989 ("**Marshal Consent Decree**"), resolving the case captioned United States of America, and

People of the State of Illinois v. Velsicol Chemical Corporation filed in the United States District Court

for the Southern District of Illinois relating to the Velsicol Chemical Corp. Superfund Site in Illinois,

also known as the Velsicol Chemical Corp. (Marshall Plant). The United States and the Reorganized

Debtors reserve all rights, claims, obligations, and defenses relating to the funds held in trust pursuant to

the Trust Agreement dated April 3, 2001 between Velsicol Chemical Corporation, as Grantor, and the

Bank of New York, as Trustee, established for the benefit of the United States Environmental Protection

Agency to provide financial assurance with respect to the Marshall Consent Decree.

26.    <u>Jurisdiction</u>. The Bankruptcy Court retains jurisdiction to:

    a.   Resolve of any and all objections to Claims;

    b.   Unless otherwise determined by a court of competent jurisdiction, determine questions and disputes regarding all Causes of Action, controversies, disputes or conflicts, whether or not subject to pending actions as of the Confirmation Date, between: (i) the Debtors and any other Person relating to any Claim or any term of the Plan or any transaction or act occurring under or pursuant to the Plan; or (ii) otherwise under the Plan, the Confirmation Order or any other order issued by the Bankruptcy Court in connection with these Cases;

    c.   Consider all applications and matters pending before the Bankruptcy Court on the date of Confirmation;

    d.   The correction of any defect and the curing of any omission or inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

    e.   Consider the Debtors' modification of the Plan after the Confirmation Date pursuant to the Bankruptcy Code and the Bankruptcy Rules;

    f.   Allowance of all applications for payment of Administrative Claims and Professional Fee Claims, which may be paid by the Debtors pursuant to the provisions of the Plan and the Bankruptcy Code and resolution of all disputes pertaining thereto;

    g.   Enter any order, including injunctions, necessary to enforce title, rights and powers of the Debtors, and to impose such limitations, restrictions, terms and conditions of such title, rights and powers as the Bankruptcy Court may deem necessary;

    h.   Enforcement of any order entered by the Bankruptcy Court;

    i.   Entry of a final order confirming substantial consummation of the Plan and closing these Chapter 11Cases;

    j.   Ensure that the Reorganized Debtors complies with the provisions of the Plan and with all orders of the Bankruptcy Court pursuant to the Plan; and

    k.   Enable the Reorganized Debtors to take all actions contemplated by the Plan

l.   Resolve any motions, adversary proceedings, or contested matters, that are pending as of the date of substantial consummation;

m.  Resolve disputes with respect to any and all injunctions created as a result of confirmation of the Plan;

n.   Review and consider issues associated with the Debtors' final report and entry of final decree, and to enter a final decree; and

o.   Enter such orders as the Court deems necessary or appropriate with respect to enforcement of the Plan.

27.   A post confirmation status hearing is set for January 14, 2026 at 10:30 a.m.

## ##

Dated: August 6, 2025

_____
Honorable David D. Cleary
United States Bankruptcy Judge

*This order prepared by:*

Jeffrey M. Schwartz, (#6209982)
Robert W. Glantz (#6201207)
**MUCH SHELIST, P.C.**
191 N. Wacker Drive, Suite 1800
Chicago, Illinois 60606
Telephone: (312) 521-2000
Facsimile: (312) 521-3000
jschwartz@muchlaw.com
rglantz@muchlaw.com

*Counsel to the Debtors*

**EXHIBIT 1**

**Debtors' Third Amended SubChapter V Joint Plan of Reorganization**

**EXHIBIT 2**

**Notice of Entry of Confirmation Order and Effective Date**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VELSICOL CHEMICAL LLC, et al. | ) | Case No 23-12544 |
| | ) | |
| Debtors.[3] | ) | Honorable David D Cleary |
| | ) | |
| | ) | (Jointly Administered) |

**NOTICE OF CONFIRMATION OF THE DEBTORS' PLAN AND CERTAIN
ADMINISTRATIVE AND REJECTION DAMAGE CLAIMS BAR DATES IN
CONNECTION WITH THE PLAN CONFIRMATION**

On August __, 2025, the Court entered an order [ECF No. ____] (the "**Plan Confirmation
Order**") in the above-captioned jointly-administered chapter 11 cases (the "**Chapter 11 Cases**")
confirming the Debtors' Third Amended Subchapter V Joint Plan of Reorganization filed on June 10,
2025 [Docket No. 248] (as may be amended, modified, or supplemented, the "**Plan**"), by Velsicol
Chemical, LLC ("**Velsicol**"), Velsicol Chemical Holding Corporation ("**Holdings**") and Resnovae
Holding Corp. ("**Resnovae**" and collectively with Velsicol and Holdings, the "**Debtors**"). Pursuant to
the Plan Confirmation Order:

**PLEASE TAKE NOTICE** that pursuant to the Plan Confirmation Order and Plan, the Effective
Date of the Plan is _____, 2025, (the "**Effective Date**")

**PLEASE TAKE NOTICE** that except for the claims of the Debtors' professionals for
compensation for services rendered in these Chapter 11 Cases, all parties requesting payment of
any Administrative Claim (as defined in the Plan), must file applications for payment of such
claims no later than _____, 2025 (the "**Administrative Claim Bar Date**"). Such proof
of Administrative Claim must include at a minimum: (i) the name of the holder of the Administrative
Claim; (ii) the asserted amount of the Administrative Claim; (iii) the basis of the Administrative Claim;
and (iv) supporting documentation for the Administrative Claim. Such proof of Administrative Claim
must be (i) filed electronically via the Bankruptcy Court's CM/ECF System, or (ii) if permitted by
the Bankruptcy Court's *Administrative Procedures for the Case Management/Electronic Case
Filing System*, filed in paper form with the Office of the Clerk of the U.S. Bankruptcy Court for
the Northern District of Illinois, Eastern Division, 219 S. Dearborn St., Room 713, Chicago, IL
60604. In the event an Administrative Claim is filed in paper form as provided above, the
claimant must also submit copies of their objection (prepaid U.S. mail, overnight delivery, or
hand delivery) to the Debtors' counsel, so as to be actually received by the Administrative Claim

---

[3] The Debtors in these Cases are Velsicol Chemical, LLC, Velsicol Chemical Holdings Corporation, and Resnovae
Holdings Corp.

Bar Date, at Much Shelist,  Much Shelist, P.C., 191 N. Wacker Drive, Suite 1800  Chicago, Illinois 60606, Attn: Jeffrey M. Schwartz and Robert W. Glantz

**FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE CLAIM TIMELY AND PROPERLY SHALL RESULT IN SUCH CLAIM BEING FOREVER BARRED AND DISALLOWED. IF FOR ANY REASON ANY SUCH ADMINISTRATIVE CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL NOT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THE PLAN AND SHALL BE SUBJECT TO THE INJUNCTION.**

Notwithstanding the foregoing, previously approved or Allowed applications for Administrative Claims do not need to be re-filed.

**PLEASE TAKE NOTICE** that, pursuant to the terms of Section 6.1 of the Plan, as of the Effective Date, the Executory Contracts and Leases (as such terms are defined in the Plan) listed on Exhibit A attached hereto (the "**Assumed Contracts and Leases**") have been assumed by the applicable Debtor. Except for the Assumed Contracts and Leases, each executory contract and unexpired lease to which any of the Debtors are a party have been rejected by the Debtors as of the Effective Date. In the event that the rejection of an executory contract or unexpired lease results in damages to the other party or parties to such contract or lease, any claim for such damages ("**Rejection Damage Claim**") shall be classified and treated in Class 3 (General Unsecured Claims) of the applicable Debtor under the Plan. A proof of claim for such Rejection Damage Claim must be filed no later than _____, 2025, (the "**Rejection Claim Bar Date**"). Such proof of a Rejection Damage Claim must include at a minimum: (i) the name of the holder of the Rejection Damage Claim; (ii) the asserted amount of the Rejection Damage Claim; (iii) the basis of the Rejection Damage Claim; and (iv) supporting documentation for the Rejection Damage Claim. Such proof of a Rejection Damage Claim must (i) filed electronically via the Bankruptcy Court's CM/ECF System, or (ii) if permitted by the Bankruptcy Court's *Administrative Procedures for the Case Management/Electronic Case Filing System*, filed in paper form with the Office of the Clerk of the U.S. Bankruptcy Court for the Northern District of Illinois, Eastern Division, 219 S. Dearborn St., Room 713, Chicago, IL 60604. In the event a Rejection Damage Claim is filed in paper form as provided above, the claimant must also submit copies of their objection (prepaid U.S. mail, overnight delivery, or hand delivery) to the Debtors' counsel, so as to be actually received by the Rejection Claim Bar Date, at Much Shelist,  Much Shelist, P.C., 191 N. Wacker Drive, Suite 1800  Chicago, Illinois 60606, Attn: Jeffrey M. Schwartz and Robert W. Glantz

**FAILURE TO FILE AND SERVE SUCH PROOF OF A REJECTION DAMAGE CLAIM TIMELY AND PROPERLY SHALL RESULT IN SUCH CLAIM BEING FOREVER BARRED AND DISCHARGED. IF, FOR ANY REASON, ANY SUCH CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THE PLAN AND SHALL BE SUBJECT TO THE INJUNCTION.**

Dated: _____, 2025

*This Notice prepared by*:
Robert W. Glantz (#6201207)
Jeffrey M. Schwartz, (#6209982)
**MUCH SHELIST, P.C.**
191 N. Wacker Drive, Suite 1800
Chicago, Illinois 60606
Telephone: (312) 521-2000
Facsimile: (312) 521-3000
rglantz@muchlaw.com
jschwartz@muchlaw.com

*Counsel to the Debtors*

15633734

**EXHIBIT 1**

**Debtors' Third Amended SubChapter V Joint Plan of Reorganization**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VELSICOL CHEMICAL LLC, et al. | ) | Case No 23-12544 |
| | ) | |
| Debtors.[1] | ) | Honorable David D Cleary |
| | ) | |
| | ) | (Jointly Administered) |

**DEBTORS' THIRD AMENDED**
**SUBCHAPTER V JOINT PLAN OF REORGANIZATION**

**MUCH SHELIST, P.C,**
Robert W. Glantz (#6201207)
Jeffrey M. Schwartz, (#6209982)
191 N. Wacker Drive, Suite 1800
Chicago, Illinois 60606
Telephone: (312) 521-2000
Facsimile: (312) 521-3000
rglantz@muchlaw.com
jschwartz@muchlaw.com

*Counsel for the Debtors*

---

1 The Debtors in these Cases are Velsicol Chemical, LLC, Velsicol Chemical Holdings Corporation, and Resnovae Holdings Corp.

## TABLE OF CONTENTS

Page

ARTICLE I

**INTRODUCTION, DISCLOSURES, DEFINITIONS, INTERPRETATION
AND EXHIBITS**..........................................................................................1

    Section 1.1 Introduction................................................................1

    Section 1.2 Disclosures................................................................1

    Section 1.3 Background of Subchapter V Cases............................2

    Section 1.4 Definitions................................................................18

    Section 1.5 Rules of Interpretation and Computation of Time. .....25

    Section 1.6 Exhibits. ...................................................................25

ARTICLE II ..................................................................................................26

**UNCLASSIFIED CLAIMS**.........................................................................26

    Section 2.1 Unclassified Claims. .................................................26

ARTICLE III .................................................................................................26

**CLASSIFICATION OF CLAIMS AND INTERESTS** ...............................26

    Section 3.1 Classified Claims. .....................................................26

    Section 3.2 Separate Plan.............................................................26

ARTICLE IV .................................................................................................27

**VOTING AND IMPAIRMENT OF CLASSES** ........................................27

    Section 4.1 Impaired Classes of Claims Entitled to Vote. .............27

    Section 4.2 Classes Deemed to Accept the Plan ...........................27

    Section 4.3 Elimination of Vacant Classes ...................................27

    Section 4.4 Voting and Confirmation Procedures .........................28

15429637

Section 4.5 Confirmation Hearing ................................................................28

Section 4.6 Cram Down...............................................................................29

Section 4.7 Fair and Equitable Test ............................................................29

Section 4.8 Best Interest Test.......................................................................30

ARTICLE V ...........................................................................................................31

TREATMENT OF CLASSES OF CLAIMS AND INTERESTS.......................31

Section 5.1 Allowed Professional Fee Claims .............................................31

Section 5.2 Allowed Other Administrative Expense Claims ........................31

Section 5.3 Class 1 Claim: Bank of America Secured Claim.......................31

Section 5.4 Class 2 Claims: Allowed Unsecured Priority Claims. ...............32

Section 5.5 Class 3 Claims: Allowed General Unsecured Claims................32

Section 5.6 Class 4 Claims: Equity Securities..............................................33

ARTICLE VI ..........................................................................................................34

TREATMENT OF EXECUTORY CONTRACTS AND LEASES......................34

Section 6.1 Executory Contracts Assumed or Deemed Rejected .................34

Section 6.2 Bar Date for Rejection Damages. ..............................................34

Section 6.3 Compensation and Benefit Plans ...............................................35

ARTICLE VII ........................................................................................................35

MEANS OF IMPLEMENTATION OF THE PLAN ..........................................35

Section 7.1 Organizational Existence. ..........................................................35

Section 7.2 Retention of Equity. ...................................................................35

Section 7.3 Vesting of Assets........................................................................35

Section 7.4 Retention of Causes of Action. ..................................................35

Section 7.5 Funding. ......................................................................................36

15429637

Section 7.6 Distribution Agent.......................................................36

Section 7.7 Management/Limitation on Compensation/No Dividends .........37

Section 7.8 Continued Corporate Existence Between the Confirmation Date

and the Effective Date.................................................................38

Section 7.9 Objections to Claims..................................................38

Section 7.10 Estimation of Claims................................................38

Section 7.11 No Distribution on Disputed Claims..........................39

Section 7.12 Section 1146 Exemption. ..........................................39

Section 7.13 Appropriate Remedies. ............................................39

Section 7.14 Distribution Record Date. ........................................39

Section 7.15 Pension Plans ..........................................................40

Section 7.16 Revocation or Withdrawal of Plan............................40

Section 7.17 Recharacterization of Affiliate Claims as Equity.....................41

Section 7.18 Post-Confirmation Discharge of Subchapter V Trustee............41

ARTICLE VIII .................................................................................41

**BAR DATES FOR ADMINISTRATIVE CLAIMS** .............................................41

Section 8.1 Bar Date for Administrative Claims. ..........................41

ARTICLE IX.....................................................................................41

**CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE**...................41

Section 9.1 Conditions to Confirmation. ......................................41

Section 9.2 Conditions to Effective Date......................................42

ARTICLE X .....................................................................................42

**EFFECTS OF CONFIRMATION**..................................................................42

Section 10.1 Debtors' Discharge...................................................42

iv

Section 10.2 Injunction. ..................................................................43

Section 10.3 Term of Bankruptcy Injunction or Stays....................................43

Section 10.4 Exculpation. ..............................................................43

Section 10.5 Releases by the Debtors ...................................................44

Section 10.6 Approval of Compromises and Settlements..............................45

Section 10.7 Other Documents and Actions. .........................................45

ARTICLE XI ..................................................................................45

**MISCELLANEOUS PROVISIONS**..................................................45

Section 11.1 Headings for Convenience Only. .......................................45

Section 11.2 Binding Effect of Plan....................................................45

Section 11.3 Modification of the Plan. ................................................45

Section 11.4 Final Order. ...............................................................46

Section 11.5 Severability................................................................46

Section 11.6 Governing Law............................................................46

Section 11.7 Notices. ....................................................................46

Section 11.8 Filing of Additional Documents.........................................47

Section 11.9 Lapsed Distributions. ....................................................47

Section 11.10 Undeliverable and Unclaimed Distributions............................48

Section 11.11 Defenses with Respect to Claims .......................................48

Section 11.12 No Injunctive Relief......................................................48

Section 11.13 No Admissions. ...........................................................48

Section 11.14 Written Agreement ......................................................48

Section 11.15 Minimal Distribution. ...................................................48

ARTICLE XII ...............................................................................48

15429637

**RETENTION OF JURISDICTION** ...................................................................48

    Section 12.1 Exclusive Jurisdiction of Bankruptcy Court. ...........................48

## PLAN EXHIBITS

Exhibit 1        Hypothetical Liquidation Analysis

Exhibit 2        Disposable Income Projections

Exhibit 3        Schedule of Assumed Contracts

Exhibit 4        The Memphis Site

Exhibit 5        DC Settlement Agreement

15429637

## ARTICLE I

### INTRODUCTION, DISCLOSURES, DEFINITIONS, INTERPRETATION AND EXHIBITS

Section 1.1   Introduction

      The Debtors propose this Third Amended Subchapter V Joint Plan of Reorganization, under sections 1129 and 1191 of chapter 11 of the Bankruptcy Code. The Debtors project that Velsicol will have $2,132,000.00 in disposable income from operations earned over a five-year period following confirmation of this Plan to be distributed to holders of Velsicol Allowed Priority Unsecured Claims, Velsicol Allowed Priority Tax Claims in Class 2, and Velsicol Allowed General Unsecured Claims in Class 3. Pursuant to the Plan, Velsicol will make payments to creditors, as described more fully herein, in the cumulative amount of the Velsicol Disposable Income Amount. Velsicol Holdings will have $38,000 to distribute to holders of Velsicol Holdings Allowed Claims and Resnovae will have $4,500 to distribute to holders of Resnovae Allowed Claims. At this time, because of contingent claims filed against the Debtors, the Debtors are unable to estimate the recovery stated as a percentage distribution to general unsecured claims.

      The Debtors believe that confirmation of the Plan is in the best interest of all parties, including the Debtors' Creditors and Estates especially in light of the Debtors payment of Velsicol's projected disposable income over a five-year period rather than a three-year period. Accordingly, the Debtors urge each Creditor that is Impaired hereunder, and entitled to vote, to vote to accept the Plan.

Section 1.2   Disclosures

      The Debtors submit this Third Amended Subchapter V Joint Plan of Reorganization and assert that it contains the information required by section 1190 of the Bankruptcy Code.

      To be counted, a ballot containing your vote to accept or to reject the Plan must be received by the Notice and Claims Agent, BMC Group, Inc. as provided in section 4.4 below by **no later than 4:00 p.m. prevailing Central Time on July 16, 2025**.

      **NO REPRESENTATIONS CONCERNING THE DEBTORS ARE AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS PLAN.**

      **THE INFORMATION CONTAINED HEREIN IS BASED ON THE DEBTORS' RECORDS. THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY, ALTHOUGH GREAT EFFORT HAS BEEN TAKEN TO MAKE SURE IT FAIRLY REPRESENTS THE DEBTORS' CURRENT POSITION. CREDITORS ARE URGED TO STUDY THE PLAN IN FULL AND CONSULT WITH COUNSEL WITH RESPECT TO THE PLAN, ITS TAX IMPLICATION(S) AND ITS EFFECT ON THEIR RIGHTS.**

15429637

Section 1.3    <u>Background of Subchapter V Cases</u>

Capitalized terms not otherwise defined in Section 1.3 shall have the meaning set forth in Section 1.4 of the Plan.

a.    ***Debtors' Organizational Structure***

The Debtors are organized as follows: Resnovae is a corporation that owns 100% of the stock of Velsicol Holdings, and Velsicol Holdings is a corporation that owns 100% of the membership interest of Velsicol, a limited liability company and 100% of the stock of Velsicol Chemical Ireland PLC, a corporation which is not a debtor in these Chapter 11 cases. Velsicol Chemical Ireland PLC was created to facilitate Velsicol selling product in Europe. Velsicol Chemical Ireland PLC itself does not manufacture or sell product but merely handles regulatory related issues in Europe.

b.    ***Debtors' Business and History***

**Resnovae**: Resnovae was established in 2012, when certain members of Velsicol's management team incorporated Resnovae for the purchase of the stock of Velsicol Holdings from its previous owner, private equity firm Arsenal Capital. The stock of Resnovae is currently owned by the Resnovae Equity Holders. Tim Horn and Dennis Leu are officers and Tim Horn, Dennis Leu and Sherman Friedman are current board members. Resnovae's assets consist of 100% of the stock of Velsicol Holdings and cash in the amount of $4,500.

**Velsicol Holdings**: Velsicol Holdings is the parent company of Velsicol. Tim Horn is the President and Dennis Leu and he are the sole board members. Velsicol Holdings' assets consist of (a) 100% of the membership interests in Velsicol; (b) an intercompany receivable from Velsicol; (c) an interest in an escrow account with de minimis assets; (d) the B of A Pledged Account; and (e) 100% of the stock of Velsicol Chemical Ireland PLC.

**Velsicol**: Velsicol traces its origins to 1931. Its original focus was on the manufacture and sale of petroleum-derived chemicals, but its core products have evolved over the decades. Today, Velsicol operates a specialty chemical business that distributes and sells a diverse range of performance chemicals to customers throughout the world. It contracts on an exclusive and semi-exclusive basis with third parties outside the United States that supply Velsicol with private-label branded products. Velsicol then uses a variety of shippers and warehouses to transport and store the products until the product is delivered to customers.

(a)    The Debtors lease their headquarters in Rosemont, Illinois. Velsicol has an additional presence in Memphis, Tennessee where it owns the Memphis Facility, which was previously a manufacturing facility. Velsicol has not manufactured

2

product in the United States since 2011. All of its facilities, other than its Memphis Facility, have been sold.

(b)      Velsicol presently has seven employees. The management team consists of four people. This management team has a broad range of experience, expansive skill set, and unique relationships necessary to manage its relatively complex global business. Of the eight employees, the following four full time employees are Resnovae Equity Holders:

| Name | Position and Description |
|---|---|
| Tim Horn | President |
| Sherman Friedman | Vice President of Sales |
| John Bonsor | Vice President of Supply Chain |
| George Harvell | Vice President of Environmental Health and Safety |

(c)      Velsicol operates an "asset-light" manufacturing model; all production is based in China, and all of the products Velsicol sells are made in facilities owned by third parties.

(d)      Velsicol has two main product categories: (1) plasticizers; and (2) flame retardants.

(i)      Plasticizers are specialty chemicals used in different paint, adhesive, caulk, PVC, and flooring applications. Velsicol was one of the original inventors of this technology and enjoys a strong reputation in the market.

1.      Plasticizers are produced in Wuhan, China, by ECOD Specialties (Wuhan) Co., Ltd. ("**ECOD**"), a company in which Velsicol owns an approximate 10% minority stake.

(ii)      Flame retardants consist of two specific chemicals that are based on chlorinated chemistry. These chemicals are primarily used for smoke suppression and flame retardancy in construction, wire and cable, and polyester resin applications.

1.      Flame retardants are produced by a company in Huian, China, which manufactures the products. This company is the only manufacturer in the world of this chemistry.

(e)      As of the Petition Date, Velsicol had three main suppliers located in China. Unless otherwise specifically provided in this Plan, on the Effective Date, the Debtors will assume all of their contracts with these suppliers as the suppliers are necessary to

3

15429637

the ongoing operations. On March 12, 2025, the Court entered an order authorizing Velsicol to enter into a new supply agreement with a supplier in China who will replace one of its current suppliers.

(f)     Velsicol maintains a sophisticated supply chain consisting of local logistics in China, a network of global freight forwarders and import customs brokers, steamship line relationships, and trucking and rail network options. In addition, Velsicol holds inventory in strategic warehouses located around the world.

(g)     This complex supply chain and customer mix requires Velsicol to maintain a significant amount of working capital to maintain sales.

(h)     Velsicol also maintains a strong technical knowledge base for its specialty chemical book of business. This knowledge base stems from Velsicol's long-term expertise in its core chemistry and its ability to sell the value customers can derive from using Velsicol's products. Because of the vast historical knowledge of its products that its employees and consultants possess, Velsicol is recognized as a market leader in some of its product categories.

(i)     During the five-year period prior to the Petition Date, Velsicol's annual gross revenue has ranged between $12.5 million and $18.9 million. On a percentage basis, customer geography by sales amount is categorized as follows: about 45% in the United States, 30% in Europe, 10% in Asia Pacific, 5% in South America, 7.5% in the Middle East and 2.5% elsewhere.

### c.     *Velsicol's Memphis Property*

The only real estate owned by Velsicol is the Memphis Facility. The Memphis Facility contains environmental contamination in the soil and groundwater related to its former operations at the site. Under a Resource Conservation and Recovery Act (RCRA) Corrective Action Only Permit (TNHW–158) issued September 30, 2014, Velsicol is required to perform corrective actions for any releases of hazardous waste or hazardous contaminates and necessary operations and maintenance. Under the RCRA permit Velsicol is required to remediate the property. In addition, a letter of credit for the benefit of TDEC is required to provide TDEC with financial assurances in the amount of $790,229 (adjusted annually for CPI). Under the Plan and the Proposed TDEC Settlement Agreement, as discussed below, the Memphis Facility will be transferred from Velsicol to an environmental response trust where the State of Tennessee is the beneficiary. Except for their obligations under the proposed TDEC Settlement Agreement, the Debtors will have no further liability to Tennessee and TDEC with respect to the Memphis Site.

15429637

#### d.   *Velsicol's Legacy Environmental Issues*

The Debtors are parties to various potentially responsible party agreements ("**PRP Agreements**") relating to environmental cleanup at various sites not owned by the Debtors. For the most part, these sites are relatively mature and almost all have been remediated. Under the Plan, the Debtors will reject all of their PRP Agreements to the extent such agreements constitute executory contracts unless otherwise specifically provided in the Plan.

#### e.   *Magnetek Litigation*

Magnetek (a successor of Universal Manufacturing Company ("**UMC**")) is a former direct or indirect subsidiary of Northwest Industries, Inc. ("***NWI***"). Both Velsicol (which was also an NWI subsidiary) and UMC were named insureds on various NWI insurance policies. UMC manufactured and sold products containing PCBs which were purchased from Monsanto. In 1972, UMC signed a "Special Undertaking" with Monsanto that enabled it to continue purchasing PCBs and allegedly required UMC to indemnify Monsanto under certain terms and conditions reflected in that agreement.

Travelers issued general liability insurance policies to NWI from October 1, 1969 to November 1, 1978 ("***Travelers Policies***"). TIC issued general liability policies to NWI from November 1, 1978 to February 12, 1986 ("***TIC Policies***")

In 1995, 1999, and again in 2004, Velsicol, after years of disputed insurance coverage litigation over numerous unrelated environmental and other claims, signed settlement agreements with Travelers and TIC. As part of those confidential settlement agreements, which were negotiated by a prior management team, the Travelers Policies and the TIC Policies were exhausted, and Velsicol has certain defense and indemnity obligations to Travelers and TIC against any future claims brought under the Travelers and TIC Policies. Travelers and TIC have tendered Magnetek's claims for coverage to Velsicol under the terms of those settlement agreements. Prior to the Petition Date Velsicol was paying for the defense of Travelers and TIC in litigation over those claims and was paying the bills of Magnetek's defense counsel in its litigation with Monsanto pursuant to a court ruling against Travelers. Velsicol also paid for its own counsel.

As of the Petition Date, Velsicol spent in excess of $3 million with respect to the claims asserted by Magnetek. Velsicol does not have any insurance coverage for this litigation.

Lawsuits are currently pending in Illinois to adjudicate whether or not Magnetek has any right to insurance coverage from Travelers or TIC. Velsicol is also a party to those disputes.

5

Magnetek has advanced various legal arguments as to why it should not be liable to Monsanto. There are also compelling defenses to Magnetek's claim for insurance coverage, especially considering that this litigation has nothing to do with Velsicol's business.

Under the Plan, the Travelers Settlement Agreements and TIC Settlement Agreements will be rejected to the extent they constitute executory contracts. Further under the Plan any Allowed Claims of Travelers and TIC will be treated as a General Unsecured Claim.

### f.   *District of Columbia Chlordane Litigation*

A lawsuit was filed by DC against Velsicol in October 2022, alleging contamination of Washington, DC's waterways. The suit was filed by DC's attorney general. It alleges that Chlordane, a product last produced more than four decades ago and that was used in pest control applications, is present in the soil and waterways. The DC Complaint alleges, *inter alia*, violations of DC's Brownfield Revitalization Act, D.C. Code § 8-631.01, public nuisance, and strict products liability and seeks damages for injury to DC's natural resources; recovery of costs to investigate, assess, analyze, monitor, and remediate the contamination; civil penalties; disgorgement of profits; litigation costs; attorney fees; and pre-judgment and post-judgment interest. DC has filed the DC Proof of Claim (as defined below) against Velsicol in an unliquidated amount of $205,000,000. Velsicol does not have insurance coverage for this litigation or these claims, so it funded the defense out of cash on hand. To date, Velsicol has spent almost $1 million on defense costs. Velsicol believes this litigation is without merit, that it has many strong legal and equitable defenses, and has aggressively asserted its rights. In addition, Velsicol believes that any liability would be mitigated or eliminated based upon DC's use of Chlordane. However, the complex nature of the claim, the associated defense costs, and the uncertainty of an adverse ruling, were reasons why Velsicol commenced its bankruptcy proceeding. The DC Complaint is currently stayed. The Plan incorporates a settlement agreement with DC to resolve DC's claims and issues with respect to Chlordane.

### g.   *Velsicol's Pension Obligations*

Velsicol has obligations related to two defined benefit pension plans. The first is a defined benefit multiemployer plan for former unionized employees of the Memphis facility. Velsicol withdrew from this plan in 2012 when the plant was shut down, and withdrawal liability was assessed against Velsicol. Velsicol is required to pay $12,344 per month into the plan until 2032. PACE Industries Union Management Pension Fund has filed general unsecured proofs of claim in each of the Debtors' Cases in the amount of $1,296,186.15. Given the Debtors' current financial situation, Velsicol does not intend to assume the withdrawal liability obligations and accordingly, such obligations will be treated as a General Unsecured Claim in each of the Debtors' Cases.

6

15429637

The other pension plan, referred to herein as the Chattanooga Pension Plan, is a defined benefit single-employer pension plan for Velsicol's former union employees at its long-shuttered Chattanooga manufacturing plant which was closed in 2007 and subsequently sold. There are no active employees in the Chattanooga Pension Plan, as they are all retired. Principal Financial actively manages the Chattanooga Pension Plan's assets. Velsicol makes payments into the Chattanooga Pension Plan and also pays premiums into the PBGC insurance fund annually on account of this pension liability. Velsicol asserts that it is current on its funding obligations under the Chattanooga Pension Plan, and as part of this Plan, the pension obligations will pass through the bankruptcy, and the Chattanooga Pension Plan will remain an obligation for Reorganized Velsicol. The PBGC has filed the PBGC Claims asserting both contingent and non-contingent claims in excess of $832,000 which the Debtors dispute. The PBGC asserts that (i) the PBGC Claims for the Chattanooga Pension Plan's unfunded benefit liabilities and termination premiums are contingent on the pension plan's termination; and (ii) the non-contingent PBGC Claims are for any unpaid flat-rate and variable-rate premiums owed to PBGC and for any unpaid minimum funding contributions owed to the Chattanooga Pension Plan, both of which are owed regardless of the pension plan's termination. Under the Plan, on the Effective Date, Reorganized Velsicol will assume the Chattanooga Pension Plan as its sponsor within the meaning of ERISA and the Internal Revenue Code ("IRC"), and the PBGC Claims will be deemed withdrawn and the Confirmation order will provide that such claims are withdrawn and will be removed from the claims docket.

h.     **Velsicol's Intercompany Claims.**

The books and records of the Debtors show intercompany payables and receivables among the Debtors, which include the Velsicol Intercompany Receivable and the Resnovae Intercompany Receivable. Intercompany payables on the books reflect that Velsicol owes Velsicol Holding the total sum of $20,652,196.00, while Resnovae owes Velsicol the total sum of $2,870.00.

The Plan will serve as a request by the Debtors, in lieu of a separate motion, to the Bankruptcy Court to recharacterize the Velsicol Intercompany Receivable as equity. While the Bankruptcy Code does not expressly provide for the recharacterization of debt to equity, most of the appellate courts that have considered the issue, have determined that the bankruptcy courts have the power to recharacterize debt to equity. *See In re Airadigm Commc'n, Inc.*, 616 F.3d 642, 657 n.11 (7th Cir.2010) (noting that the Third, Fourth, Sixth, and Tenth Circuits have adopted this approach). In addition, *In re Emerald Casino Inc.,* 2015 WL 1843271, the United States District Court for the Northern District of Illinois, Eastern Division, agreed with the majority of the Circuit Courts that the bankruptcy courts have the power to recharacterize debt to equity, citing *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), in its decision and noting that the Supreme Court stated that "bankruptcy courts should look to the substance rather than the form of transactions"

15429637

and that bankruptcy courts have equitable authority to properly characterize a transaction. See *In re Emerald Casino Inc.*, 2015 WL 1843271, at pages 8-9.

Most courts use an eleven-factor test. The factors that a court may consider in determining whether it should recharacterize a claim include (i) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claim of outside creditors; (10) the extent to which the advances were used to acquire capital assets; (11) the presence or absence of a sinking fund to provide repayments. While none of these factors are dispositive and their significance may vary depending upon circumstances, these factors all speak to whether the transaction appears to reflect the characteristics of an arm's length negotiation.

Applying these factors to the Velsicol Intercompany Receivable shows recharacterization to equity is amply justified. In that regard: (i) no instruments exist between Velsicol and Velsicol Holdings with respect to the claim,(ii) evidence exits that repayment was never expected nor required; (iii) an interest rate was not established; (iv) no interest was ever accrued or paid; (v) no cash payments occurred on the indebtedness; (vi) the intercompany receivables are between related entities; and (vii) there was no security given for the amounts.

i. ***Reasons Necessitating Bankruptcy***

The Debtors' chapter 11 cases were necessitated primarily by two legacy obligations: (i) the "Magnetek Litigation", which, as described above, involves alleged contamination from products (PCBs) used by a pre-1986 sister company of Velsicol that Velsicol is alleged to be contractually obligated to address by virtue of certain insurance contracts and indemnities; and (ii) the District of Columbia Litigation (described above) brought by DC, for alleged contamination of waterways in the District of Columbia for a product (Chlordane) that was last sold over four decades ago.

These extraordinary events led Velsicol to believe that its long-term viability was in doubt. Although Velsicol's business is sustainable, it is simply not profitable enough to generate enough cash to continue to pay for the costs of the Magnetek Litigation and the District of Columbia Litigation. As a result of its dwindling cash position and the other risks of the litigation, Velsicol was forced to seek relief under chapter 11 of the Bankruptcy Code.

8

15429637

### j. Significant Events in the Bankruptcy Case

On September 21, 2023, each of the Debtors filed voluntary petitions under Subchapter V of Chapter 11 of the Bankruptcy Code. The Debtors are managing their operations and financial affairs as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

On September 22, 2023, Matthew Brash was appointed as Subchapter V Trustee in each of the Debtors' cases.

On September 22, 2023, the Debtors filed a number of motions and an application seeking certain "first day" relief. In addition, the Debtors filed The Declaration of Tim Horn in Support of Chapter 11 Filings and First Day Pleadings. A summary of the relief sought pursuant to the First Day Motions and certain other motions and applications is set forth below:

- **Joint Administration Motion**. Pursuant to the Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases and to Shorten Notice, the Debtors sought an order approving the joint administration of the Debtors' Cases for procedural purposes only. An order granting the Motion was entered on September 27, 2023.

- **Cash Management Motion**. Pursuant to the Debtors Motion for Entry of Order Authorizing (i) Continued Use of (a) Existing Bank and Investment Accounts and (b) Cash Management System, (ii) Waiver of Investment and Deposit Guidelines and (iii) Shortening Notice, the Debtors sought entry of an order to permit them to maintain their existing bank accounts and continue using their current cash management system and maintain their existing bank accounts. The Court entered three interim orders approving the motion and on October 27, 2023, entered a final order approving the motion. Under the final order, the Debtors were required to close certain investment accounts and move those accounts to an authorized depository.

- **Wages Motion**. Pursuant to the Debtors' Motion for Authority To (a) Pay Prepetition Employee Obligations (b) Continue Administering Employee Benefits Plans and (c) Shorten Notice, the Debtors sought authorization to (a) pay prepetition employee wages, salaries and other compensation; (b) continue administering employee benefits plans; (c) pay and honor employee medical and other benefits; and (d) be provided related relief. An order approving the motion was entered on September 27, 2023.

- **Application to Retain BMC Group, Inc**. Pursuant to the Debtors' Application to Employ BMC Group, Inc. as Noticing Claims and Balloting Agent, the Debtors sought an Order appointing BMC Group, Inc. as claims and noticing agent for the

9

Chapter 11 Cases. An order granting the application was entered on October 5, 2023.

- **Foreign/Lien Creditor Motion.** Pursuant to the Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Lien Claimants, (B) Import Claimants, and (C) Foreign Vendors (Including 503(b)(9) Claimants), (ii) Confirming Administrative Expense Priority of Outstanding Orders, (iii) Authorizing the Debtors to Honor Customer Programs and (iv) Granting Related Relief, the Debtors sought authorization to (i) pay the prepetition claims of certain foreign vendors and certain service providers (including warehouses, shippers, freight forwarders, common carriers, and customs brokers); and (ii) to honor certain prepetition customer programs. An interim order granting the motion was entered on September 27, 2023, and a final order granting the motion was entered on October 12, 2023.

- **Utilities Motion.** Pursuant to the Debtors' Motion for Order (A) Prohibiting Utilities from Altering, Refusing or Discontinuing Service on Account of Prepetition Invoices; (B) Deeming Utilities Adequately Assure for Future Payment; and (C) Establishing Procedures for Determining Requests For Additional Adequate Assurance Payment, the Debtors sought an order, among other things, prohibiting utilities from altering, refusing or discontinuing service, approving the Debtors' proposed adequate assurance of payment for postpetition services, and established procedures for resolving requests for additional adequate assurance of payment. An order grating the motion was entered on October 18, 2023

The Debtors also filed an application to retain (i) GlassRatner Advisory & Capital Group, LLC d/b/a/ B. Riley Advisory Services as the Debtors' financial advisors; and (ii) Jonathan Friedman, Jeffrey Schwartz and Robert Glantz and the law firm Much Shelist P.C: as Debtors' counsel. An order granting the application to employ B Riley as of the Petition Date was entered on October 25, 2023 and an order granting the application to employ Much Shelist as of the Petition Date was entered on November 1, 2023.

On October 16, 2023, each of the Debtors filed their schedules and statements of financial affairs.

On October 30, 2023, the United States Trustee's office conducted the meeting of creditors pursuant to section 341 of the Bankruptcy Code for each of the Debtors. On October 30, 2023, the United States Trustee's office concluded the meeting of creditors for both Velsicol Holdings and Resnovae, and on November 13, 2023, the United States Trustee's office concluded the meeting of creditors for Velsicol.

On November 8, 2023, the Debtors filed their Subchapter V Status Report. On November 22, 2023, pursuant to section 1188 of the Bankruptcy Code, the Court conducted the subchapter V status conference and has subsequently conducted status hearings on January

10

15429637

31, 2024, April 3, 2024, June 12, 2024, July 17, 2024, November 26, 2024, December 18, 2024 and January 15, 2025.

On November 22, 2023, the Debtors filed the Debtors' Motion for Entry of an Order (i) Setting Deadlines for Filing Proofs of Claim; and (ii) Approving Form, Manner and Sufficiency of Notice requesting the Court set bar dates for filing proofs of claim (including claims under section 503(b)(9) of the Bankruptcy Code); and approving the form of notice and publication notice. On November 30, 2023, the Court entered an order setting a general bar date to file proofs of claim for January 19, 2024 and a bar date for governmental agencies to file proofs of claim for March 19, 2024.

On January 11, 2024, the Debtors filed the Debtors' Motion To Extend Time to Assume or Reject Nonresidential Real Property Leases with respect to its office lease in Rosemont Illinois to April 18, 2024. The Court entered an order extending the time until April 18, 2024 and subsequently entered orders extended the time to assume or reject to and including July 17, 2024, November 17, 2024, March 19, 2025 and May 21, 2025.

On October 16, 2024, the Bankruptcy Court entered an Order requiring the Debtors to file an amended plan on or before November 13, 2024.

On June 17, 2024, the Debtors filed the First Interim Application of GlassRatner Advisory & Capital Group, LLC d/b/a Riley Advisory Services for Compensation for Services Rendered and Reimbursement of Expenses as Financial Advisor to the Debtors (the "**GlassRatner First Interim Fee Application**"). On July 10, 2024. the Bankruptcy Court entered an Order approving the GlassRatner First Interim Fee Applications allowing on an interim basis, $166,729.90 as compensation for services rendered, and $41.40 as reimbursement of actual and necessary expenses.

On July 24, 2024, the Debtors filed the Debtors' Application To Employ K&L Gates As Special Environmental Counsel to advise the Debtors with respect to certain of its environmental liabilities, including, but not limited to, the TDEC Proof of Claim. On August 1, 2024, the Bankruptcy Court entered an order authorizing the Debtors to retain and employ K&L Gates as their special environmental counsel.

On August 28, 2024, the Debtors filed the First Interim Fee Application of Much Shelist P.C. as Counsel to the Debtors and Debtors in Possession for the Period September 21, 2023 Through April 30, 2024 (the "**Much First Interim Fee Application**"). On September 18, 2024. the Bankruptcy Court entered an Order approving the Much First Interim Fee Application allowing on an interim basis, $454,822.00 as compensation for services rendered, and $6,104.00 as reimbursement of actual and necessary expenses.

*The District of Columbia's 2004 Motion.* On December 11, 2023, DC filed its Motion of the District of Columbia Pursuant to Federal Rule of Bankruptcy Procedure 2004 For Order Authorizing Discovery Relating to Debtors and Related Entities and Individuals (the "**2004 Motion**") seeking to obtain documents relating to the financial condition of the Debtors,

15429637

as well as conduct Rule 2004 examinations of each of the Debtors, the Resnovae Equity Holders and certain other entities. On January 9, 2024, the Debtors filed an objection to the 2004 Motion arguing the 2004 Motion failed to set forth a proper basis for the Rule 2004 request, was based upon misleading arguments, and that the request was overly broad and unduly burdensome.

On February 23, 2024, after additional briefing and argument, the Bankruptcy Court entered an Order Granting Motion of the District of Columbia Pursuant to Fed. R. Bankr. P. 2004 For Order Authorizing Discovery Relating to Debtors and Related Entities and Individuals (the "**2004 Order**"). The 2004 Order authorized DC to examine each of the Debtors, the Resnovae Equity Holders and Arsenal Capital Partners and reserved the right of the Debtors and other entities subject to examination to object to individual requests on any other grounds.

Pursuant to the 2004 Order, the Debtors produced voluminous documents to DC and on May 8, 2024, DC took the 2004 examination of Tim Horn as designee of all three Debtors and in his personal capacity.

**The District of Columbia's Motion To Expand SubChapter V Trustee Powers**. On October 9, 2024, DC filed the Motion of the District of Columbia Pursuant to 11 U.S.C. § 1183(b)(2) For Order Authorizing the Trustee to Investigate the Conduct, Assets, Liability, and Financial Condition of the Debtors (the "**Investigation Motion**") requesting the Court expand the SubChapter V Trustee's powers to investigate the conduct, assets, and financial condition of the Debtors, and in particular, transfers made from all three Debtors to the shareholders. More specifically in the Investigation Motion, DC alleges (without any support) that the Resnovae Equity Holders have received excess pay and compensation and that they received alleged fraudulent transfers with respect to distributions the Debtors made in 2018 in the amount of $3.5 million and in 2020 in the amount of $1.5 million.

The Debtors objected to the Investigation Motion asserting DC has failed to allege any facts which would support an investigation and DC has already conducted such investigation when it conducted its examination of the Debtors pursuant to the 2004 Order. The Debtors assert that compensation paid by Velsicol is not only reasonable but it is at or below market and that the distributions made in 2018 and 2020 were not fraudulent transfers because, among other things, the Debtors were not insolvent at the time and the 2018 distribution falls outside the applicable statute of limitations. Moreover, the Debtors allege that even if there was some validity to DC's allegations (which they dispute) creditors will receive more under this Plan than they would receive in a liquidation where the alleged fraudulent transfers pursued.

On November 22, 2024, the Court entered an order denying the Investigation Motion finding that no cause exists to grant the Investigation Motion and that the SubChapter V Trustee raised no issues with the Debtors' conduct during these bankruptcy cases and that this is not a case with a continued lack of disclosure.

12

15429637

On December 17, 2024, the Debtors filed the Debtors' Application To Employ Hollingsworth LLP as Special Counsel to advise the Debtors with respect to the DC Complaint and the proof of claim filed by DC. On January 8, 2025, the Bankruptcy Court entered an order authorizing the Debtors to retain and employ Hollingsworth LLP as Special Counsel.

On January 8, 2025, the Debtors' filed the Debtors' Motion for Entry of an Order (I) Scheduling a Hearing to Consider Confirmation of the Plan; (II) Approving the Form of Ballots and Proposed Solicitation and Tabulation Procedures; (III) Scheduling Certain Dates in Connection with Confirmation; (IV) Establishing a Bar Date for Requesting Allowance of Certain Administrative Expenses and (V) Granting Further Relief. As of the date of this Plan, the Court has not entered an order approving the Motion.

On March 5, 2025, the Debtors filed the Debtors' Motion For Entry of an order: (I) authorizing Velsicol Chemical LLC to Enter Into Exclusive Supply Agreement; and (II) Granting Related Relief. On March 12, 2025, the Court entered an order approving the Motion.

On March 5, 2025, the Debtors filed the First Interim Fee Application of K&L Gates LLP As Special Environmental Counsel to the Debtors and Debtors In Possession For the Period June 12, 2024 Through November 30,2024. On April 2, 2025, the Bankruptcy Court entered an Order approving the K&L Gates First Interim Fee Applications allowing on an interim basis $86,891.00 as compensation for services rendered, and $0.00 as reimbursement of actual and necessary expenses.

### k.   Post-Petition Restructuring Efforts

Since the filing of these Cases, the Debtors have been in regular communication with customers and vendors (including trips to China and Europe) to achieve a successful transition into Chapter 11, to help alleviate concerns regarding the bankruptcy process, to strengthen customer relationships and to help ensure the Debtors can continue to adequately service their customers throughout the Chapter 11 process and into the future so as to maximize value, fund ongoing operations and fund a plan of reorganization. This includes meeting with all of their suppliers, meeting with their major customers throughout the world and meeting with key logistics providers.

The Debtors have also had numerous discussions with certain creditors regarding the treatment of their claims and have kept the Subchapter V trustee informed of the status of its business and restructuring efforts.

### l.   Potential Proceeds Relating to 2002 Settlement with the Department of Justice.

Over 20 years ago, in 2002 in the Fruit of the Loom bankruptcy case, Velsicol Chemical Corporation entered into a Settlement Agreement with the United States on behalf of U.S. Environmental Protection Agency, U.S. Department of the Interior and the National Oceanic and Atmospheric Administration of the United States Department of Commerce,

13

the Nuclear Regulatory Commission (collectively referred to as the "Federal Claimants"), the States of Michigan, New Jersey, Tennessee, and Illinois, True Specialty Corporation, and the Successor Liquidation Trust by and through LePetomane II, Inc., not individually but solely as Successor Liquidation Trustee in In re Fruit of the Loom, No. 99-4497 (Bankr. D. Del., August 19, 2002) ("FTL Settlement Agreement"). Pursuant to the FTL Settlement Agreement, certain assets of Velsicol Chemical Corporation were assigned to and vested in Lepetomane II, Inc., as Trustee for the Successor Liquidation Trust. To the extent Lepetomane II, Inc., as Trustee for the Successor Liquidation Trust, receives any recoveries with respect to certain of those assets, it is required to pay the recoveries 50% to Lepetomane II, Inc., as Trustee for the Successor Liquidation Trust and 50% to the Velsicol Environmental Trust (both Trusts having been established as part of the Fruit of the Loom Bankruptcy Case.

Recently the Department of Justice informed Velsicol that it is negotiating a resolution of certain issues which may result in Lepetomane II, Inc., as Trustee for the Successor Liquidation Trust receiving certain payments which could then potentially result in 50% of such amount (which could be upwards of $250,000) being paid to the Velsicol Environmental Trust. Any funds paid to the Velsicol Environmental Trust may result in all or some of such amount being paid to Velsicol.

The Debtors do not know if and when Lepetomane II, Inc., as Trustee for the Successor Liquidation Trust may receive such funds and is so, whether the Velsicol Environmental Trust will receive any portion of such funds and to the extent the Velsicol Environmental Trust receives such funds, whether Velsicol will receive any portion of such funds. Due to this uncertainty, the Plan provides that any such amounts received prior to the Final Distribution Date by Velsicol, if any (after deducting Velsicol's cost and expense in recovering any such amounts), shall be added to the next scheduled payment of the Velsicol Disposable Income Amount and will be included in the next distribution to be made under the Plan. Accordingly, to the extent any FOL/DOJ Proceeds are received by Velsicol from the Velsicol Environmental Trust prior to the Final Distribution Date, such amount (less cost and fees) will be paid to creditors with Allowed Claims in Class 3A under the Plan as part of the next scheduled payment to creditors with Allowed Claims in Class 3A.

*m.*     ***TDEC Proposed Settlement***

As set forth above, the Memphis Facility contains environmental contamination in the soil and groundwater related to former operations at the site. Velsicol is operating under the TDEC Permit with respect to the Memphis Site that was issued by TDEC. The TDEC Permit not only covers the Memphis Facility but also covers the Memphis Site.

The TDEC Proofs of Claim filed by TDEC assert general unsecured claims against Velsicol for remediation costs for (i) Carbon Tetrachloride Groundwater Plume; (ii) Cypress Creek, including systematic investigation and removal along Cypress Creek; (iii) remediation of

14

15429637

the Memphis Facility; and (iv) oversite cost through January 31, 2024. The TDEC Proofs of Claim apportion Velsicol's share as between $137,370,352 and $143,370,352.

The Debtors dispute the TDEC Proofs of Claim. The Debtors and TDEC have entered into protracted settlement discussions and, as a result, the Debtors and TDEC have agreed in principle to the terms of a settlement, subject to appropriate approvals and documentation. which will resolve the Debtors' liability to TDEC with respect to the Memphis Site and for any claims, liabilities or obligations asserted in the TDEC Proofs of Claim.

The terms of the proposed TDEC Settlement Agreement, subject to TDEC proving public notice, approvals, documentation and approval by the Bankruptcy Court are as follows:

- On the Effective Date, Velsicol shall transfer, convey and assign the Memphis Facility to an Environmental Response Trust ("**ERT**") pursuant to a quitclaim deed on an as is where is basis with no representations or warranties of any kind for the sum of one dollar ($1.00). The ERT will assume all site operating costs and, except for the ERT Funding Obligations, the Debtors and Reorganized Debtors will have no further obligations with respect to the Memphis Site, or ownership or other residual interest in the Memphis Facility or ERT.

- **Funding of the ERT**: The ERT shall be funded (the "**ERT Funding Obligations**") as follows:

  o On the Effective Date, the Debtors and TDEC shall cancel the TDEC Letter of Credit and remit the funds securing the TDEC Letter of Credit (in the approximate amount of $791,000) to the ERT. Each of the Debtors and Reorganized Debtors shall have no further financial assurance obligations with respect to the Memphis Site.
  o In addition, Velsicol shall pay the ERT:
  o $750,000 to be paid in the first year after the Effective Date as follows: (i) $375,000 to be paid within six (6) months after the Effective Date and (ii) an additional $375,000 to be paid within twelve (12) months of the Effective Date.
  o $1,250,000 to be paid in the second year after the Effective Date as follows: (i) $625,000 to be paid within eighteen (18) months after the Effective Date and (ii) $625,000 to be paid within twenty-four (24) months after the Effective Date
  o $200,000 a year for five (5) years consisting of quarterly payments in the amount of $50,000 with the first quarterly payment commencing three (3) months after the Effective Date.

- In exchange for the payments outlined above, TDEC shall provide covenants not to sue releases and other protections agreed to by the parties to each of the Debtors and Reorganized Debtors for any claims, liabilities, or other obligations with respect to the

Memphis Site, the TDEC Permit, and any matters raised in the TDEC Proofs of Claim, including but not limited to, any carbon tetrachloride groundwater plume, Cypress Creek, and the Memphis Facility. The Debtors and Reorganized Debtors shall have no further liability to TDEC and Tennessee relating to the Memphis Site and shall be entitled to contribution protection.

- The TDEC Allowed Claim shall be an Allowed General Unsecured Claim in the amount of $250,000 solely against Velsicol and shall be included as an Allowed Claim in Class 3A.

The Debtors believe that the terms of the proposed TDEC Settlement Agreement are fair and equitable, in the best interest of the Debtors, their estates and all creditors. By entry into the Settlement Agreement, the Debtors will obtain full and final resolution of the Memphis Site and the claims asserted in the TDEC Proofs of Claim. The TDEC Settlement Agreement will not only provide protections to the Debtors with respect to the environmental claims but will also allow Velsicol to reduce its overhead and other costs associated with owning and operating the Memphis Facility.

*n.*      **District of Columbia Settlement.**

As set forth above, prior to the Petition Date, DC filed the DC Complaint alleging, *inter alia*, contamination of DC's waterways and violations of the DC's Brownfield Revitalization Act, D.C. Code § 8-631.01, public nuisance, and strict products liability and seeking damages for injury to the DC's natural resources; recovery of costs to investigate, assess, analyze, monitor, and remediate the contamination; civil penalties; disgorgement of profits; litigation costs; attorney fees; and pre-judgment and post-judgment interest. DC filed the DC Proof of Claim asserting a general unsecured claim against Velsicol in the unliquidated amount of $205,000,000. Velsicol disputes the DC Proof of Claim and denies any liability to DC.

Velsicol and DC have entered into protracted settlement discussions and, with the help of the Subchapter V Trustee, have agreed, subject to Court approval, to resolve their disputes as set forth more fully in the DC Settlement Agreement, a copy of which is attached hereto as EXHIBIT 6. While the Debtors dispute the amount of the DC Proof of Claim, the Debtors believe the settlement is in the best interest of creditors because, among other things (i) it resolves the largest proof of claim filed in the Velsicol Case; (ii) if the DC Proof of Claim were litigated, unless the Debtors were successful in entirely wiping out the DC Proof of Claim, the amount of any allowed proof of claim could dwarf the amount of the entire creditor pool; (iii) the cost of litigation regarding the DC Proof of Claim would be significant and such cost would have reduced disposable income available to be distributed under the Plan; and (iv) the DC Settlement Agreement allows other creditors to receive more than they likely would if liability with respect to the DC Proof of Claim were litigated and DC was successful.

16

15429637

The terms of the DC Settlement Agreement, subject to approval by the Bankruptcy Court, are as follows:

- The DC Proof of Claim shall be an Allowed General Unsecured Claim solely against Velsicol and be included in Class 3A of the Plan in an amount that will allow DC to receive distributions under the Plan as a Class 3A General Unsecured Creditor in the cumulative amount of $1,300,000.00. DC shall have no other claims in the Debtors' Cases.

- To determine the amount of each distribution that will be paid to DC under the Plan as the holder of an Allowed General Unsecured Claim in Class 3A (which cumulative amount shall be a total of $1,300,000), the following calculations shall be made:

  The numerator shall be $1,300,000 and the denominator shall be the Velsicol Disposable Income Amount. That percentage shall then be multiplied by the amount of the Velsicol Disposable Income Amount to be distributed for each distribution under the Plan.

- Pursuant to the DC Settlement Agreement, solely for purposes of voting to accept or reject the Plan and not for the purpose of allowance or for distribution, DC shall be entitled to vote its claim in the amount of $50,000,000.00 (the "**DC Voting Amount**"). The DC Voting Amount is for voting purposes only and such amount shall not impair the DC Allowed Claim and is without prejudice to the Debtors' or DC's rights regarding the amount of damages asserted by DC in the DC Proof of Claim.

- The DC Settlement Agreement provides that, on the Settlement Effective Date (as defined in the DC Settlement Agreement), DC shall provide the Debtors and certain others a release.

- In addition, as set forth more specifically in the DC Settlement Agreement:
  - DC covenants not to sue or take any other civil or administrative action against any of the Debtors, Reorganized Debtors of Debtor Parties for any Released Claim.
  - Each of the Debtors and Reorganized Debtors are entitled to protection from contribution and/or indemnity actions or claims asserted against any of the Debtors or Reorganized Debtors by any person or persons who are not parties to the DC Settlement Agreement to the fullest extent provided under any provision of applicable federal, state, or local law, including but not limited to CERCLA § 113(f)(2), 42 U.S.C. § 9613(f)(2), and the Brownfield Revitalization Act § 8-634.09, for the matters addressed in the DC Settlement Agreement and for all Released Claims as defined in the DC Settlement Agreement.
  - Velsicol grants certain releases to DC.
  - DC shall dismiss the DC Complaint with prejudice.

17

15429637

### o.     *Tariff Issues*

This Plan includes considerations of the current tariff situations on Velsicol's business and the potential macro-economic environment with respect to the current tariff policy between the United States and other countries, including China. Velsicol's current supply chain includes manufacturing products in China and selling those products in various countries around the world, including the United States. Product imported from China into the United States accounts for approximately 23% of Velsicol's gross sales and margin. Current U.S. tariffs on these products imported into the United States range from 50% to 60% (down from 175%).

The Plan assumes that the current tariff rates will not go away altogether but that the tariff rates will be set at a more realistic level for both countries. Velsicol believes it can successfully navigate the tariff issues and has many risk mitigation options available to it especially due to its product and customer diversity and the price elasticity that exists in certain product lines subject to the tariffs. Velsicol also believes that the current geopolitical macro environment may lead to lower global demand but that such demand will ultimately go back to normal historical levels.

### p.     *Exhibits to the Plan*

      **EXHIBIT 1** – **Hypothetical Liquidation Analysis**
      **EXHIBIT 2** – **Disposal Income Analysis**
      **EXHIBIT 3** – **Assumed Executory Contracts List**
      **EXHIBIT 4** – **Rejected Executory Contracts List**
      **EXHIBIT 5** – **Memphis Site**
      **EXHIBIT 6** – **DC Settlement Agreement**

Section 1.4     <u>Definitions</u>.

"**Administrative Claim**" means a Claim of a Creditor of the kind specified in section 503(b) of the Bankruptcy Code that is entitled to priority under section 507(a)(2) of the Bankruptcy Code, and includes: (i) actual and necessary costs and expenses incurred by a Debtor after such Debtor's Petition Date with respect to preserving such Debtor's Estate and operating the Debtor's business; (ii) any Professional Fee Claims approved by the Bankruptcy Court under section 330 of the Bankruptcy Code that are incurred on or before the Confirmation Date; and (iii) all fees and charges properly owed to a trustee appointed in the Cases under section 1183 of the Bankruptcy Code. For the avoidance of doubt, these Claims shall include Other Administrative Expense Claims and Professional Fee Claims.

18

15429637

"**Allowed Claim**" or "**Allowed . . . Claim**" means a Claim, proof of which is filed within the time fixed by the Bankruptcy Court, or that has been, or is hereafter, scheduled by the Debtors as liquidated in amount and not disputed or contingent, and to which no objection to allowance thereof has been raised by the Debtors within the applicable period fixed pursuant to the Plan, or as to which a Final Order allowing such Claim has been entered.

"**Avoidance Action**" shall mean causes of action against Persons arising under sections 502, 510, 541, 542, 544, 545, 547 through 551 and 553 of the Bankruptcy Code, or under related state or federal statutes and common law, including fraudulent transfer laws, whether or not litigation is commenced before or after the Effective Date to prosecute such Avoidance Actions.

"**B of A Pledged Account**" means that certain Bank account ending is 9429 at Bank of America pledged to secure the TDEC Letter of Credit.

"**Bankruptcy Code**" means Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Northern District of Illinois, located in Chicago, Illinois, and any other court having jurisdiction over these Cases or a proceeding arising in, or arising under or related to these Cases.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, as now in effect.

"**Business Day**" means any day, other than a Saturday, Sunday or "legal holiday" as that term is defined in Bankruptcy Rule 9006(a).

"**Case**" or "**Cases**" means these cases commenced under chapter 11 of the Bankruptcy Code by the Debtors on the Petition Date, which are jointly administered under Case No. 23-12544, currently pending before the Bankruptcy Court.

"**Cash**" means legal tender of the United States of America and equivalents thereof.

"**Causes of Action**" means all claims and causes of action, including Avoidance Actions, of the Debtors as of the Effective Date, whether arising under any contract, the Bankruptcy Code, or other federal or state law, including, but not limited to, all litigation pending in any jurisdiction in which the Debtors are plaintiffs, defendants or other parties, and all other adversary proceedings and lawsuits, together with all products and proceeds thereof.

"**Claim**" means any right to payment, other than an Administrative Claim, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, as defined by section 101(5) of the Bankruptcy Code.

"**Class**" means a class of Holders of Claims as described in the Plan.

19

15429637

"**Chattanooga Pension Plan**" means that certain United Steelworkers of America and Velsicol Chemical Corp. Amended and Restated Pension Plan.

"**Confirmation Date**" means the date of entry of the Confirmation Order.

"**Confirmation Hearing**" means the hearing of the Bankruptcy Court on the confirmation of the Plan.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan.

"**Creditors**" means all Persons holding Claims against the Debtors.

"**DC**" means The District of Columbia.

"**DC Allowed Claim**" means the allowed Class 3A General Unsecured Claim of DC in the amount that will allow DC to receive a distribution under the Plan as a Class 3A General Unsecured Claim in the cumulative amount of $1,300,000.

"**DC Complaint**" means the lawsuit filed by DC against Velsicol, Case No 2022-004711B in the Superior Court of the District of Columbia.

"**DC Proof of Claim**" means any proofs of claim filed by DC against the Debtors including Claim number 62 filed by DC against Velsicol in the unliquidated amount of $205,000,000.00 as a general unsecured claim.

"**DC Settlement Agreement**" means the settlement agreement by and among DC and Velsicol attached as Exhibit 6.

"**Debtor Released Parties**" means, the Resnovae Equity Holders, the Velsicol Holdings Equity Holders, the Velsicol Members and each of their respective officers and directors.

"**Debtors**" means Velsicol, Velsicol Holdings, and Resnovae as debtors and debtors-in-possession in these Cases.

"**Disputed Claim**" means any Claim that is not an Allowed Claim or a claim the Debtors agree should be allowed.

"**Distribution Agent**" means any Person or Entity designated or retained by the Debtors (prior to the Effective Date) or the Reorganized Debtors (after the Effective Date), without the need for any further order of the Bankruptcy Court, to serve as distribution agent under the Plan.

"**Effective Date**" means the later of (i) the date on which all of the conditions to the effectiveness of the Plan as specified in Section 9.2 of the Plan have been satisfied or waived in accordance therewith or (ii) two (2) business days after the Confirmation Order is no longer appealable under the Federal Rules of Bankruptcy Procedure or the local rules for the Bankruptcy Court for the Northern District of Illinois.

15429637

"**Entity**" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

"**Equity Security**" has the meaning as defined in section 101(16) of the Bankruptcy Code.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERT Funding Obligations**" shall have the meaning set forth in Section 1.3(l) of the Plan.

"**Estates**" means the estates of the Debtors created in these Cases under section 541 of the Bankruptcy Code.

"**Exculpated Parties**" shall have the meaning ascribed to it in Section 10.4 of the Plan.

"**Executory Contract**" means a contract or lease to which the Debtors are a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

"**Final Distribution Date**" means the earlier of (a) the date that is five (5) years after the Effective Date and (b) the date that the Velsicol Disposable Income Amount has been paid in full.

"**Final Order**" means an order or judgment as to which the time to appeal or seek direct review or rehearing has expired and as to which no timely appeal or petition for review or rehearing is pending.

"**FOL/DOJ Proceeds**" means any proceeds which Velsicol receives from the Velsicol Environmental Trust between the Effective Date and the Final Distribution Date.

"**General Unsecured Claim**" means any Unsecured Claim, arising prior to the Petition Date, as applicable to each Debtor, which is not a Professional Fee Claim, Other Administrative Expense Claim, Class 1 Claim, Class 2 Claim, or Class 4 Equity Securities.

"**Holder**" means an entity, Person, or governmental unit that owns a Claim or Interest.

"**Impaired**" means any Class, or any Claim or Equity Security in a Class, which is impaired within the meaning of section 1124 of the Bankruptcy Code.

"**Insider**" has the meaning provided by section 101(31) of the Bankruptcy Code.

"**Intercompany Claim**" means any Unsecured Claim held by any Debtor against another Debtor.

"**Interest**" means a right of the owners or Holders of any equity interests of the Debtors, including, but not limited to, the Equity Security Holders of the Debtors.

"**Lapsed Distribution**" means any distribution which has not been cleared or deducted from the Debtors' bank account within ninety (90) days of the date of the distribution.

15429637

"**Lien**" has the meaning provided by section 101(37) of the Bankruptcy Code.

"**Magnetek**" means Magnetek, Inc., a successor of Universal Manufacturing Company.

"**Magnetek Litigation**" means Case No 2017 CH 02118 filed by Velsicol and TIC against Magnetek, Inc. pending in the Circuit Court of Cook County and Case No. 17-cv-3173 filed by Magnetek, Inc. against Travelers Indemnity Company and Travelers Casualty and Surety Company f/k/a The Aetna Casualty and Surety Company and Velsicol.

"**Memphis Pension Plan**" means that certain multiemployer defined benefit pension plan which Velsicol withdrew from effective December 31, 2011.

"**Memphis Facility**" means the real estate owned by Velsicol located at 1199 Warford Street, Memphis, Tennessee 38108

"**Memphis Site**" means (a) the 83-acre site located at 1199 Watford Street and as more specifically identified by the boundaries on Figure 1 attached hereto as **Exhibit 5**; (b) the Cypress Creek Area of Concern as described on Figure 2 attached hereto as **Exhibit 5**; and c) the areal extent of contamination releases from the above locations.

"**Notice and Claims Agent**" means the Debtors' notice and claims agent, BMC Group, Inc.

"**Other Administrative Expense Claim**" means an Administrative Claim that is not a Professional Fee Claim.

"**PBGC**" means the Pension Benefit Guaranty Corporation, a wholly owned United States government corporation, and an agency of the United States, created under Title IV of ERISA, 29 U.S.C. §§ 1301-1461 to administer the federal pension insurance program.

"**PBGC Claims**" means the proofs of claim and amended proofs of claim filed by the PBGC against each of the Debtors in the Chapter 11 Cases related to the Chattanooga Pension Plan; these Claims were assigned Claim numbers 8, 9, 10, 11, 12, 13, 14, 15, 16, 65, 66, 67, 68, 69, 70, 71, 72 and 73. The PBGC Claims are for, *inter alia* (a) unpaid minimum funding contributions owed to the Chattanooga Pension Plan under 29 U.S.C. §§ 1082, 1083, and 26 U.S.C. §§ 412, 430, (b) the Chattanooga Pension Plan's unfunded benefit liabilities under 29 U.S.C. §1362(b), and (c) pension insurance premiums under 29 U.S.C. §§ 1306 and 1307, including termination premiums at the rate of $1,250 per plan participant per year for three years under 29 U.S.C. § 1306(a)(7).

"**Person**" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization or other entity.

"**Petition Date**" means September 21, 2023, which is the date that each of the Debtors filed petitions under Chapter 11 of the Bankruptcy Code.

15429637

**"Plan"** means the Debtors' Third Amended Subchapter V Joint Plan of Reorganization dated June 10, 2025, together with all exhibits, schedules, and annexes hereto, all as may be modified, supplemented, or amended from time to time.

**"Post-Effective Date Debtors"** means the Debtors in their post-Effective Date status.

**"Priority Tax Claim"** means a Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

**"Priority Unsecured Claim"** means a Claim, other than an Administrative Claim or a Priority Tax Claim, which is entitled to priority under section 507(a) of the Bankruptcy Code\.

**"Pro Rata"** means proportionately so that the ratio of the amount of the distribution made on account of a particular Allowed Claim to the distribution made on account of all Allowed Claims of the Class in which the particular Allowed Claim is included is the same as the ratio of the amount a particular Allowed Claim to the total amount of the Allowed Claims of the Class of which a particular Allowed Claim is included.

**"Professional Fee Claim"** means a Claim of a Professional Person for compensation for services rendered in this Case prior to the Confirmation Date under sections 327, 328, 330, 331, 363, 503 or 1103 of the Bankruptcy Code, for such Professional Person.

**"Professional"** or **"Professional Persons"** means Persons, including attorneys, accountants and financial advisors retained by the Debtors, or to be compensated under sections 327, 328, 330, 331, 363, 503 or 1103 of the Bankruptcy Code.

**"Reorganized Debtors"** means each of the Debtors upon the Effective Date of the Plan. Where the context requires, the term "Debtors" will mean the Reorganized Debtors.

**"Resnovae"** means Resnovae Holding Corp. one of the Debtors in the Case.

**"Resnovae Equity Holders"** means Sherman Friedman, George Harvell, John Bonsor, Dennis Leu, Tim Horn, Wood Leu Family Trust dated July 5, 2012, Horn Family Trust dated July 5, 2012, Harvell Family Trust dated July 6, 2012, JPB Family Trust dated June 28, 2012, and SAF 2012 Family Trust dated June 28, 2012.

**"Resnovae Intercompany Receivable"** means the intercompany receivable listed in the Velsicol schedules due from Resnovae in the amount of $2,870.00.

**"Schedules of Assets and Liabilities"** means the Schedules of Assets and Liabilities and Statements of Financial Affairs filed by the Debtors in the Cases and any amendments thereto.

**"Secured Claim"** means a Claim secured by a lien on property of the Estate, or a Claim subject to set off under section 553 of the Bankruptcy Code, to the extent of the value of such Creditor's Lien or security interest in property of the Estate, or to the extent of the amount subject to set off, as the case may be, which is either agreed to by the Debtors pursuant to this Plan or, in

15429637

the absence of agreement, has been determined or is determined in accordance with Sections 506(a) and 502(b).

"**TDEC**" means the Tennessee Department of Environment & Conservation.

"**TDEC Allowed Claim**" means Claim No 64 filed by TDEC which shall be an Allowed General Unsecured Claim in Class 3A in the amount of $250,000.

"**TDEC Letter of Credit**" means that certain letter of credit issued by Bank of America to TDEC in order to secure the obligations under the TDEC Permit in the approximate amount of $791,000.

"**TDEC Permit**" means that certain RCRA Corrective Action Permit issued on September 30, 2014 and identified as Permit No. THNW-158 as amended and modified from time to time.

"**TDEC Proofs of Claims**" means the proofs of claim filed by the TDEC against Velsicol including Claim number 64 in the unliquidated amount and claim number 63 in the amount of $8,507.56. The TDEC Claims are for, inter alia, remediation costs for (a) the Memphis Plant, (b) carbon tetrachloride groundwater plume. (c) Cypress Creek and (d) oversight costs.

"**TDEC Settlement Agreement**" means the settlement agreement to be executed prior to Confirmation of the Plan by and among the State of Tennessee, TDEC and each of the Debtors.

"**TIC**" means Transportation Insurance Company, Continental Casualty Company, and Continental Insurance Company

"**TIC Policies**" means any and all TIC issued general liability policies to Northwest Industries, Inc.

"**Total Holdings Distribution Amount**" means $38,000.

"**Total Resnovae Distribution Amount**" means $4,500.

"**Total Velsicol Distribution Amount**" means the Velsicol Disposable Income Amount.

"**Travelers**" means The Travelers Indemnity Company, Inc., Travelers Casualty and Surety Company, f/k/a The Aetna Casualty and Surety Company

"**Travelers Policies**" means any and all general liability insurance policies issued by Travelers to Northwest Industries, Inc.

"**Unsecured Claim**" means a Claim not secured by a Lien on property of the Estates, not entitled to be classified as a Priority Unsecured Claim or Priority Tax Claim under section 507 of the Bankruptcy Code.

"**Velsicol**" means Velsicol Chemical, LLC, one of the Debtors in this Case.

24

15429637

"**Velsicol Members**" means Velsicol Holdings.

"**Velsicol Disposable Income Amount**" shall mean Velsicol's projected disposable income for the first five (5) years after the Effective Date, in the cumulative amount of $2,132,000 as set forth on the Chart in Section 4.7 of the Plan, less any distributions paid to Allowed Priority Tax Claims and Allowed Class 2 Claims.

"**Velsicol Holdings**" means Velsicol Chemical Holding Corp, one of the Debtors in the Case.

"**Velsicol Holdings Equity Holders**" means Resnovae.

"**Velsicol Intercompany Receivable**" means the intercompany receivable listed in Velsicol Holding's schedules due from Velsicol in the amount of $20,652,196.

"**Velsicol Ireland**" means Velsicol Chemical Ireland, Ltd.

"**U.S. Trustee**" means the United States Trustee.

Section 1.5   Rules of Interpretation and Computation of Time.

For purposes of the Plan, unless otherwise provided herein: (i) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (ii) unless otherwise provided in the Plan, any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (iii) any reference in the Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified or supplemented pursuant to the Plan; (iv) any reference to any entity as a holder of a Claim or Equity Security includes the entity's successors and assigns; (v) all references in the Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Plan; (vi) the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (vii) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (viii) the rules of construction set forth in section 102 of the Bankruptcy Code will apply; and (ix) in computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) will apply.

Section 1.6   Exhibits.

All exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full herein, regardless of when filed. All references to "the Plan" shall be construed, where applicable, to include references to this document and all of its exhibits, appendices, schedules and annexes (and any amendments thereto made in accordance with the Bankruptcy Code). To the extent that the description of any exhibit, appendix, schedule or annex, to the Plan is inconsistent with the

15429637

actual terms or conditions of such exhibit, appendix, schedule or annex, the terms and conditions of the exhibit, appendix, schedule or annex, shall control.

## ARTICLE II

## UNCLASSIFIED CLAIMS

Section 2.1    <u>Unclassified Claims</u>.

    a.    <u>Administrative Claims</u>. In accordance with sections 1123(a)(1) and 1129(a)(9) of the Bankruptcy Code, Administrative Claims are not classified and are excluded from the Classes designated in Article III of the Plan. Administrative Claims shall include Professional Fee Claims and Other Administrative Claims. The treatment accorded unclassified Claims is set forth in Article V of the Plan. The holders of such Claims are not entitled to vote on the Plan.

    b.    <u>Priority Tax Claims</u>. Priority Tax Claims are not classified under the Plan in accordance with Section 1123(a)(1) of the Bankruptcy Code. Each holder of an Allowed Priority Tax Claim shall either be paid (i) in full in Cash on the date that is fifteen (15) days after the Effective Date or fifteen (15) days after the date on which the Bankruptcy Court enters an order allowing such Priority Tax Claim, or as soon thereafter as is practicable, or (ii) in equal semi-annual installments over a period ending not later than five (5) years after the Effective Date of a total value, as of the Effective Date, equal to the Allowed amount of such Priority Tax Claim in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code. The holders of such Claims are not entitled to vote on the Plan.

## ARTICLE III

## CLASSIFICATION OF CLAIMS AND INTERESTS

Section 3.1    <u>Classified Claims and Interests</u>.

    Under section 1123(a)(1) of the Bankruptcy Code, Claims and Equity Securities are classified as follows:

    a.    Class 1 consists of the secured claim of Bank of America against Velsicol Holdings.

    b.    Class 2 consists of the Allowed Priority Unsecured Claims against the Debtors.

    c.    Class 3 consists of the Allowed General Unsecured Claims against the Debtors.

    d.    Class 4 consists of Equity Securities of the Debtors.

26

15429637

Section 3.2     <u>Separate Plan</u>

The Plan constitutes a separate Plan for each Debtor, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. Certain of the Debtors may not have Claims or Interests in a particular Class, and such Claims or Interests shall be treated as set forth herein. For all purposes under the Plan, each Class will contain sub-Classes for each Debtor. Tabulation of votes accepting or rejecting the Plan shall be conducted on a Debtor-by-Debtor basis.

## ARTICLE IV

## VOTING AND IMPAIRMENT OF CLASSES

Section 4.1     <u>Impaired Classes of Claims Entitled to Vote</u>.

Under the Bankruptcy Code, only classes of claims and interests that are impaired under the plan are entitled to vote to accept or reject a plan. A class is impaired if the legal, equitable or contractual rights to which the holders of claims or interests are entitled are modified, other than by curing defaults and reinstating the debt. Pursuant to sections 1126(f) and (g) of the Bankruptcy Code, classes of claims and interests that are not impaired are conclusively presumed to have accepted the plan and are not entitled to vote on a plan, and classes of claims and interests whose holders will receive or retain no property under the plan are deemed to have rejected a plan and are not entitled to vote on a plan. Creditors who hold disputed or disallowed claims are not entitled to vote to accept or reject the plan.

Under the Bankruptcy Code, a class of claims accepts a plan if holders of at least two-thirds in dollar amount and more than one-half in number of the claims properly voted in that class, voted to accept. A vote may be disregarded if the Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Except as otherwise ordered by the Bankruptcy Court, Class 3 is Impaired, and the holders of Claims in Class 3 are entitled to vote to accept or reject the Plan, except to the extent that such Creditor is an Insider.

Section 4.2     <u>Classes Deemed to Accept the Plan</u>.

Classes 1, 2, and 4 are unimpaired and deemed to accept the Plan.

Section 4.3     <u>Elimination of Vacant Classes</u>

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court solely for voting purposes as of the date of the Confirmation Hearing shall be deemed eliminated from the

15429637

Plan solely for purposes of (i) voting to accept or reject the Plan and (ii) determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

Section 4.4 <u>Voting and Confirmation Procedures</u>

If you are entitled to vote to accept or reject the Plan, a ballot is enclosed for the purpose of voting on the Plan. Please carefully follow the instructions set forth in the ballot and vote and return your ballot(s), by first class mail, hand or overnight courier or electronically to:

**IF BY FIRST CLASS MAIL**:
BMC Group
Attn: Velsicol Ballot Processing
PO Box 90100
Los Angeles, CA 90009

**IF BY OVERNIGHT MAIL OR HAND DELIVERY**:
BMC Group
Attn: Velsicol Ballot Processing
3732 West 120th Street
Hawthorne, CA 90250

**IF ELECTRONICALLY**:
ballots.bmcgroup.com/velsicol

**BALLOTS RETURNED BY FACSIMILE OR E-MAIL WILL NOT BE COUNTED.**

**TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN 4:00 P.M. (PREVAILING CENTRAL TIME) ON JULY 16, 2025 (THE "*VOTING DEADLINE*").**

**ANY BALLOT WHICH IS EXECUTED BUT DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR WHICH BOTH THE ACCEPTANCE AND REJECTION BOX IS CHECKED, WILL BE DEEMED TO BE CONSIDERED NULL AND VOID AND WILL NOT BE COUNTED. ANY BALLOT THAT IS EITHER UNRETURNED BY THE VOTING DEADLINE OR IS RETURNED BUT NOT EXECUTED WILL BE CONSIDERED NULL AND VOID AND WILL NOT BE COUNTED.**

If you are a holder of a Claim entitled to vote on the Plan and did not receive a ballot, received a damaged ballot or lost your ballot, or if you have any questions concerning the Plan or the procedures for voting on the Plan, please email counsel for the Debtors, Much Shelist, P.C., Attention: Jeffrey M. Schwartz, Esq. at jschwartz@muchlaw.com.

15429637

Section 4.5    Confirmation Hearing

A Confirmation Hearing is scheduled for August 5, 2025 at 10:00 a.m. (prevailing Central Time) before the Honorable David D. Cleary in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, 219 South Dearborn Street, Courtroom No. 644, Chicago, Illinois 60604. Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan. Any objection to confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served on all required parties on or before the objection deadline of July 16, 2025 at 4:00 p.m. (prevailing Central Time) that has been set by the Bankruptcy Court. Unless an objection to confirmation is timely served and filed, it may not be considered by the Bankruptcy Court.

Section 4.6    Cram Down.

The Debtors will request confirmation of the Plan under section 1191(b) of the Bankruptcy Code with respect to each Class that rejects the Plan.

Section 4.7    Fair and Equitable Test

To obtain confirmation of a plan over the objection of a class of claims or interests that rejects such plan, it must be demonstrated that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to each such non-accepting class. In order for a plan to be found to be "fair and equitable" and thus subject to confirmation by "cramdown" under the Bankruptcy Code, the Debtors must demonstrate under section 1191(c)(2) of the Bankruptcy Code that:

(2)  As of the effective date of the plan:

(A) The plan provides that all of the projected disposable income of the debtor to be received in the three-year period, or such longer period not to exceed five years as the court may fix, beginning on the date that the first payment is due under the plan will be applied to make payments under the plan; or

(B) The value of the property to be distributed under the plan in the three years period, or such longer period not to exceed five years as the court may fix, beginning on the date on which the first distribution is due under the plan is not less than the projected disposable income of the debtor; and

(3) (A) The debtor will be able to make all payments under the plan; or

(B)(i) there is a reasonable likelihood that the debtor will be able to make all payments under the plan; and

(ii) the plan provides for appropriate remedies, which may include the liquidation of nonexempt assets, to protect the holders of claims or interests in the event that the payments are not made.

15429637

The Debtors believe that the Plan meets the fair and equitable test, as the Debtors will make distributions under the Plan in an amount at least equal to their projected disposable income over a five-year period following Plan confirmation. Additionally, the Plan provides for appropriate remedies in the event of a default in Section 7.13.

The Debtors will also pay Allowed Administrative Claims upon the Effective Date. The Debtors projected disposable income is calculated on **Exhibit 2** to this Plan and is summarized in the table below:

| **Debtors** | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Total |
|---|---|---|---|---|---|---|
| Velsicol | $524,000 | $225,000 | $379,000 | $491,000 | $513,000 | $2,132,000 |
| Velsicol Holdings | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Resnovae | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

Section 4.8   Best Interest Test

With respect to each impaired class of claims and interests, confirmation of a plan requires that each holder of a claim or interest either: (i) accept the plan; or (ii) receive or retain under the plan property of a value, as of the effective date, that is not less than the value such holder would receive or retain if the debtor was liquidated under Chapter 7 of the Bankruptcy Code. The Debtors believe that holders of Impaired Claims and interests in each Impaired Class under the Plan would receive no less than under a Chapter 7 liquidation. This difference is represented in the hypothetical liquidation analysis (the **"Hypothetical Liquidation Analysis"**) attached hereto as **Exhibit 1**.

To calculate the probable distribution to holders of each impaired class of claims and interests if each debtor was liquidated under Chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from such debtor's assets in a chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of such debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of the bankruptcy case and priority claims. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as that of counsel and other professionals retained by the trustee, asset disposition expenses and all unpaid expenses incurred until the liquidation is completed. With respect to Velsicol, the costs of liquidation would also include the cost to remedy environmental contamination with respect to the Memphis Facility.

The Debtors believe that the Plan meets the "best interests of creditors" test of section 1129(a)(7) of the Bankruptcy Code. The Debtors believe that the members of each Impaired Class will receive under the Plan at least as much as they would receive in a chapter 7 liquidation proceeding. The Debtors have carefully considered the probable effects of liquidation under

15429637

Chapter 7 on the ultimate proceeds available for distribution to Creditors and holders of Interests, including the following: (a) the possible costs and expenses of the Chapter 7 trustee or trustees and their professionals; (b) the possible substantial increase in Claims, which would have priority over or on parity with those of Unsecured Creditors; (c) the possible significant reduction in recoveries due to the need to liquidate assets rather than sell those assets as part of an ongoing business; (d) the possible difficulties of collecting accounts receivable from customers throughout the world; (c) the ramifications relating to remedying certain environmental issues related to the Memphis Facility. After review of all of the above-referenced considerations, the Debtors believe that the best interests test is satisfied under the circumstances.

The Debtors' Hypothetical Liquidation Analysis demonstrates that in the event of liquidation as described therein, holders of Unsecured Claims would receive little or no distribution on their Claims. The Plan will provide at least as much or a greater recovery than under Chapter 7 due to: (i) the value the Debtors believe can be generated through the Debtors' future operations which will fund distributions to Unsecured Creditors; and (ii) by avoiding the additional expenses associated with conversion to a Chapter 7 case.

## ARTICLE V

### TREATMENT OF CLASSES OF CLAIMS AND INTERESTS

Section 5.1    Allowed Professional Fee Claims.

The Debtors will pay Allowed Professional Fee Claims in full and in Cash within ten (10) days of such Claims becoming Allowed Professional Fee Claims pursuant to Section 8.1 herein or as soon as reasonably practicable thereafter, provided, however, that payment of an Allowed Professional Fee Claim may be made at a later date by agreement between the Debtors and the Professional.

Section 5.2    Allowed Other Administrative Expense Claims.

The Debtors shall pay Allowed Other Administrative Expense Claims in full and in Cash on the latest of: (i) as soon as practicable following the Effective Date; (ii) thirty (30) days after such Claims become Allowed Other Administrative Expense Claims; (iii) the date upon which such Allowed Other Administrative Expense Claims become due in the ordinary course of business; and (iv) such other time as may be agreed in writing between the Debtors and the holder of the Allowed Other Administrative Expense Claim. **Creditors seeking payment of Other Administrative Expense Claims have thirty (30) days following the occurrence of the Effective Date to file an application with the Bankruptcy Court requesting allowance and payment, or such Claims will be forever barred, unless otherwise ordered by the Court in accordance with applicable law. The Debtors may settle and pay any Allowed Other Administrative Claim in their reasonable discretion without any further notice, and without any action, order, or approval of the Bankruptcy Court.**

Section 5.3    Class 1 Claim: Bank of America Secured Claim.

31

15429637

Class 1 consists of the Allowed Secured Claim of Bank of America, NA against Velsicol Holdings relating to a bank account ending in 9428 at Bank of America which account was pledged by Velsicol Holdings to Bank of America in order to secure a TDEC Letter of Credit. As of the Petition Date there was $782,000.00 in the account which secures the TDEC Letter of Credit.

The Allowed Secured Claim of Bank of America, NA shall be unimpaired and the legal, equitable, and contractual rights of Holders of Class 1 Secured Claims are unaltered by this Plan. On the Effective Date, the TDEC Letter of Credit shall be terminated and Bank of America's obligations with respect to the TDEC Letter of Credit shall also be terminated. The Reorganized Debtor shall pay the Allowed Class 1 Claim in the ordinary course of business. The Holder of Allowed Secured Claims in Class 1 are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

Section 5.4    Class 2 Claims: Allowed Unsecured Priority Claims.

Allowed Class 2 Priority Claims against the Debtors. Pursuant to section 1129(a)(9) of the Bankruptcy Code, (a) each holder of an Allowed Priority Unsecured Claim of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code shall, on or before the earlier of: (i) thirty (30) days after such Claims become Allowed Priority Claims and (ii) such other time as may be agreed to in writing between the Debtors and the holders of such Allowed Priority Claims, shall receive, in full satisfaction of its Allowed Priority Claim that is due and payable on account of and in full and complete settlement and release of such Claim, Cash in an amount equal to the amount of such Allowed Priority Claim; provided, however, that, in the event an Allowed Priority Claim is also a Secured Claim, such Claim shall, to the extent it is Allowed, be treated as a Secured Claim if such Claim is not otherwise paid in full. Notwithstanding anything herein to the contrary, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Unsecured Claim or Allowed Priority Tax Claim that does not compensate the Holder for actual pecuniary loss shall be treated as a General Unsecured Claim, and the Holder (other than as the Holder of a General Unsecured Claim) may not assess or attempt to collect such penalty from the Debtors or their respective property.

Section 5.5    Class 3 Claims: Allowed General Unsecured Claims.

Allowed Class 3 General Unsecured Claims against the Debtors shall be divided into three Subclasses: Class 3A consisting of all Unsecured Claims against Velsicol; (ii) Class 3B consisting of all Unsecured Claims against Velsicol Holdings; and (iii) Class 3C consisting of all Unsecured Claims against Resnovae. Except as otherwise specifically provided in this section 5.5 with respect to DC's Allowed General Unsecured Claim in Class 3A, each holder of an Allowed Unsecured Claim in Class 3A, shall receive in full satisfaction, settlement, release and discharge of and in exchange for its Claim, its Pro-Rata share of the portion of Velsicol Disposable Income Amount in Cash. Each holder of an Allowed Unsecured Claim in Class 3B, shall receive in full satisfaction, settlement, release and discharge of and in exchange for its Claim, its Pro-Rata share of the portion of the Total Holdings Distribution Amount in Cash which remains after the Class 2 Claims are satisfied. Each holder of an Allowed Unsecured Claim in Class 3C, shall receive in full satisfaction,

32

15429637

settlement, release and discharge of and in exchange for its Claim, its Pro-Rata share of the portion of the Resnovae Projected Disposable Income in Cash which remains after the Class 2 Claims are satisfied.

The distributions to Class 3 Claimants with Allowed General Unsecured Claims shall be as follows:

        (i)     With respect to Allowed General Unsecured Claims in Class 3A, distributions shall be made as follows: (a) $524,000 of the Velsicol Disposable Income Amount for Class 3A on or before twelve (12) months after the Effective Date); (b) $225,000 of the Velsicol Disposable Income Amount for Class 3A on or before twenty-four (24) months after the Effective Date; (c) $379,000 of the Velsicol Disposable Income Amount for Class 3A on or before thirty-six (36) months after the Effective Date; (d) $491,000 of the Velsicol Disposable Income Amount for Class 3A on or before forty-eight (48) months after the Effective Date; and (e) $513,000 of the Velsicol Disposable Income Amount for Class 3A on or before the Final Distribution Date, provided however that the payments above shall be reduced by the amount of any distributions to Allowed Priority Tax Claims and Allowed Class 2 Claims in the payment period such claims are paid.

        (ii)    With respect to Allowed General Unsecured Claims in Class 3B. such creditors will receive their pro rata share of the Total Velsicol Holdings Distribution Amount within 30 days of the Effective Date.

        (iii)   With respect to Allowed General Unsecured Claims in Class 3C such creditors shall receive their pro rata share of the Total Resnovae Distribution Amount within 30 days of the Effective Date.

(collectively, the "**Distribution Schedule**").

To the extent a Class 3 Claim is not an Allowed Claim on a distribution date, the Disbursing Agent will set aside such Holder's Pro-Rata distribution. If the Claim becomes Allowed, such amount will be promptly distributed to such Holder. If the Claim is disallowed, the set aside amount will be added to the next pro-rata distribution to Holders of Class 3 Claims and if there is no further scheduled distribution for such Holder, will be paid within 30 days of the Claim becoming an Allowed Claim.

The Debtors may, but are not required to, make the distribution to Class 3A or any installment or portion thereof sooner than required to under this paragraph, with any such payment applied against the next required installment.

For purposes of determining the amount of each distribution that will be paid under the Plan to DC as the holder of an Allowed General Unsecured Claim in Class 3A, (which cumulative amount shall be a total of $1,300,000), the following calculations shall be made: the numerator shall be $1,300,000 and the denominator shall be the Velsicol Disposable Income Amount. That percentage shall then be multiplied by the amount of the Velsicol Disposable Income Amount to

33

be distributed for each distribution under the Plan to Allowed General Unsecured Claims in Class 3A with the cumulative amount to be received by DC to be a total of $1,300,000 and in no event shall DC be entitled to received more or less than $1,300,000.

Section 5.6    Class 4 Claims: Equity Securities.

Class 4 Claims consist of the holders of Equity Securities in the Debtors. Allowed Class 4 Claims shall be divided into three Subclasses: (i) Class 4A consisting of all Equity Securities in Velsicol; (ii) Class 4B consisting of all the holders of Equity Securities in Velsicol Holdings; and (iii) Class 4C consisting of the holders of Equity Securities in Resnovae. Velsicol Holdings, the holder of all Class 4A Claims (the Equity Securities in Velsicol) shall retain its Equity Securities in Velsicol. Resnovae, the holder of a Class 4B Claim (the Equity Securities in Velsicol Chemical) shall retain its Equity Securities in Velsicol Holding. The Resnovae Equity Holders, the holder of all Class 4C Claims (the Equity Securities in Resnovae shall retain their respective Equity Securities in Resnovae.

## ARTICLE VI

## TREATMENT OF EXECUTORY CONTRACTS AND LEASES

Section 6.1    Executory Contracts Assumed or Deemed Rejected.

Unless otherwise provided herein, all Executory Contracts of the Debtors that: (i) are not listed on **Exhibit 3** to this Plan; or (ii) have not (a) expired by their own terms and (b) otherwise been assumed prior to the Effective Date or pursuant to this Plan, will be deemed rejected under section 365 of the Bankruptcy Code on the Effective Date.

The Executory Contracts listed on **Exhibit 3** to the attached to this Plan shall be deemed assumed. The Debtors may file an additional or amended schedule of assumed contracts at any time prior to the Effective Date, as an amended **Exhibit 3** to the Plan, respectively. Debtors shall only be required to send notice of the filing of a schedule of assumed contracts to the counter-parties to such contracts. Parties in interest shall have ten (10) business days from the later of the date of filing of the schedules of assumed or, in the case of counter parties to such contracts, the date of receipt of notice of the filing to object to a schedule of assumed or rejected contracts filed pursuant to this section (the "**Assumption or Rejection Objection Deadline**"). If no objections are filed on or before the Assumption or Rejection Objection Deadline, the contracts on the timely filed schedule of assumed contracts shall be deemed assumed or rejected, respectively. The amount necessary to cure any assumed contract shall be the amount listed in **Exhibit 3**, unless the counter-party to an assumed contract files a timely objection to the scheduled cure amount on or before the Assumption or Rejection Objection Deadline and the Court enters an order allowing a different cure amount.

Section 6.2    Bar Date for Rejection Damages.

All proofs of claim with respect to Claims arising from the rejection of Executory Contracts pursuant to Section 6.01 of the Plan must, unless the Bankruptcy Court has ordered otherwise, be filed with the Bankruptcy Court no later than thirty (30) days after the Effective Date. The Claims of any Person arising from the rejection of Executory Contracts or unexpired leases pursuant to Section 6.01 of the Plan that fails to timely file a proof of claim will be discharged under section 1141(d) of the Bankruptcy Code and forever barred from assertion against the Debtors or their assets.

Section 6.3   Compensation and Benefit Plans.

All employment and severance practice policies in place on the Effective Date (except for the Chattanooga Pension Plan and Memphis Pension Plan which are treated in section 7.16 of the Plan) shall continue under the Plan, subject with respect to the Resnovae Equity Holders to the provisions contained in section 7.7 of the Plan.

## ARTICLE VII

## MEANS OF IMPLEMENTATION OF THE PLAN

The Plan will be effectuated as follows:

Section 7.1   Organizational Existence.

Except as otherwise provided in the Plan, each Debtor shall, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal Entity, each with all the powers of a corporation or other form of organization, as applicable, under the laws of its respective jurisdiction of organization and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under the law of the applicable state or other jurisdiction.

Section 7.2   Retention of Equity.

The Equity Security Holders will retain their Interests in the Debtors.

Section 7.3   Vesting of Assets.

A. On the Effective Date, except as set forth in Section 7.3(B), unless otherwise modified by this Plan, the Assets (including, without limitation, all Causes of Action) of (i) Velsicol's Estate will vest in Velsicol; (ii) of Velsicol Holdings will vest in Velsicol Holdings; and (iii) of Resnovae will vest in Resnovae Estate. Thereafter, Velsicol, Velsicol Holdings and Resnovae may operate their businesses and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Court. As of the Effective Date, all property of the Reorganized Debtors shall be free and clear of all Claims and Liens, except as specifically provided in this Plan or the Confirmation Order.

35

15429637

B.  If the Plan is confirmed pursuant to 11 U.S.C. § 1191(b), all property of the applicable Debtor shall remain part of the Debtors' bankruptcy estate and shall not revest with such Debtor, as a Reorganized Debtor, until all payments under Section 5.5 of this Plan are completed.

Section 7.4    Retention of Causes of Action.

Except for Causes of Action that have been settled or released, all Causes of Action shall survive confirmation of this Plan and the commencement of prosecution of Causes of Action shall not be barred or limited by any res judicata or estoppel, whether judicial, equitable or otherwise, based upon confirmation of the Plan. The Debtors' rights to commence and prosecute Causes of Action shall not be abridged or materially altered in any manner by reason of confirmation of the Plan.

Section 7.5    Funding.

The Plan will be funded by cash on hand, continued operations and the disposable income from the Debtors' business operations. In addition, to the extent Velsicol Holdings needs funds for the payment of the Total Holdings Distribution Amount, Velsicol Ireland will upstream such funds to Velsicol Holdings.

Section 7.6    Distribution Agent.

Matthew Brash, the Subchapter V trustee, shall be the Distribution Agent charged with making the payments required under the Plan to holders of Allowed Claims in Class 3, unless he is unable to do so or resigns, in which case, the Debtors, through their respective President or Chief Financial Officer, Tim Horn, shall be the disbursing agent, with such replacement to be within the sole discretion of the Debtors.

a)  Within ten (10) days prior to the date of the distribution or annual distributions required to be made under the Plan, the Debtors shall remit to the Disbursing Agent the amounts required to be disbursed in accordance with Section 5.5 of the Plan.

b)  The Distribution Agent shall then calculate the payments required under the Plan to members of Class 3 holding Allowed Claims and make such distributions accordingly.

c)  The calculations required by the Plan to determine the amount of the distributions to the holders of Allowed Claims and to be reserved for disputed claims shall be made as if all disputed claims were Allowed Claims in the full amount claimed by the holders of Allowed Claims unless otherwise ordered by the Court. The Debtors and the Disbursing Agent will work together to determine which Claims are disputed claims for purposes of each distribution. No payment or distribution shall be made with respect to any claim to the extent it is a disputed claim unless and until such disputed claim becomes an Allowed Claim.

36

15429637

d)    At such time as a disputed claim becomes an Allowed Claim, the distributions due on account of such Allowed Claim and accumulated in the Disputed Claims Reserve account shall be released and paid to the holder of such Allowed Claim.

e)    The Distribution Agent shall be compensated for his post-confirmation duties at his normal hourly rate, In addition, Distribution Agent shall be paid up to $5,000 annually from the Debtors to cover his fees and costs; to the extent such amount is insufficient to cover the Distribution Agent's fees and expenses any remaining amounts shall be paid from the Disposable Income payable to Class 3 General Unsecured Claims.

f)    Within ten (10) days prior to the date of the distribution or annual distributions required to be made under the Plan to Class 3 Claims, the Debtors shall provide the Subchapter V trustee with a statement of the compensation, bonuses and/or consulting fees paid to the Resnovae Equity Holders to date. In addition, the Debtors shall maintain proper books of accounts and records and enter therein complete and accurate entries and records of all of their transactions with any Resnovae Equity Holder and shall give the Subchapter V trustee access thereto at all reasonable times, including permission to examine such books and records and such other information, as the Subchapter V trustee may reasonably request from time to time, which might be helpful to the Subchapter V trustee in the evaluation of any limitations upon the compensation and consulting fees paid to the Resnovae Equity Holders specifically contained in Section 7.7 of this Plan.

g)    The Subchapter V trustee shall provide prompt notice to the members of Class 3 holding Allowed Claims of the Subchapter V trustee's actual knowledge of any payment by the Debtors of compensation, bonuses and/or consulting fees paid to the Resnovae Equity Holders in violation of any limitations on such amounts specifically contained in Section 7.7 of this Plan.

Section 7.7   <u>Management/Limitation on Compensation/No Dividends.</u>

a)    <u>Management</u>. The Debtors' current managers shall continue to operate and manage the Reorganized Debtors. The Reorganized Debtors may replace their management and officers and directors, as necessary after the Effective Date.

b)    <u>Limitation on Compensation/No Dividends</u>. After the Effective Date and until all required distributions under Section 5.5 of this Plan have been made on account of Class 3 Claims:

i)    The compensation and/or consulting fees (collectively, "**Insider Compensation**") paid by the Debtors to any employee, officer or manager of any of the Debtors who is also a Resnovae Equity Holder, shall not increase on an annual cumulative basis by more than two and one half percent (2.5%) (the "<u>Insider Compensation Cap</u>").

37

15429637

ii)    For purposes of section 7.7 and in calculating any cap on Insider Compensation, the starting point to calculate the annual compensation and/or consulting fees for the first year shall be $1 million.

iii)   Except for Insider Compensation, reimbursement of expenses (including health insurance and tax return preparation) and distributions made for legitimate tax purposes related to pass-through tax obligations, no dividends or other distributions shall be made by the Debtors to any employee, officer or manager of any of the Debtors who is also a Resnovae Equity Holder.

iv)    Notwithstanding anything in Section 7.7, the Debtors and Reorganized Debtors shall be allowed to make distributions to each of its members or equity holders to enable each member or equity holder to satisfy the estimated tax liability attributable to the Debtors' or Reorganized Debtors' net taxable income allocated to such member or equity holder. Such distributions (referred to herein as "**Tax Distributions**") shall be made to each member or equity holder based upon the members' or equity holders' taxable income determined by the Debtors or Reorganized Debtors' accountant or authorized tax professional.

Section 7.8    Continued Corporate Existence Between the Confirmation Date and the Effective Date.

Between the Confirmation Date and the Effective Date, the Debtors shall continue in possession and control and continue to act in accordance with the Bankruptcy Code.

Section 7.9    Objections to Claims.

Each Claim shall be allowed or disallowed, as the case may be, in such amount as the Bankruptcy Court shall determine, whether prior to or following Confirmation, and whether pursuant to the Plan or otherwise, except that after the Effective Date, the Reorganized Debtors may settle or compromise any objections and/or controversies regarding Claims without notice or further order of the Bankruptcy Court. The deadline for the Reorganized Debtors to file all objections to Claims shall be no later sixty (60) days after the Effective Date, which deadline may be extended by the Bankruptcy Court for good cause shown.

Section 7.10    Estimation of Claims

Before the Effective Date, the Debtors, or after the Effective Date, the Debtors or Reorganized Debtors, may, within their reasonable discretion, at any time request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. If the Court estimates any contingent or

38

unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or the maximum limitation on the Claim, as determined by the Court. If the estimated amount constitutes the maximum limitation on the Claim the Debtors or Reorganized Debtors may elect to pursue supplemental proceedings to object to the ultimate allowance of such Claim. All of the aforementioned Claim objections, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Court.

Section 7.11    No Distribution on Disputed Claims.

Notwithstanding any provision of the Plan specifying the time for payment of distributions to holders of Claims, no payment or distribution shall be made to the holder of any Disputed Claim until the time such Claim has been determined to be an Allowed Claim. Notwithstanding the existence of a Disputed Claim in a Class to which a distribution under this Plan is due, such distribution to other creditors shall not be affected by any delay in the resolution and/or allowance of the Disputed Claim (other than as to the amount initially distributed as a result of the amount required to be held back in connection with Disputed Claims). Upon the allowance of any Disputed Claim, the holder shall be paid the amount that such holder would have received had its Claim been an Allowed Claim on the Effective Date.

Section 7.12    Section 1146 Exemption.

Under, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, the making or delivery of any instrument whatsoever in furtherance of or in connection with the Plan will not be subject to any document recording tax, stamp tax, conveyance fee, mortgage tax, real estate transfer tax, mortgage recording tax, filing or recording fee, or other similar tax or governmental assessments.

Section 7.13    Appropriate Remedies.

In the event of a post-Effective Date payment default by the applicable Debtor, the affected creditor may give written notice to such Debtor and the Subchapter V Trustee of the default; and the Debtor shall have forty-five (45) days from the date the Debtor receives such written notice to cure such default (the "**Initial Cure Period**"). If the Debtor fails to cure the default during the Initial Cure Period, the Debtor shall sell inventory or other assets in a sufficient amount to cure the default within ninety (90) days following the expiration of the Initial Cure Period (the "**Additional Cure Period**"). During the Additional Cure Period, the Subchapter V Trustee shall monitor the applicable Debtor to ensure the applicable Debtor is using reasonable business efforts to liquidate the necessary inventory or other assets in a timely manner to cure the default before the expiration of the Additional Cure Period. In addition, in the event of a post-Effective Date payment default by the applicable Debtor that is not cured prior to the expiration of the Additional Cure Period, the affected creditor may seek to convert of dismiss the case under section 1112 of the Bankruptcy Code.

Section 7.14    Distribution Record Date.

39

15429637

The distribution record date shall be the close of business on Effective Date, at which time all transfer ledgers, transfer books, registers and any other records maintained by the Debtors or their agents with respect to ownership of any Claims will be closed and, for purposes of the Plan, there shall be no further changes in the record holders of such Claims.

Section 7.15   Pension Plans.

**The Chattanooga Pension Plan**. Subject to the occurrence of the Effective Date, Reorganized Velsicol shall assume the Chattanooga Pension Plan as its sponsor within the meaning of ERISA and the IRC. The Chattanooga Pension Plan shall continue in accordance with its terms (as such terms may be amended from time to time) and applicable nonbankruptcy law, including ERISA and the IRC (and Reorganized Velsicol reserve all rights thereunder). Velsicol does not presently intend to terminate the Chattanooga Pension Plan. However, the PBGC asserts that if the Chattanooga Pension Plan terminates under 29 U.S.C. §§ 1341(c) or 1342, Reorganized Velsicol Holdings and Reorganized Resnovae will each be jointly and severally liable for obligations under the Chattanooga Pension Plan as a member of the contributing sponsor's controlled group, pursuant to 29 U.S.C. § 1301(a)(14).

After the Effective Date, Reorganized Velsicol shall, in the ordinary course of its business, as and to the extent required by the Chattanooga Pension Plan's governing documents and in accordance with applicable non-bankruptcy law (a) satisfy the minimum funding requirements under 26 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083, (b) pay all required premiums, if any, owed to the PBGC under 29 U.S.C. §§ 1306 and 1307, for the Chattanooga Pension Plan under ERISA or the IRC, and (c) administer the Chattanooga Pension Plan in accordance with the applicable provisions of ERISA and the IRC.

Since the Plan provides that Reorganized Velsicol will assume and continue the Chattanooga Pension Plan, the PBGC and the Debtors agree that PBGC's claims filed in this bankruptcy proceeding shall be deemed withdrawn on the Effective Date, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court and the Confirmation Order shall provide that the PBGC Claims and any other claims filed by the PBGC shall be deemed withdrawn and the Notice and Claims Agent be authorized to remove such claims from the claims register.

Nothing in the Debtors' Cases, Plan, Confirmation Order or any other document filed in the Debtors' Cases shall be construed to discharge, release, limit, or relieve the Reorganized Debtors, their successors or assigns, or any party in interest (as defined in 29 U.S.C. § 1002(14)) from liabilities or requirements imposed under any law or regulatory provision with respect to the Chattanooga Pension Plan or from any claim by the PBGC with respect to the Chattanooga Pension Plan. The PBGC and the Chattanooga Pension Plan shall not be enjoined or precluded from enforcing their rights with respect to the Chattanooga Pension Plan as a result of any provision of the Plan, Confirmation Order, section 1141 of the Bankruptcy Code or any other document filed in the Debtors' Cases.

15429637

**The Memphis Pension Plan**. The Memphis Pension Plan and any obligations related thereto or related withdraw liability shall not be assumed and any claims related to the Memphis Pension Plan shall be treated as a General Unsecured Claim in Velsicol's case.

Section 7.16   Revocation or Withdrawal of Plan.

The Debtors reserve the right to revoke or withdraw this Plan at any time prior to the Confirmation Date. If the Debtors take such action, the Plan shall be deemed null and void.

Section 7.17   Recharacterization of Affiliate Claims as Equity.

The books and records of the Debtors show intercompany payables and receivables among the Debtors, which include the Velsicol Intercompany Receivable. Intercompany payables on the books reflect that the Velsicol owes Velsicol Holding the total sum of $20,652,196.00. The Plan will serve as a request by the Debtors, in lieu of a separate motion, to the Bankruptcy Court to recharacterize intercompany payables by the Debtors as equity. Accordingly, on the Effective Date, the Velsicol Intercompany Receivable shall be recharacterized as equity and there shall no distribution of the claim related to the Velsicol Intercompany Receivable.

Section 7.18   Post-Confirmation Discharge of Subchapter V Trustee. If the Plan is confirmed under § 1191(a) of the Bankruptcy Code, then upon the Effective Date of this Plan, except as otherwise provided in the Plan (including acting as Disbursing Agent and to monitor any cure payments as provided in section 7.14), the Subchapter V Trustee's services shall be terminated. If the Plan is confirmed under § 1191(b) of the Bankruptcy Code, then the Subchapter V Trustee shall remain appointed and act as the Disbursing Agent to ensure that all distributions are being reserved and made, as applicable, to Holders of Class 3 claims, until all such payments have been completed and the Subchapter V Trustee is discharged by the Bankruptcy Court..

## ARTICLE VIII

### BAR DATES FOR ADMINISTRATIVE CLAIMS

Section 8.1   Bar Date for Administrative Claims.

Notwithstanding anything to the contrary or alternative provided by prior orders of the Bankruptcy Court regarding allowance or payment of Professional Fee Claims, all Persons requesting payment of any Administrative Claim, including but not limited to Professional Fee Claims, and Other Administrative Claims, must file applications for payment no later than thirty (30) days after the Effective Date. **Any Administrative Claims for which applications are not timely filed in accordance herewith will be deemed discharged and barred from being asserted against the Debtors unless otherwise ordered by the Bankruptcy Court; *provided that* previously approved or Allowed applications for Administrative Claims do not need to be re-filed.**

### ARTICLE IX

15429637

## CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE

Section 9.1    <u>Conditions to Confirmation.</u>

The Plan shall not be confirmed unless and until the following conditions have occurred or have been waived in writing by the Debtor:

a. the Court approves this Plan and the disclosures contained herein;

b. the TDEC Settlement Agreement shall have been executed by and approved by the Court;

c. the DC Settlement Agreement shall have been executed by DC and approved by the Court; and

d. the Court enters the Confirmation Order in form and substance acceptable to the Debtors.

Section 9.2    <u>Conditions to Effective Date</u>.

The Effective Date shall occur only if, unless waived in writing by the Debtors:

a. the Confirmation Order has been entered and has not been vacated, reversed, stayed, enjoined or restrained by order of a court of competent jurisdiction;

b. The TDEC Public Notice Period shall have expired and TDEC shall have confirmed in writing to the Debtors that the TDEC has not withdrawn from the TDEC Settlement Agreement; and

c. the deadline for an appeal of the Confirmation Order has lapsed.

## ARTICLE X

## EFFECTS OF CONFIRMATION

Section 10.1    <u>Debtors' Discharge</u>.

**If the Plan is confirmed under § 1191(a)**, on the Confirmation Date of this Plan, the Debtors will be discharged from any debt that arose before the Confirmation Date, subject to the occurrence of the Effective Date, to the extent specified in § 1141(d) of the Bankruptcy Code; or

**If the Plan is confirmed under § 1191(b)**, as soon as practicable after completion by the Debtors of all payments due under the Plan, unless the Bankruptcy Court approves a written waiver of discharge executed by the Debtors after the order for relief under this chapter, the

42

15429637

Bankruptcy Court shall grant the Debtors a discharge of all debts provided in § 1141(d)(1)(A) of this title, and all other debts allowed under § 503 of this title provided for in this Plan, except any debt-

    1. on which the last payment is due after the first three years of the Plan, or such other time not to exceed five years fixed by the Court; or

    2. if applicable, of the kind specified in § 523(a) of this title.

    This Plan constitutes the Debtors' request that if the Plan is confirmed under § 1191(b), the discharge applies to all debts on which the last payment is due on or before the Final Distribution Date.

Section 10.2   <u>Injunction</u>.

    EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE CONFIRMATION DATE, ALL PERSONS AND ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD LIENS, CLAIMS OR INTERESTS IN OR AGAINST THE DEBTORS ARE, WITH RESPECT TO OR ON ACCOUNT OF ANY SUCH LIENS, CLAIMS OR INTERESTS, PERMANENTLY ENJOINED FROM: (I) COMMENCING, CONDUCTING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION OR OTHER PROCEEDING OF ANY KIND (INCLUDING, WITHOUT LIMITATION, ANY PROCEEDING IN A JUDICIAL, ARBITRAL, ADMINISTRATIVE OR OTHER FORUM) AGAINST OR AFFECTING THE DEBTORS, OR ANY OF THEIR RESPECTIVE PROPERTY; (II) ENFORCING AGAINST, LEVYING UPON OR ATTACHING (INCLUDING, WITHOUT LIMITATION, ANY PREJUDGMENT ATTACHMENT) THE DEBTORS, OR ANY OF THEIR RESPECTIVE PROPERTY, ; (III) ENFORCING, LEVYING, ATTACHING (INCLUDING, WITHOUT LIMITATION, ANY PRE-JUDGMENT ATTACHMENT), COLLECTING OR OTHERWISE RECOVERING BY ANY MANNER OR MEANS WHETHER DIRECTLY OR INDIRECTLY, OF ANY JUDGMENT, AWARD, DECREE, CLAIM OR ORDER AGAINST THE DEBTORS, OR ANY OF THEIR RESPECTIVE PROPERTY; (IV) CREATING, PERFECTING OR OTHERWISE ENFORCING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY LIENS, CLAIMS OR INTERESTS OF ANY KIND AGAINST OR IN THE DEBTORS, OR ANY OF THEIR RESPECTIVE PROPERTY; (V) OTHER THAN AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN, ASSERTING ANY RIGHT OF SETOFF, SUBORDINATION OR RECOUPMENT OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST ANY OBLIGATION DUE THE DEBTORS, OR ANY OF THEIR RESPECTIVE PROPERTY; AND (VI) TAKING ANY ACTIONS IN ANY PLACE AND IN ANY MANNER WHATSOEVER THAT DO NOT CONFORM TO OR COMPLY WITH THE PROVISIONS OF THE PLAN.

Section 10.3   <u>Term of Bankruptcy Injunction or Stays</u>.

15429637

All injunctions or stays provided for in these Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect through the imposition of the injunction set forth in Section 10.2 of the Plan.

Section 10.4   Exculpation.

None of the Debtors, Reorganized Debtors, Professionals and Subchapter V Trustee and each of their respective officers, directors, and members (acting in such capacity) (collectively, the "**Exculpated Parties**") shall have or incur any liability to, or be subject to any right of action by, any Holder of a Claim Interest or Administrative Claim, or any other party in interest, or any of their respective employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or affiliates, or any of their successors or assigns, for any act or omission occurring on or after the Petition Date and before the Effective Date in connection with, relating to, or arising out of, the Cases, formulating, negotiating or implementing the Plan, the solicitation of acceptances of this Plan, the confirmation of this Plan, or the administration of this Plan or the property to be distributed under this Plan or any contract, instrument, release or other agreement or document created or entered into entered into in connection with this Plan, provided, however, that the foregoing provision shall not apply to an act or omission that is determined by a Final Order of the Bankruptcy Court to have constituted willful misconduct or gross negligence. Any of the Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

Section 10.5   Releases by the Debtors.

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code, and notwithstanding anything to the contrary in the Plan or Confirmation Order, on the Confirmation Date and effective as of the Effective Date, for good and valuable consideration provided by each of the Debtor Released Parties, including the Debtor Released Parties' support and agreement to the Insider Compensation Cap and the other provisions and limitations contained in this Section 7.7, the adequacy of which is hereby confirmed, and to the fullest extent permitted by applicable law, in exchange for their cooperation, the Debtors, the Reorganized Debtors, and their Estates (collectively, the "**Debtor Releasing Parties**") hereby settle, release and discharge the Debtor Released Parties from any and all claims, interests, obligations, debts, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivate claim asserted on behalf of any Debtor and/or Reorganized Debtor and their Estates (as such derivative claims are hereby settled   pursuant to this Plan), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the Subchapter V Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the transfer of any property by any Debtor to a Debtor Release Party, the business or contractual arrangements between any Debtor and any Debtor Released Party, any other act or omission, transaction, agreement, event, or other occurrence taking place on or before

44

15429637

the Effective Date (the "**Debtor Release**"), other than Debtor Release against a Debtor Released Party (i) arising out of the gross negligence, willful misconduct, intentional fraud, or criminal liability of any such person or entity as determined by a Final Order of the Court or any other court of competent jurisdiction that do not otherwise relate to a claim for an avoidance action under applicable state law and under sections 544, 547, 548 and 549 of the Bankruptcy Code; and/or (ii) the rights of such Debtor Releasing Party to enforce this Plan and the contracts, instruments, releases, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Court.

Section 10.6    <u>Approval of Compromises and Settlements</u>.

The Plan serves as a motion to approve the TDEC Settlement Agreement, the DC Settlement Agreement, and the settlement related to the Debtor Release pursuant to Bankruptcy Rule 9019. For the avoidance of doubt, Debtor Releasing Parties are deemed to have settled and released any and all claims the Debtors Releasing Parties may have against the Debtor Released Parties, including but not limited to any claims for avoidance actions under applicable state law and under sections 544, 547, 548 and 549 of the Bankruptcy Code. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of each of the compromises and settlements provided for in the TDEC Settlement, the DC Settlement and the releases related to the Debtor Release, and the Bankruptcy Court's findings shall constitute its determination that each compromise and settlement is (i) entered in good faith and for valuable consideration; (ii) fair, equitable and reasonable; and (iii) in the best interests of the Debtors, the Estates, Holders of Claims and Interests, and other parties in interest.

Section 10.7    <u>Other Documents and Actions</u>.

The Debtors are authorized to execute such documents and take such other action as is necessary to effectuate the transactions contemplated by the Plan.

## ARTICLE XI

### MISCELLANEOUS PROVISIONS

Section 11.1    <u>Headings for Convenience Only</u>.

The headings in the Plan are for convenience of reference and will not limit or otherwise affect the meanings thereof.

Section 11.2    <u>Binding Effect of Plan</u>.

The provisions of the Plan shall be binding upon and inure to the benefit of the Debtors, the Estates, and any holder of a Claim or holder of an Equity Security treated herein or any entity named or referred to in the Plan and each of their respective representatives, and, to the fullest

15429637

extent permitted under the Bankruptcy Code and other applicable law, each other Person affected by the Plan.

Section 11.3   Modification of the Plan.

The Debtors may modify the Plan at any time before confirmation of the Plan pursuant to § 1193(a). However, the Bankruptcy Court may require additional items including revoting on the Plan.

If the Plan is confirmed under § 1191(a), the Debtors may also seek to modify the Plan at any time after Confirmation only if (1) the Plan has not been substantially consummated *and* (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

If the Plan is confirmed under § 1191(b), the Debtors may seek to modify the Plan at any time only if (1) it is within three years of the Effective Date, or such longer time not to exceed five years as fixed by the court *and* (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing. This Plan represents the Debtors' request that the Court enter an order that the Debtors may seek to modify the Plan under such circumstances within five years of the Effective Date, since, the Plan payments go out five years.

Section 11.4   Final Order.

Except as otherwise expressly provided in the Plan, the Debtors may waive any requirement in the Plan for a Final Order. No such waiver shall prejudice the right of any party in interest to seek a stay pending appeal of any order that is not a Final Order.

Section 11.5   Severability.

Should the Bankruptcy Court determine, prior to the Confirmation Date, that any provision of the Plan is either illegal on its face or illegal as applied to any Claim or Equity Security, such provision shall be unenforceable as to all holders of Claims or Equity Securities to the specific holder of the Claim or Equity Security, as the case may be, as to which the provision is illegal. Unless otherwise determined by the Bankruptcy Court, such a determination of unenforceability shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan. The Debtors reserve the right not to proceed with Confirmation or consummation of the Plan if any such ruling occurs.

Section 11.6   Governing Law.

EXCEPT TO THE EXTENT THAT THE BANKRUPTCY CODE OR BANKRUPTCY RULES OR OTHER FEDERAL LAWS ARE APPLICABLE, AND SUBJECT TO THE PROVISIONS OF ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT ENTERED INTO IN CONNECTION WITH THE PLAN, THE CONSTRUCTION, IMPLEMENTATION AND ENFORCEMENT OF THE PLAN AND ALL RIGHTS AND OBLIGATIONS ARISING UNDER THE PLAN SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE

46

15429637

STATE OF ILLINOIS, WITHOUT GIVING EFFECT TO CONFLICTS-OF-LAW PRINCIPLES WHICH WOULD APPLY THE LAW OF A JURISDICTION OTHER THAN THE STATE OF ILLINOIS OR THE UNITED STATES OF AMERICA.

Section 11.7    Notices.

Any notice required or permitted to be provided under this Plan shall be in writing and served by either: (i) certified mail, return receipt requested, postage prepaid; (ii) hand delivery; (iii) electronic mail; or (iv) reputable overnight delivery service, freight prepaid, with copies to the following parties and others, if any, set forth in the any plan or amendment:

If to the Debtors:

Tim Horn
Velsicol Chemical LLC
10400 W. Higgins Rd. STE 303
Rosemont, IL 60018
thorn@velsicol.com

and

Jeffrey M. Schwartz, Esq
Steven Blonder, Esq.
Much Shelist, P.C.
191 N. Wacker Drive, Suite 1800
Chicago, Illinois 60606
Telephone: (312) 521-2000
E-mail: jschwartz@muchlaw.com
           sblonder@muchlaw.com

If to the United States Trustee:

Gretchen Silver, Esq.
Office of the United States Trustee
219 S. Dearborn St., Room 873
Chicago, IL 60604

If to the Subchapter V Trustee:

Matthew Brash
Newpoint Advisors Corporation
5600 N. River Road
Suite 800
Rosemont, IL 60018
Telephone: (847) 404-7845
E-mail: mbrash@newpointadvisors.us

47

**Section 11.8** <u>Filing of Additional Documents</u>.

To the extent not filed with the Plan, the Debtors will file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**Section 11.9** <u>Lapsed Distributions</u>.

Lapsed Distributions will revert to the Estates and be distributed Pro Rata in accordance with the priorities of the Plan.

**Section 11.10** <u>Undeliverable and Unclaimed Distributions</u>.

If any distribution to a holder of an Allowed Claim is returned as undeliverable, no further distributions to such holder of an Allowed Claim will be made unless the Debtors are notified in writing of the holder's current address within sixty (60) days after the distribution date. Upon receipt of the notification, the Debtors will remit the distribution to the holder of the Allowed Claim without interest. All claims for undeliverable distributions or notice of address must be made within sixty (60) days after the distribution date or else the distribution will be deemed to be a Lapsed Distribution. Nothing in the Plan will require the Debtors to attempt to locate any holder of an Allowed Claim other than for the Disbursing Agent making a reasonable effort to locate such creditor. For any distribution which becomes a Lapsed Distribution, the Debtors shall be deemed to have made such distribution for the purpose of satisfying the amount required under this Plan.

**Section 11.11** <u>Defenses with Respect to Claims</u>.

Except as otherwise provided in the Plan, nothing shall affect the rights and legal and equitable defenses of the Debtors, with respect to any Claim, including but not limited to all rights in respect of legal and equitable defenses to setoffs or recoupments against such Claims.

**Section 11.12** <u>No Injunctive Relief</u>.

No Claim shall under any circumstances be entitled to specific performance or other injunctive, equitable or prospective relief.

**Section 11.13** <u>No Admissions</u>.

Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed an admission by the Debtors with respect to any liability on any Claim.

**Section 11.14** <u>Written Agreement.</u>

Any provision of this Plan which requires written agreement may be satisfied by email or other electronic communication indicating agreement of the relevant party.

15429637

Section 11.15  <u>Minimal Distribution.</u>

If any Pro-Rata distribution to a holder of an Allowed Claim under this Plan would be in an amount less than $50.00, the Debtors are not required to make such distribution and for the purposes of satisfying the amount required under this Plan of Contributed Proceeds from Operations, the distributions shall be treated as having been made.

## ARTICLE XII

## RETENTION OF JURISDICTION

Section 12.1  <u>Exclusive Jurisdiction of Bankruptcy Court</u>.

The Bankruptcy Court will retain jurisdiction over these Cases for the following purposes:

a.  Resolution of any and all objections to Claims;

b.  Unless otherwise determined by a court of competent jurisdiction, determination of all questions and disputes regarding all Causes of Action, controversies, disputes or conflicts, whether or not subject to pending actions as of the Confirmation Date, between: (i) the Debtors and any other Person relating to any Claim or any term of the Plan or any transaction or act occurring under or pursuant to the Plan; or (ii) otherwise under the Plan, the Confirmation Order or any other order issued by the Bankruptcy Court in connection with these Cases;

c.  Consider all applications and matters pending before the Bankruptcy Court on the date of Confirmation;

d.  The correction of any defect and the curing of any omission or inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

e.  Modification of the Plan after the Confirmation Date pursuant to the Bankruptcy Code and the Bankruptcy Rules;

f.  Allowance of all Claims and applications for payment of Administrative Claims and Professional Fee Claims, and Professional's expenses which may be paid by the Debtors pursuant to the provisions of the Plan and the Bankruptcy Code and resolution of all disputes pertaining thereto;

g.  Enter any order, including injunctions, necessary to enforce title, rights and powers of the Debtor, and to impose such limitations, restrictions, terms and conditions of such title, rights and powers as the Bankruptcy Court may deem necessary;

h.  Enforcement of any order entered by the Bankruptcy Court;

15429637

i.  Entry of a final order confirming substantial consummation of the Plan and closing the Cases;

j.  To ensure that the Reorganized Debtors complies with the provisions of the Plan and with all orders of the Bankruptcy Court pursuant to the Plan; and

k.  Enable the Reorganized Debtors to take all actions contemplated by the Plan.

15429637

Dated June 10, 2025

**VELSICOL CHEMICAL, LLC**

By _____
Tim Horn, Its President


**VELSICOL CHEMICAL HOLDINGS
CORPORATION**

By _____
Tim Horn, Its President


**RESNOVAE HOLDINGS CORP.**

By _____
Tim Horn, Its President


14814211

51

15429637

## EXHIBIT 1

**Hypothetical Liquidation Analysis**

**Resnovae Holdings Corp.**
Hypothetical Liquidation Analysis

| $000s Assets | 01-Sep-2025 Book Value | | Estimated Recovery | | | |
|---|---|---|---|---|---|---|
| | | | Low | | High | |
| | | | $ | % | $ | % |
| Cash | $ | 4.5 | $ 4.5 | 100% | $ 4.5 | 100% |
| Restricted Cash | | - | - | 0% | - | 0% |
| | | | | | | |
| Accounts Receivable | | | | | | |
| *United States* | | - | - | 60% | - | 80% |
| *Europe* | | - | - | 40% | - | 60% |
| *Rest of the World* | | - | - | 25% | - | 50% |
| Total Accounts Receivable (net) | | - | - | 0% | - | 0% |
| | | | | | | |
| Inventory | | | | | | |
| *Chlorendic Anhydride* | | - | - | 25% | - | 50% |
| *Hex* | | - | - | 20% | - | 33% |
| *Velsiflex* | | - | - | 33% | - | 67% |
| *Flame Retardants* | | - | - | 0% | - | 0% |
| Total Inventory | | - | - | 0% | - | 0% |
| | | | | | | |
| Prepaids | | - | - | 0% | - | 0% |
| PP&E (net) | | - | - | 0% | - | 0% |
| Investment in Wuhan | | - | - | 0% | - | 0% |
| Hypothetical Preference Recovery | | - | - | | - | |
| Intangibles | | - | - | 0% | - | 0% |
| **Total Book Value** | $ | 4.5 | | | | |
| **Total** | | | $ 4.5 | 100% | $ 4.5 | 100% |
| **Less: Liquidation Costs** | | | | | | |
| Memphis Remediation and O&M Costs | | | - | | - | |
| Chapter 7 Trustee Fee | | | - | | - | |
| Chapter 7 Professional Fees | | | - | | - | |
| Other Chapter 7 Winddown Costs | | | - | 100% | - | 70% |
| **Total Chapter 7 Costs** | | | $ - | | $ - | |
| Unpaid Chapter 11 Professional Fees & Exp. | | | - | 100% | - | 90% |
| Other Accrued Chapter 11 Costs | | | - | | - | |
| **Total Liquidation Costs** | | | $ - | | $ - | |
| **Net Proceeds Available for Priority and General Unsecured Claims** | | | $ 4.5 | | $ 4.5 | |

Average Net Proceeds Available for Claims                    $    4.5

**Velsicol Chemical Holdings Corporation**

Hypothetical Liquidation Analysis

| | | | | Estimated Recovery | | |
|---|---|---|---|---|---|---|
| **$000s** | **01-Sep-2025** | | Low | | High | |
| **Assets** | **Book Value** | **$** | **%** | | **$** | **%** |
| Cash | $ - | $ - | 100% | $ | - | 100% |
| Restricted Cash | 791 | - | 0% | | - | 0% |
| | | | | | | |
| Accounts Receivable | | | | | | |
| *United States* | - | - | 60% | | - | 80% |
| *Europe* | - | - | 40% | | - | 60% |
| *Rest of the World* | - | - | 25% | | - | 50% |
| Total Accounts Receivable (net) | - | - | 0% | | - | 0% |
| Inventory | | | | | | |
| *Chlorendic Anhydride* | - | - | 25% | | - | 50% |
| *Hex* | - | - | 20% | | - | 33% |
| *Velsiflex* | - | - | 33% | | - | 67% |
| *Flame Retardants* | - | - | 0% | | - | 0% |
| Total Inventory | - | - | 0% | | - | 0% |
| Velsicol Chemical Ireland | 59 | 30 | 50% | | 56 | 95% |
| Prepaids | - | - | 0% | | - | 0% |
| PP&E (net) | - | - | 0% | | - | 0% |
| Investment In Wuhan | - | - | 0% | | - | 0% |
| Hypothetical Preference Recovery | - | - | | | - | |
| Intangibles | - | - | 0% | | - | 0% |
| **Total Book Value** | $ 850 | | | | | |
| **Total** | | $ 30 | 3% | $ | 56 | 7% |
| **Less: Liquidation Costs** | | | | | | |
| Memphis Remediation and O&M Costs | | - | | | - | |
| Chapter 7 Trustee Fee | | 4 | | | 6 | |
| Chapter 7 Professional Fees | | - | | | - | |
| Other Chapter 7 Winddown Costs | | - | 100% | | - | 70% |
| **Total Chapter 7 Costs** | | $ 4 | | $ | 6 | |
| Unpaid Chapter 11 Professional Fees & Exp. | | - | 100% | | - | 90% |
| Other Accrued Chapter 11 Costs | | - | | | - | |
| **Total Liquidation Costs** | | $ 4 | | $ | 6 | |

| Net Proceeds Available for Priority and General Unsecured Claims | $ 26 | $ 50 |
|---|---|---|

| Average Net Proceeds Available for Claims | $ 38 |
|---|---|

**Velsicol Chemical LLC**

Hypothetical Liquidation Analysis

| $000s | 01-Sep-2025 | Estimated Recovery | | | |
|---|---|---|---|---|---|
| | | Low | | High | |
| Assets | Book Value | $ | % | $ | % |
| Cash | $ 2,853 | $ 2,853 | 100% | $ 2,853 | 100% |
| Restricted Cash | - | - | 0% | - | 0% |
| | | | | | |
| Accounts Receivable | | | | | |
| *United States* | 763 | 458 | 60% | 610 | 80% |
| *Europe* | 731 | 292 | 40% | 439 | 60% |
| *Rest of the World* | 257 | 64 | 25% | 129 | 50% |
| Total Accounts Receivable (net) | 1,751 | 814 | 47% | 1,178 | 67% |
| Inventory | | | | | |
| *Chlorendic Anhydride* | 5,295 | 1,324 | 25% | 2,648 | 50% |
| *Hex* | 418 | 84 | 20% | 138 | 33% |
| *Velsiflex* | 573 | 189 | 33% | 384 | 67% |
| *Flame Retardants* | - | - | 0% | - | 0% |
| Total Inventory | 6,286 | 1,596 | 25% | 3,169 | 50% |
| Prepaids | 145 | - | 0% | - | 0% |
| PP&E (net) | 25 | - | 0% | - | 0% |
| Investment In Wuhan | 325 | - | 0% | - | 0% |
| Hypothetical Preference Recovery | - | 100 | | 200 | |
| Intangibles | 45 | - | 0% | - | 0% |
| **Total Book Value** | $ 11,430 | | | | |
| Total | | $ 5,364 | 47% | $ 7,400 | 65% |
| **Less: Liquidation Costs** | | | | | |
| Memphis Remediation and O&M Costs | | 4,034 | | 4,034 | |
| Chapter 7 Trustee Fee | | 180 | | 239 | |
| Chapter 7 Professional Fees | | 600 | | 400 | |
| Other Chapter 7 Winddown Costs | | 503 | 100% | 352 | 70% |
| **Total Chapter 7 Costs** | | $ 5,317 | | $ 5,026 | |
| Unpaid Chapter 11 Professional Fees & Exp. | | 1,045 | 100% | 1,045 | 100% |
| Other Accrued Chapter 11 Costs | | 646 | | 646 | |
| **Total Liquidation Costs** | | $ 7,009 | | $ 6,717 | |

| Net Proceeds Available for Priority and General Unsecured Claims | $ (1,645) | | $ 683 | |
|---|---|---|---|---|

Average Net Proceeds Available for Claims    $ 342

## EXHIBIT 2

**Disposable Income Projections**

14992054

## Velsicol Chemical Holdings Corporation
### Forecast Income Statements Excluding Dischargable Expenses

| (000's) | Post Confirmation Forecast | | | | | Total |
| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | 60 mos. |
|---|---|---|---|---|---|---|
| **Volumes (lbs)** | | | | | | |
| Hex | - | - | - | - | - | |
| Velsiflex | - | - | - | - | - | |
| Benzoic Acid | - | - | - | - | - | |
| Chlorendic | - | - | - | - | - | |
| **Total** | - | - | - | - | - | |
| | | | | | | |
| **Gross Sales** | - | - | - | - | - | |
| Sales Deductions | - | - | - | - | - | |
| **Net Sales** | $ - | $ - | $ - | $ - | $ - | |
| Cost of Sales | - | - | - | - | - | |
| Gross Margin | - | - | - | - | - | |
| SG&A Expense | - | - | - | - | - | |
| Operating Profit | - | - | - | - | - | |
| Other (Income)Expense | - | - | - | - | - | |
| **Net Income** | $ - | $ - | $ - | $ - | $ - | $ - |

## Resnovae Holdings Corp.
## Forecast Income Statements Excluding Dischargable Expenses

| (000's) | Post Confirmation Forecast | | | | | Total 60 mos. |
| --- | --- | --- | --- | --- | --- | --- |
| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | |
| **Volumes (lbs)** | | | | | | |
| Hex | - | - | - | - | - | |
| Velsiflex | - | - | - | - | - | |
| Benzolc Acid | - | - | - | - | - | |
| Chlorendic | - | - | - | - | - | |
| **Total** | - | - | - | - | - | |
| | | | | | | |
| **Gross Sales** | - | - | - | - | - | |
| Sales Deductions | - | - | - | - | - | |
| **Net Sales** | $ - | $ - | $ - | $ - | $ - | |
| Cost of Sales | - | - | - | - | - | |
| Gross Margin | - | - | - | - | - | |
| SG&A Expense | - | - | - | - | - | |
| Operating Profit | - | - | - | - | - | |
| Other (Income)Expense | - | - | - | - | - | |
| **Net Income** | $ - | $ - | $ - | $ - | $ - | $ - |

## Velsicol Chemical, LLC

### Disposable Income Calculation, Annually

| Disposable Income Calculation (000's) | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Total 60 mos. |
|---|---|---|---|---|---|---|
| Net Income | $ 597 | $ 294 | $ 752 | $ 713 | $ 644 | $ 3,001 |
| *Cash payments to TDEC and Chatt. pension | (987) | (1,490) | (240) | (240) | (240) | (3,197) |
| Working Capital change | 915 | 1,670 | 117 | 18 | 109 | 2,829 |
| Working Capital Reserve | - | (250) | (250) | - | - | (500) |
| Disposable Income - Annual | $ 524 | $ 225 | $ 379 | $ 491 | $ 513 | $ 2,132 |
| Disposable Income - Cum | $ 524 | $ 749 | $ 1,128 | $ 1,619 | $ 2,132 | $ 2,132 |

*Payments do not include the release of Letter of Credit to TDEC.

## Velsicol Chemical LLC
### Forecast Income Statements Excluding Dischargable Expenses

| (000's) | Post Confirmation Forecast | | | | | Total |
| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | 60 mos. |
|---|---|---|---|---|---|---|
| **Volumes (lbs)** | | | | | | |
| Hex | 772 | 315 | 501 | 501 | 501 | |
| Velsiflex | 1,121 | 1,120 | 1,227 | 1,227 | 1,227 | |
| Benzoic Acid | 0 | 0 | 0 | 0 | 0 | |
| Chlorendic | 2,364 | 2,363 | 2,578 | 2,578 | 2,578 | |
| Total | 4,257 | 3,798 | 4,306 | 4,306 | 4,306 | |
| **Gross Sales** | 12,854 | 11,845 | 13,412 | 13,427 | 13,427 | |
| Sales Deductions | 310 | 240 | 273 | 273 | 273 | |
| Net Sales | $ 12,544 | $ 11,605 | $ 13,138 | $ 13,154 | $ 13,154 | |
| Cost of Sales | 9,183 | 8,773 | 9,900 | 9,900 | 9,900 | |
| Gross Margin | 3,361 | 2,832 | 3,238 | 3,254 | 3,254 | |
| SG&A Expense | 2,771 | 2,629 | 2,578 | 2,632 | 2,702 | |
| Operating Profit | 590 | 202 | 660 | 621 | 552 | |
| Other (Income)Expense | (7) | (92) | (92) | (92) | (92) | |
| Net Income | $ 597 | $ 294 | $ 752 | $ 713 | $ 644 | $ 3,001 |

## EXHIBIT 3

**SCHEDULE OF PROPOSED ASSUMED
CONTRACTS AND LEASES AND PROPOSED
CURE AMOUNT**

Case 23-12544  Doc 289  Filed 08/06/25  Entered 08/06/25 17:42:15  Desc Main
Document  Page 89 of 107

Case 23-12544  Doc 276-1  Filed 07/30/25  Entered 07/30/25 18:53:43  Desc Exhibit
Page 69 of 87

Case 23-12544  Doc 248  Filed 06/10/25  Entered 06/10/25 17:12:34  Desc Main
Document  Page 68 of 72

## Schedule of Proposed Assumed Contracts and Leases and Proposed Cure Amount

| Velsicol Debtor | Counter Party | Address | Contact | Date | Description | Cure Amount |
|---|---|---|---|---|---|---|
| Velsicol Chem LLC | Adams Anon Jiangsu Ltd. | 30 Huagong Road Huaian Jiangsu, China | Jianhua Liu | 1/1/2022 | Supply Agreement for CA and Hex | $0.00 |
| Velsicol Chem LLC | YH Rosemont LLC | 10800 w. Higgins road Rosemont, IL 60018 | Adriana Yanibos | 8/19/2022 | Corporate office lease | $0.00 |
| Velsicol Chem LLC | Galalupps Industrial Park LLC | P.O. Box 4261 Chattanooga, TN 37405 | Jabik Vries | 11/18/2009 | Chattanooga property sale | $0.00 |
| Velsicol Chem LLC | Replicwelood Development LLC | 18864 e 1350 road Marshall, IL 62441 | John Boyer | 5/16/2022 | Marshall property sale | $0.00 |
| Velsicol Chem LLC | W2P (premier environmental services) | 193 N Main st Collierville, TN 38017 | Joe Ricker | 1/20/2007 | Environmental consulting agreement | $15,987.00 |
| Velsicol Chem LLC | Ecoli Specialities | Room 1122 Jinye International Mansion Renzhou road Wuhan, China | Hu Yonghong | 10/15/2013 | Veloffax supply agreement | $0.00 |
| Velsicol Chem LLC | Wuhan Yogi Industries | 2hd Chemical road Wuhan, China 430082 | Tony | 1/13/2022 | Benzoin Acid supply agreement | $0.00 |
| Velsicol Chem LLC | PSI Urethanes | 13503 Metropolitan Drive Austin, TX 78758 | Richard Manson | 2/1/2022 | Veloffax supply agreement | $0.00 |
| Velsicol Chem LLC | Okahata Sanigyo Co, Ltd | 1-7-11 Minami Semba Chuo Ku Osaka, Japan | Kiyomi Mineta | 12/1/2013 | Veloffax supply agreement | $2.00 |
| Velsicol Chem LLC | Allnex Belgium SA/NV | Anderlechtstraat 33 1620 Drogenbos, Belgium | Philip Tanct | 8/1/2018 | CA Supply Agreement | $0.00 |
| Velsicol Chem LLC | Reichold Inc. | 2400 Ellis Road Durham, NC 27703 | Alessandro Verde | 1/1/2012 | CA Supply agreement | $0.00 |
| Velsicol Chem LLC | Ashland Inc./ Ineca | 5200 Blazer Parkway Dublin, Ohio 43017 | General Counsel | 1/1/2011 | CA Supply agreement | $0.00 |
| Velsicol Chem LLC | Zeon Corporation | 1-6-2 Marunouoch Chiyoda-ku, Tokyo 100-8246 | Yoshihiko Kurashakima | 4/1/2022 | Hex Supply Agreement | $0.00 |
| Velsicol Chem LLC | Rohm and Haas / Dupont | 400 Arcola Road Collegeville, PA 19426 | Joelle Zimmerman | 8/1/2008 | Hex Supply Agreement | $0.00 |
| Velsicol Chem LLC | Daniele Isak | 10400 w. Higgins road Rosemont, IL 60018 | Daniele Isak | 1/2/2020 | Retention agreement | $0.00 |
| Velsicol Chem LLC | David Wall | 10400 w. Higgins road Rosemont, IL 60018 | David Wall | 1/2/2020 | Retention agreement | $0.00 |
| Velsicol Chem LLC | Tim Horn | 10400 w. Higgins road Rosemont, IL 60018 | Tim Horn | 12/1/2012 | Employment Contract | $0.00 |
| Velsicol Chem LLC | Dennis Leu | 10400 w. Higgins road Rosemont, IL 60018 | Dennis Leu | 12/1/2012 | Employment Contract | $0.00 |
| Velsicol Chem LLC | George Harvell | 10400 w. Higgins road Rosemont, IL 60018 | George Harvell | 12/1/2012 | Employment Contract | $0.00 |
| Velsicol Chem LLC | Sherman Friedman | 10400 w. Higgins road Rosemont, IL 60018 | Sherman Friedman | 12/1/2012 | Employment Contract | $0.00 |
| Velsicol Chem LLC | John Bonsor | 10400 w. Higgins road Rosemont, IL 60018 | John Bonsor | 12/1/2012 | Employment Contract | $0.00 |
| Renovate Holdings Corporation | T. Horn, D Leu, G. Harvell, J. Bonsor, S. Friedman | 10400 w. Higgins road Rosemont, IL 60018 | Tim Horn | 7/25/2012 | Shareholder Agreement | $0.00 |
| Velsicol Chem LLC | State of Tennessee (TDEC) | 500 James Robertson Parkway Nashville, TN 37243 | General Counsel | 1/10/2003 | Environmental settlement agreement | $0.00 |
| Velsicol Chem LLC | Isabel, Galten, Misc.class participans | 81 Monroe Ave Memphis, TN 38103 | Arthur Horne | 9/1/2007 | Isabel Class action settlement | $0.00 |
| Velsicol Chem LLC | USEPA | 230 S. Dearborn St, Chicago, IL 60604 | DK Waste Management Div | 9/14/1989 | CD Marshall Plant Site | $0.00 |
| Velsicol Chem LLC | USEPA Region 5 | 77 W. Jackson Blvd (SR-6J) Chicago, IL 60604 | Callin Shanahan - RPM | 9/14/1989 | CD Marshall Plant Site | $0.00 |
| Velsicol Chem LLC | USEPA | 230 S. Dearborn St, Chicago, IL 60604 | Regional Counsel | 9/14/1989 | CD Marshall Plant Site | $0.00 |
| Velsicol Chem LLC | USDOJ | 10h & Pennsylvania Ave, NW Washington, DC 20530 | Asst.AG Land & Natural Resources Div | 9/14/1989 | CD Marshall Plant Site | $0.00 |
| Velsicol Chem LLC | State of IL | 2200 Churchill Rd POBox 19276 Springfield, IL 62794-9276 | Velsicol Marshall Project Mgr | 9/14/1989 | CD Marshall Plant Site | $0.00 |
| Velsicol Chem LLC | State of IL | 500 South Second St, Springfield, IL 62706 | Joseph Maizona - AG State of IL | 9/14/1989 | CD Marshall Plant Site | $0.00 |

**EXHIBIT 4**

**THE MEMPHIS SITE**

Case 23-12544    Doc 276-1    Filed 07/30/25    Entered 07/30/25 18:53:43    Desc Exhibit
Page 71 of 87





**EXHIBIT 5**

2

14992054

## SETTLEMENT AGREEMENT AND CONSENT JUDGMENT

This Settlement Agreement and Consent Judgment (the "<u>Settlement Agreement</u>") is entered into as of June __, 2025, by and between the District of Columbia ("<u>District</u>") and Velsicol Chemical, LLC ("<u>Velsicol</u>"). The District and Velsicol are each a "<u>Party</u>" and collectively referred to herein as the "<u>Parties</u>".

**WHEREAS,** on October 13, 2022, the District, by its Attorney General, filed its Complaint for Environmental Damages and Civil Penalties against Velsicol in the Superior Court of the District of Columbia, Case No 2022-004711B (the "<u>District Complaint</u>"), in which the District asserted various claims against Velsicol for alleged environmental impairments related to chlordane, including alleged impairments to water bodies, natural resources, and stormwater systems;

**WHEREAS,** on September 21, 2023 (the "<u>Petition Date</u>"), each of the Debtors (as defined below) filed with the United States Bankruptcy Court for the Northern District of Illinois voluntary petitions for relief under chapter 11 of title 11 of the United States Code, as then amended (the "<u>Bankruptcy Code</u>"), which petitions have been consolidated for procedural purposes and are being administered jointly as Case No. 23-12544;

**WHEREAS,** the District filed the District Proof of Claim (as defined below) against Velsicol in the Bankruptcy Cases in the unliquidated amount of $205,000,000.00 as a general unsecured claim;

**WHEREAS,** Velsicol denies any liability in connection with the District Complaint and the District Proof of Claim.

**WHEREAS,** the parties have agreed to resolve their disputes and claims, including but not limited to the District Complaint, the District Proof of Claim and issues related to the Debtors' Plan (as defined below) without the need for further litigation;

**WHEREAS,** Velsicol, by entering into this Settlement Agreement, does not admit any allegations in the District Complaint or to any wrongdoing, fault, violation of law, or liability of any kind on the part of Velsicol.

**WHEREAS,** in consideration of, and in exchange for, the promises and covenants herein, the Parties hereby agree to the terms and provisions of this Settlement Agreement;

**WHEREAS,** this Settlement Agreement is fair, reasonable, and in the public interest, and is an appropriate means of resolving the matters addressed in this Settlement Agreement.

**AND WHEREAS,** the intention of the District in effecting this settlement is to fully and finally resolve the District's claims against the Debtor Parties (as defined below);

**NOW, THEREFORE,** without the admission of liability or any trial or adjudication of issues of fact or law, without this Settlement Agreement constituting evidence against Velsicol, and upon the consent and agreement of the Parties by their authorized attorneys and authorized officials, it is hereby agreed as follows:

## RECITALS INCORPORATED

1.    The Recitals listed above are incorporated into and made a part of this Settlement Agreement.

## DEFINITIONS

2.    As used in this Settlement Agreement, the following terms shall have the defined meanings set forth below.

2

a. "Allowed General Unsecured Claim" shall have the meaning set forth in the Plan.

b. "Avoidance Actions" shall mean any and all actual or potential avoidance, recovery, subordination, or other similar claims, causes of action, or remedies that may be brought by under the Bankruptcy Code or applicable non-bankruptcy law, including claims, causes of action, or remedies arising under chapter 5 of the Bankruptcy Code, or under similar or related local, state, District of Columbia, federal, or foreign statutes and common law, including but not limited to fraudulent conveyance or transfer law.

c. "Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Illinois, located in Chicago, Illinois.

d. "Case" or "Cases" means these cases commenced under chapter 11 of the Bankruptcy Code by the Debtors on the Petition Date, which are jointly administered under Case No. 23-12544, currently pending before the Bankruptcy Court.

e. "Confirmation Date" means the date of entry of the Confirmation Order.

f. "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan.

g. "Debtors" means, collectively, Velsicol Chemical, LLC, Velsicol Chemical Holding Corporation and Resnovae Holding Corp.

h. "DC Court" means the Superior Court of the District of Columbia, Civil Division, where the District Complaint is pending.

i. "DC Voting Amount" has the meaning set forth in paragraph 7 below.

j. "District Complaint" means the lawsuit filed by the District against Velsicol in the DC Court, pending as Case No 2022-004711B.

3

15016787_10

k.     "District Proof of Claim" means the proof of claim (Claim number 62) filed by the District against Velsicol in the unliquidated amount of $205,000,000.00 as a general unsecured claim.

l.     "Debtor Parties" means each of the Debtors and Reorganized Debtors, including each and all, direct or indirect, predecessors, successors (including but not limited to successors by merger or acquisition), parents (including intermediate parents and ultimate parents), subsidiaries, divisions, partnerships, and joint ventures; and any officer, director, member, shareholder, employee, partner, trustee, predecessor, successor, or assignee of any of the above.

m.    "Plan" means the Debtors' Third Amended Subchapter V Joint Plan of Reorganization dated June 10, 2025, together with all exhibits, schedules, and annexes hereto, all as may be modified, supplemented, or amended from time to time.

n.     "Plan Effective Date" shall mean the Effective Date of the Plan as defined in the Plan.

o.     "Released Claims" has the meaning set forth in paragraph 9 below.

p.     "Reorganized Debtors" means each of the Debtors upon the Plan Effective Date of the Plan.

q.     "Settlement Amount" means One Million Three Hundred Thousand dollars ($1,300,000.00).

r.     "Settlement Effective Date" has the meaning set forth in paragraph 14 below.

s.     "The District" means the District of Columbia Government.

15016787_10

t. "Velsicol Disposable Income Amount" shall have the meaning set forth in the Plan, which will be the total amount of disposable income Velsicol will pay under the Plan.

## FINANCIAL TERMS

3. The District Proof of Claim shall be allowed (and the Plan shall so provide) as an Allowed General Unsecured Claim solely against Velsicol and be included as an allowed claim in Class 3(a) of the Plan in an amount that will allow the District to receive distributions under the Plan as a Class 3(a) General Unsecured Creditor in the cumulative amount of $1,300,000.00.

4. To determine the amount of each distribution that will be paid under the Plan to the District as the holder of an Allowed General Unsecured Claim in Class 3(a), (which cumulative amount shall be a total of $1,300,000), the following calculations shall be made:

The numerator shall be $1,300,000 and the denominator shall be the Velsicol Disposable Income Amount provided in the Plan. That percentage shall then be multiplied by the amount of the Velsicol Disposable Income Amount to be distributed for each distribution under the Plan. For illustrative purposes only, the following chart sets forth how the payment of the Settlement Amount shall be calculated and paid to the District using as an example the Velsicol Disposable Income Amount set forth in the Debtors' Third Amended Subchapter V Joint Plan of Reorganization --

$1,300,000 (the Settlement Amount) ÷ $2,132,000 (the Velsicol Projected Disposable Income) = 60.9756098 percent which percentage shall then be multiplied against the amount of disposable income to be distributed at any one time:

| | Year 1 Distribution | Year 2 Distribution | Year 3 Distribution | Year 4 Distribution | Year 5 Distribution | Total |
|---|---|---|---|---|---|---|
| Velsicol Disposable Income Amount | $524,000.00 | $225,000.00 | $379,000.00 | $491,000.00 | $513,000.00 | $2,132,000.00 |
| | multiplied by .609756098 | multiplied by .609756098 | multiplied by .609756098 | multiplied by .609756098 | multiplied by .609756098 | multiplied by .609756098 |
| Amount to be Paid to the District from each Distribution | $319,512.20 | $137,195.12 | $231,097.56 | $299,390.24 | $312,804.88 | $1,300,000.00 |

5. For the avoidance of doubt, the Parties acknowledge and agree that while the Velsicol Disposable Income Amount under a Plan may be lower or higher than the amount set forth

in the Debtor's Third Amended Subchapter V Joint Plan of Reorganization, the District shall be entitled to $1,300,000 of such amount whether or not such disposable income amount is lower or higher, but in no event shall the District receive more or less than $1,300,000.

6.     In no event shall the District assert or maintain any other claims against the Debtors in the Cases; provided, however, that nothing in this sentence shall preclude the District from enforcing the terms of this Settlement Agreement or the Plan.

### THE PLAN

7.     Solely for purposes of voting to accept or reject the Plan and not for the purpose of allowance or for distribution, the District shall be entitled to vote its claim in the amount of $50,000,000.00 (the "DC Voting Amount"). The DC Voting Amount  is for voting purposes only and such amount shall not impair the DC Allowed Claim (as that term is defined in the Plan) and is without prejudice to the Debtors' or the District's rights regarding the amount of damages asserted by District in the DC Proof of Claim.

8.     The Debtors shall incorporate this Settlement Agreement into the Plan by reference and approval of this Settlement Agreement shall be a condition precedent to confirmation of the Plan. The Debtors shall not amend the Plan in a manner inconsistent with the terms and provisions of this Settlement Agreement or propose terms for the Plan or any order confirming the Plan that are inconsistent with this Settlement Agreement. The District acknowledges that the terms of the Debtor's Third Amended Subchapter V Joint Plan or Reorganization are not inconsistent with the terms of this Settlement Agreement. The District agrees that it shall support confirmation of the Plan (and shall not oppose any term or provision of the Plan or Confirmation Order) and vote in favor of the Plan so long as the terms of the Plan and Confirmation Order are not inconsistent with the term of this Settlement Agreement. The District's commitment not to oppose confirmation of

6

the Plan and to vote in favor of the Plan applies only to the Third Amended Plan provided to the

District on June 10, 2025 and any other Plan that is not inconsistent with the terms of this

Settlement Agreement. In the event that the District does not support confirmation of the Plan and

vote in favor of the Plan, this Settlement Agreement shall be null and void.

<u>**MUTUAL RELEASE / COVENANT NOT TO SUE**</u>

9.       On the Settlement Effective Date as defined in paragraph 14 below, the District fully

and finally releases and discharges the Debtor Parties, and each of them, from all claims, demands,

rights, damages, obligations, suits, debts, liens, contracts, agreements, and causes of action of every

nature and description whatsoever (including any claim for attorneys' fees, expenses, and costs under

local, state or federal law), existing now or arising in the future, alleged or which could be alleged by

the District, known or unknown, suspected or unsuspected, both at law and at equity, related to (i) the

manufacture, sale, testing, disposal, release, marketing or management of Chlordane, regardless of

the legal theory or type or nature of damages claimed including but not limited to all investigation,

cleanup, response, remedial, removal, and restoration actions taken or to be taken and all associated

costs and/or civil penalties incurred or to be incurred in connection with the natural resources within

the District of Columbia by the District, the Debtor Parties, or any other person; (ii) the District

Complaint; (iii) the matters set forth in the District Proof of Claim; (iii) any Avoidance Actions; and

(iv) any distributions or payments made by any of the Debtors to any of its officers, directors,

members, shareholders or owners (collectively, subsections (i), (ii), (iii), and (iv) are the "<u>Released</u>

<u>Claims</u>").

10.       Additionally, the District hereby covenants not to sue or take any other civil or

administrative action against any of the Debtor Parties for any Released Claim. Notwithstanding the

foregoing releases, or any other term of this Settlement Agreement, the District does not release the

following claims: (i) any claims arising under the District's revenue code other than Avoidance

15016787_10

Actions or (ii) any criminal liability. Each of the Debtors and Reorganized Debtors are entitled to protection from contribution and/or indemnity actions or claims asserted against any of the Debtors or Reorganized Debtors by any person or persons who are not parties to this Settlement Agreement to the fullest extent provided under any provision of applicable federal, state, or local law, including but not limited to CERCLA § 113(f)(2), 42 U.S.C. § 9613(f)(2), and the Brownfield Revitalization Act D.C. Code § 8-634.09, for all Released Claims.

11. On the Settlement Effective Date, as defined in Paragraph 14 below, Velsicol fully and finally releases and discharges the District and its employees from all claims, demands, rights, damages, obligations, suits, debts, liens, contracts, agreements, and causes of action of every nature and description whatsoever (including any claim for attorneys' fees, expenses, and costs under local, state or federal law), existing now or arising in the future, alleged or which could be alleged by Velsicol, known or unknown, suspected or unsuspected, both at law and at equity, related to the manufacture, sale, testing, disposal, release, marketing or management of Chlordane, regardless of the legal theory or type or nature of damages claimed including but not limited to all investigation, cleanup, response, remedial, removal, and restoration actions taken or to be taken and all associated costs and/or civil penalties incurred or to be incurred in connection with the natural resources within the District of Columbia by Velsicol regarding Chlordane. Notwithstanding the foregoing releases, or any other term of this Settlement Agreement, Velsicol does not release the following: (i) any action to enforce the terms of this Settlement Agreement or the Plan and (ii) the right to assert or maintain any defense to any claims arising under the District's revenue code.

15016787_10

## BANKRUPTCY COURT APPROVAL

12.    The settlement reflected in this Settlement Agreement shall be subject to approval by the Bankruptcy Court pursuant to Bankruptcy Rule 9019 and may be approved either by motion or as part of the Plan.

## DISMISSAL OF THE DISTRICT COMPLAINT

13.    Within fourteen (14) days after the Plan Effective Date, the District shall file with the DC Court a Joint Stipulation of Dismissal with Prejudice pursuant to D.C. Superior Court Rule of Civil Procedure 41(a)(1)(A)(ii) substantially in the form attached hereto as Exhibit A. That stipulation of dismissal will attach this Settlement Agreement and Consent Judgment as an exhibit..

## EFFECTIVENESS OF SETTLEMENT AGREEMENT

14.    This Settlement Agreement shall be effective upon (i) approval by the Bankruptcy Court of this Settlement Agreement; and (ii) the Plan Effective Date (the "Settlement Effective Date").

## OTHER TERMS

15.    If the Settlement Effective Date does not occur, this Settlement Agreement shall be null and void and any negotiations, statements, communications, proceedings, and pleadings relating thereto, and the fact that the parties agreed to the Settlement Agreement shall not be used for any purpose whatsoever in any subsequent proceeding in this action or in any other action in any court or tribunal, and shall not be construed as an admission or concession by any party of any fact, matter, or allegation.

16.    This Settlement Agreement in no way impairs the scope and effect of any discharge or exculpation of the Debtors under Sections 1141 or 1192 of the Bankruptcy Code, the Plan,

9

15016787_10

and/or the Confirmation Order, except for the District's retained right to enforce the terms of this Settlement Agreement and any order approving the Settlement Agreement.

17.     The Bankruptcy Court shall retain jurisdiction to enforce the terms of this Settlement Agreement. The parties may jointly seek to modify the terms of this Settlement Agreement, subject to the approval of the Bankruptcy Court, if necessary.

18.     Each Party will bear its own costs and attorneys' fees associated with this litigation.

19.     The Parties acknowledge that this Settlement Agreement was entered into and agreed upon as a compromise and final settlement of disputed claims and that the execution of this Settlement Agreement and/or payment of the Settlement Amount is not, and may not be construed as, an admission of liability.

20.     Each of the Parties agrees that this Settlement Agreement, in its final form, is the product of mutual drafting efforts of their attorneys following review and consideration by each. No Party nor any attorney for a Party shall be deemed the drafter of this Settlement Agreement for purposes of interpreting any provision hereof in any judicial or other proceeding that may arise between or among them.

21.     This Settlement Agreement may be executed by the Parties in counterparts, each of which shall be treated as an original for all purposes, and all of which together shall constitute one and the same instrument.

*[Signature Page Follows]*

10

15016787_10

**IN WITNESS WHEREOF**, the Parties have executed this Settlement Agreement as of the date and year first written above.

**VELSICOL CHEMICAL, LLC**

By: _____

Its: _____

Date: _____

**For the District of Columbia:**

[signature block to come]

11

## EXHIBIT A

## JOINT STIPULATION OF DISMISSAL WITH PREJUDICE

15016787_10

IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | |
|---|---|
| DISTRICT OF COLUMBIA,<br><br>    *Plaintiff*,<br><br>  v.<br><br>VELSICOL CHEMICAL LLC,<br><br>    *Defendant*. | Civil Action No.: 2022 CA 004711 B<br>Judge Donald W. Tunnage |

## JOINT STIPULATION OF DISMISSAL WITH PREJUDICE

Plaintiff District of Columbia (the "District") and Defendant Velsicol Chemical LLC ("Velsicol") (collectively, the "Parties"), pursuant to SCR-Civil R. 41(a), agree to the dismissal with prejudice this action. Each party will bear their own attorneys' fees and costs.

Dated: _____, __, 2025

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

JENNIFER C. JONES
Deputy Attorney General
Public Advocacy Division

LAURA C. BECKERMAN
Acting Chief
Housing and Environmental Justice Section

_____
WESLEY ROSENFELD (#1002428)
Assistant Attorney General
400 6th Street, N.W., 10th Floor
Washington, DC 20001
Tel: (202) 368-2569

Respectfully submitted,

/s/ *Pete Chattrabhuti*_____
PETE CHATTRABHUTI (#155693)
MATTHEW J. MALINOWSKI (#501245)
Hollingsworth LLP
1350 I Street, N.W.
Washington, DC 20005
Tel: (202) 898-5800
pchattrabhuti@hollingsworthllp.com
mmalinowski@hollingsworthllp.com

*Attorneys for Defendant*

13

15016787_10

wesley.rosenfeld1@dc.gov

---

JIMMY R. ROCK (#493521)
Edelson PC
1255 Union Street NE, Suite 850
Washington, DC 20002
Tel: (202) 987-6303
jrock@edelson.com

DAVID BALTMANIS*
ROBERT S. LIBMAN*
BENJAMIN BLUSTEIN (#418930)
Miner, Barnhill & Galland, P.C.
325 North LaSalle, Suite 350
Chicago, IL 60654
Tel: (312) 751-1170
dbaltmanis@lawmbg.com
rlibman@lawmbg.com
bblustein@lawmbg.com

BICKY CORMAN
Bicky Corman Law PLLC
1250 Connecticut Avenue, N.W., Suite 700
Washington, DC 20036
Tel: (202) 261-3529
bcorman@bickycormanlaw.com

*Admitted *pro hac vice*

*Attorneys for Plaintiff*

15016787_10